UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

SPECIAL SITUATIONS FUND III QP, L.P.; :
SPECIAL SITUATIONS CAYMAN FUND, L.P.; :
COLUMBIA PACIFIC OPPORTUNITY FUND, :
L.P.; FIR TREE VALUE MASTER FUND, L.P.; :
FIR TREE CAPITAL OPPORTUNITY MASTER :    No. 1:13-cv-01094 (ER)
FUND, L.P.; LAKE UNION CAPITAL FUND :
L.P.; LAKE UNION CAPITAL TE FUND L.P.; :
ASHFORD CAPITAL MANAGEMENT, INC.; ZS :
EDU L.P.; MRMP MANAGERS LLC; WHI :
GROWTH FUND QP, LP; DOUGLAS N. :
WOODRUM; ROBERT A. HORNE; HOWARD S. :
BERL; BRIGHTLIGHT CAPITAL PARTNERS :
LP; and TORTUS CAPITAL MASTER FUND, LP, :
                                         :
          Plaintiffs, :
                                         :
            v. :
                                       :
DELOITTE TOUCHE TOHMATSU CPA, LTD.; :
DELOITTE & TOUCHE LLP; ANTONIO SENA; :
JUSTIN TANG; YIN JIANPING; RICHARD XUE; :
MICHAEL SANTOS, JOHN AND JANE DOES 1- :
10; and ABC CORPS. 1-10, :
                                       :
          Defendants. :

-----------------------------------------------------------------x

**MEMORANDUM OF LAW IN OPPOSITION TO DELOITTE & TOUCHE LLP'S
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT .........................................................................................1

BACKGROUND ................................................................................................................2

      a.   Auditors' Special Obligations To The Investing Public ..............................3

      b.   Deloitte US's Control Over The ChinaCast Audit .....................................5

      c.   The ChinaCast Fraud .................................................................................10

ARGUMENT ....................................................................................................................12

  I.   THE COMPLAINT PLEADS A CLAIM UNDER SECTION 18 ....................................12

      a.   The Complaint Pleads that Deloitte US Caused Misstatements ...............14

      b.   The Complaint Pleads Reliance Necessary for a Section 18 Claim ..........17

      c.   The Complaint Pleads a Section 18 Claim Based on the 10-Q Filings .................18

  II.   THE COMPLAINT PLEADS A CLAIM UNDER SECTION 20(a) ..............................18

      a.   The Complaint Sufficiently Pleads Control .............................................19

      b.   Culpable Participation is Not Required for a Section 20(a) Claim and, in Any Event, Has Been Adequately Alleged ....................................22

  III.   THE COMPLAINT PLEADS A CLAIM FOR COMMON LAW FRAUD ....................25

CONCLUSION .................................................................................................................25

## TABLE OF AUTHORITIES

**PAGES**

C<small>ASES</small>

*In re Adelphia Communications Corp. Securities & Derivative Litigation*,
   No. 03 MD 1529 (LMM), 2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007) ..............................19

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
   824 F. Supp. 2d 1164 (C.D. Cal. 2011) ................................................................................35

*In re Alstom SA Secs. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)......................................................................16, 17, 24

*Anwar v. Fairfield Greenwich Ltd.*,
   728 F. Supp. 372 (S.D.N.Y. 2010) .........................................................................................29

*Arista Records, LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010).....................................................................................................11

*In re Asia Pulp & Paper Sec. Litig.*,
   293 F. Supp. 2d 391 (S.D.N.Y. 2003).............................................................................28, 29

*ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)......................................................................................................32

*AUSA Life Ins. Co. v. Ernst & Young*,
   206 F.3d 202 (2d Cir. 2000).......................................................................................................4

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................................................11, 10

*In re Blech Securities Litigation*,
   961 F. Supp. 569 (S.D.N.Y. 1997) ........................................................................................30

*Campanella v. County of Monroe*,
   853 F.Supp.2d 364 (W.D.N.Y. 2012) ...................................................................................10

*In re Complete Mgmt. Inc. Secs. Litig.*,
   153 F. Supp. 2d 314 (S.D.N.Y. 2001)....................................................................................34

*Cornwell v. Credit Suisse Grp.*,
   689 F. Supp. 2d 629 (S.D.N.Y. 2010)....................................................................................26

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009).....................................................................................................12

*Deephaven Private Placement Trading, Ltd v. Grant Thornton & Co.*,
   454 F.3d 1168 (10th Cir. 2006) ..............................................................................................20

*Dietrich v. Bauer*,
    126 F. Supp. 2d 759 (S.D.N.Y. 2001)......................................................................27

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
    822 F.2d 1242 (2d Cir. 1987)................................................................................22

*FHFA v. JP Morgan Chase & Co.*,
    902 F. Supp. 2d 476 (S.D.N.Y. 2012)..................................................................11

*Gold v. DCL Inc.*,
    399 F. Supp. 1123 (S.D.N.Y. 1973).......................................................................5

*Gould v. Winstar Commc'ns, Inc.*,
    692 F.3d 148 (2d Cir. 2012)...................................................................... passim

*Heit v. Weitzen*,
    402 F.2d 909 (2d Cir. 1968)...................................................................................22

*Ho v. Duoyuan Global Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012)..................................................................30

*In re Ikon Solutions, Inc.*,
    277 F.3d 658 (3d Cir. 2002)....................................................................................4

*In re Initial Public Offering Secs. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003).........................................................5, 30, 31

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
    822 F. Supp. 2d 368 (S.D.N.Y. 2011)..................................................................23

*Kuelling v. Roderick Lean Mfg. Co.*,
    183 N.Y. 78 (1905) ...............................................................................................35

*Lieberman v. City of Rochester*,
    07-CV-6316L, 2011 BL 114991 (W.D.N.Y. Apr. 29, 2011) ................................11

*Luce v. Edelstein*,
    802 F.2d 49 (2d Cir. 1986).....................................................................................22

*New Mexico State Inv. Council v. Ernst & Young LLP*,
    641 F.3d 1089 (9th Cir. 2011) .................................................................................4

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...........................................................................18, 33

*Nuevo Mundo Holdings v. PricewaterhouseCoopers LLP*,
    No. 03 Civ. 0613 GBD, 2004 WL 112948 (S.D.N.Y. Jan. 22, 2004) ...............28, 29

*Police & Fire Ret. Sys. of Detroit v. IndyMac MBS, Inc.*,
    721 F.3d 95 (2d Cir. 2013)..............................................................................32

*In re Quebecor World (USA) Inc.*,
    719 F.3d 94 (2d Cir. 2013)..............................................................................24

*In re Quintel Entm't Inc. Sec. Litig.*,
    72 F. Supp. 2d 283 (S.D.N.Y. 1999)..........................................................27, 30

*In re Refco, Inc. Secs. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)..................................................26, 33, 34

*Ross v. A.H. Robins Co., Inc.*,
    607 F.2d 545 (2d Cir. 1979)............................................................................17

*Rudolph v. Arthur Andersen & Co.*,
    800 F.2d 1040 (11th Cir. 1986) .........................................................................5

*S.E.C. v. Price Waterhouse*,
    797 F. Supp. 1217 (S.D.N.Y. 1992)................................................................33

*In re Scholastic Corp. Securities Litig.*,
    252 F.3d 63 (2d Cir. 2001)..............................................................................11

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)................................................................27, 31, 35

*Star Energy Corp. v. RSM Top-Audit*,
    No. 08 Civ. 00329 (DC), 2008 WL 5110919 (S.D.N.Y. Nov. 26, 2008) ................28

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999)..............................................................................12

*STMicroelectronics v. Credit Suisse Grp.*,
    775 F. Supp. 2d 525 (E.D.N.Y. 2011) ........................................................26, 27

*In re Stone & Webster, Inc. Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005)...........................................................................17

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006)................................................................16, 19, 23, 34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................32

*Tuosto v. Philip Morris USA Inc.*,
    672 F. Supp. 2d 350 (S.D.N.Y. 2009)..............................................................35

*United States v. Arthur Young & Co.*,
   465 U.S. 805 (1984)...........................................................................................3, 4, 5, 21

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
   672 F. Supp. 2d 596 (S.D.N.Y. 2009)..................................................................20, 26, 33

*Woori Bank v. RBS Sec., Inc.*,
   No. 12 Civ. 4254 (HB), 2012 WL 6703352 (S.D.N.Y. Dec. 27, 2012) ................................35

*In re Worldcom, Inc. Secs. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003)..................................................................25, 30, 31

*In re Worldcom, Inc. Secs. Litig.*,
   No. 02 Civ. 3288 (DLC), 2003 WL 21488087 (S.D.N.Y. June 25, 2003) ............................34

*Zielinski v. DeFreest*,
   12 CIV. 1160 JPO, 2013 WL 4838833 (S.D.N.Y. Sept. 10, 2013) ......................................10

**STATUTES**

15 U.S.C. § 78.............................................................................................. passim

**RULES**

F.R.C.P. 8...........................................................................................10, 11, 12, 26

F.R.C.P. 9(b) ....................................................................................11, 12, 18, 19

F.R.C.P. 12(b)(6) ...........................................................................................23

**REGULATIONS**

17 C.F.R. § 240.12b-2.....................................................................................27

17 C.F.R. § 240.13a-13(d) .............................................................................24

Plaintiffs[1] respectfully submit this memorandum of law in opposition to Deloitte & Touche LLP's ("Deloitte US") motion to dismiss the First Amended Complaint.

## PRELIMINARY STATEMENT

This matter presents a stunning case of auditor failure by a vaunted "Big 4" United States-based accounting firm and its China-based affiliate.  As Plaintiffs' complaint alleges in detail, Deloitte US and its affiliate in China, Deloitte Touche Tohmatsu CPA Ltd. ("DTTC"), failed to conduct even *the most basic* of audit tests of ChinaCast Education Corporation, Inc., a Delaware company traded on the NASDAQ ("ChinaCast" or the "Company"), which would have revealed the Company to be a massive fraud by no later than 2007.  Deloitte U.S. (i) was responsible for insuring that the Company's audited financial statements were presented in compliance with U.S. Generally Accepted Accounting Principles ("GAAP"), and (ii) controlled DTTC's audits and audit opinions.  Indeed, Deloitte US's approval was required before DTTC would sign-off on *any* filings with the Securities and Exchange Commission ("SEC").  While Deloitte US was careful not to sign its own name to the bottom of the audited financials, its conduct clearly subjects it to liability for violations of Section 18 of the Securities Exchange Act of 1934 (the "Exchange Act") for causing DTTC and ChinaCast to make false statements in the Company's Exchange Act filings.  Deloitte US is also liable under well-established principles as a control person under Section 20(a) of the Exchange Act and for committing common law fraud under New York law.

---

[1] The Plaintiffs are Special Situations Fund III QP, L.P.; Special Situations Cayman Fund, L.P.; Columbia Pacific Opportunity Fund, L.P.; Fir Tree Value Master Fund, L.P.; Fir Tree Capital Opportunity Master Fund, L.P.; Lake Union Capital Fund, L.P., Lake Union Capital TE Fund L.P.; Ashford Capital Management, Inc.; ZS Edu L.P.; MRMP Managers LLC; WHI Growth Fund QP, LP; Douglas N. Woodrum; Robert A. Horne; Howard S. Berl; Brightlight Capital Partners LP; and Tortus Capital Master Fund, LP.

None of Deloitte US's arguments warrants dismissal of Plaintiffs' claims.  The Court should deny the motion to dismiss in its entirety.

## BACKGROUND

Plaintiffs are investment funds, entities and individuals who purchased the securities of ChinaCast, a Delaware company, the common stock of which traded on the NASDAQ stock exchange under the symbol CAST.  (Amended Complaint ("Compl.") ¶ 1.) ChinaCast was and is a provider of educational services in the People's Republic of China ("China" or the "PRC").  (*Id*. ¶ 2.)  ChinaCast was formed in 2006 through a "reverse merger" in which a foreign company merges with a publicly traded U.S. shell company, usually in order to raise financing.  (*Id*. ¶¶ 1, 39, 45.)  ChinaCast had two divisions, an internet based "E-learning" business and a set of traditional "bricks and mortar" universities.  (*Id.* ¶¶ 40-41, 48.)

In 2012, the Company's new management revealed that prior management had engaged in massive acts of fraud, which were concealed from investors.  (*Id*. ¶¶ 172-84.)  The components of the fraud included (among other things):   (i) the Company's CEO misappropriated $35 million in proceeds from a Company stock offering, (ii) the Company never received payment for more than $30 million worth of stock, (iii) substantial portions of its term deposits were pledged to cover the debts of unrelated third parties (without disclosure of this fact to investors), (iv) massive amounts of cash flowed in and out of the Company to and from third parties with no legitimate business relationship to ChinaCast, indicating that the Company was taking out numerous undeclared loans for huge amounts of money, and (v) the Company never made the payments it claimed to have made for three of its brick and mortar universities and, contrary to its representations to investors, did not actually own these assets.

Plaintiffs are seeking to hold ChinaCast's auditors, DTTC and Deloitte US, liable under the federal securities laws and New York common law for their inexcusable failure to

conduct anything that even remotely resembled a proper audit of ChinaCast, resulting in DTTC giving clean audit opinions to ChinaCast's plainly fraudulent financial statements.

> ### a.   Auditors' Special Obligations To The Investing Public

The information disclosed in periodically-issued corporate financial statements is the lifeblood of the public capital markets.  The SEC requires that the financial statements of publicly-traded companies like ChinaCast be audited by an independent certified public accountant under auditing standards promulgated by the Public Company Accounting Oversight Board ("PCAOB") – what have traditionally been referred to as Generally Accepted Auditing Standards ("GAAS").  *See generally United States v. Arthur Young & Co.*, 465 U.S. 805, 811 and n.6 (1984).  The auditor must examine the issuer's books and records and determine whether its financial statements were prepared in accordance with GAAP.  *See id.* at 811.  If the auditor determines they were, then it may issue an unqualified opinion certifying that the "company's financial statements fairly represent the financial position of the company, the results of its operations, and the changes in its financial position for the period under audit, in conformity with [GAAP,]" which is "the most favorable report an auditor may give."  *Id.* at 818 n.13.  Otherwise, the auditor must issue a qualified or adverse opinion on the financial statements, or else disclaim any ability to issue an opinion due to lack of supporting evidence.  *Id.*; *see also New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1099 (9th Cir. 2011) (quoting *In re Ikon Solutions, Inc.*, 277 F.3d 658, 663 n.4 (3d Cir. 2002)) ("'Accountants will 'qualify' their opinion where discrepancies are identified in a client's financial statements.'").  Any result other than an unqualified (or, as it's referred to in the industry, a "clean") audit opinion can be the kiss of death for a publicly-traded company, as investors will generally avoid buying the securities of companies on whose financial statements they cannot rely.

The point of the auditor's opinion is to give investors assurance from an independent professional that they can rely on the truthfulness, accuracy and integrity of the company's financial statements as prepared by management. *See Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012) (quoting *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 221 (2d Cir. 2000) (noting that a "Big Four" accounting firm "'knows well that its opinions and certifications are afforded great weight, and it must have known that its financial certifications with regard to [its client] would be compelling to the investors….'")).  As a result, an accountant that serves as an auditor of a publicly-traded company has an obligation to protect the investing public – ***not*** to serve the interests of the company paying its bill.  Auditors are supposed to be investors' watchdogs.  As explained by the United States Supreme Court,

> By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a *public* responsibility transcending any employment relationship with the client.  ***The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to [the] investing public.  This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust.***

*Arthur Young*, 465 U.S. at 817-18 (bold italics added).  The auditor thus assumes a "'***special relationship of trust vis-à-vis the public***'" and "'holds itself out as an independent professional source of assurance that the audited company's financial presentations are accurate and reliable….'"  *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1044 (11th Cir. 1986) (quoting *Gold v. DCL Inc.*, 399 F. Supp. 1123, 1127 (S.D.N.Y. 1973)) (emphasis added).

GAAS require an auditor to conduct a thorough investigation of the issuer, with "a central 'objective of the independent auditor's engagement [being] to obtain sufficient competent evidential matter to provide him with a reasonable basis for forming an opinion.'"

*Gould*, 692 F.3d at 159 n.10 (quoting AU § 9326) (internal quotation marks omitted).  The auditor cannot simply accept the representations of management without verification, and must exercise "[p]rofessional skepticism" and "a questioning mind" throughout the audit process.  *Id*. (quoting AU §§ 230.07-08) (internal quotation marks omitted).  Gathering sufficient evidence, including from the issuer's records, to support the audit opinion is key; without it, the auditor cannot certify the financial statements.  (*See* Compl. ¶ 153 (quoting AU § 326.16) ("'[W]ithout adequate attention to the…accuracy of the underlying accounting data, an opinion on the financial statements would not be warranted.'").)  In gathering such evidence, the auditor should maintain control over the confirmation requests and responses (such as by going to the bank in person to obtain printed copies of the bank statements) in order to avoid undue interference and tampering by management.  (*Id*. (quoting AU § 330.28).)  It must always be on the lookout for potential fraud.  (*Id*. (quoting AU § 316.68) ("'The auditor's *assessment of the risks of material misstatement due to fraud should be ongoing throughout the audit*.'") (emphasis added).)

      In this case, as explained below, both Deloitte US and DTTC ignored the most basic indicators of fraud in the course of their audits of ChinaCast.

### b.      Deloitte US's Control Over The ChinaCast Audit

      DTTC was ChinaCast's auditor of record.  (Compl. ¶ 31.)  DTTC is an auditing firm located in the PRC, with its headquarters in Shanghai.  *Id*.  DTTC is registered with the PCAOB.  (*Id*.)  DTTC (with, as explained below, Deloitte US's approval) issued a clean audit opinion on all of ChinaCast's annual financial statements at issue in this matter.

      DTTC, however, did not provide audit services to ChinaCast all by itself.  *Id*. Instead, DTTC was substantially controlled by Deloitte US, a Delaware limited liability partnership headquartered in New York.  (*Id*. ¶ 32.)  Deloitte US's review and approval of

ChinaCast's financial statements gave the Company its ticket into the U.S. capital markets. (*Id.* ¶ 8.) Deloitte US controlled the ChinaCast audit – and did so in a variety of ways. (*Id.* ¶ 32.)

- Deloitte US had final authority over all US GAAP matters. (Compl. ¶ 32; *see also id.* ¶ 8 (Deloitte US "had ultimate review related to all US GAAP issues").) DTTC *could not have signed off* on the Company's financial statements and their supposed compliance with GAAP without the approval of Deloitte US. (*Id.* ¶ 219.) For example, Deloitte US was required to confirm that the consolidation of CCT HK (a ChinaCast subsidiary) was proper under US GAAP before DTTC could certify the Company's financial statements. (*Id.* ¶ 59.)

- During the relevant period, Deloitte US was involved in all of the Company's SEC financial filings and *provided sign-off before the Company filed financial information with the SEC*. (*Id.* ¶ 32.) DTTC *simply would not sign* the Company's filings with the SEC until Deloitte US had reviewed and approved those filings. (*Id.*) In fact, DTTC forwarded to ChinaCast written comments made by Deloitte US representatives on ChinaCast's draft SEC filings and made clear that those comments *had* to be addressed before DTTC could approve the filings. (*Id.* ¶ 53.) DTTC and ChinaCast personnel reported to Deloitte US on accounting issues relating to the Company's quarterly reports as well as its annual reports. (*Id.* ¶ 32.)

- Deloitte US *directly counseled ChinaCast's audit committee* on key audit issues. (*Id.* ¶ 53.) One can infer from this that DTTC, despite being "the" auditor, could not actually implement Deloitte US's directions by itself; Deloitte US had to provide instructions to the Company directly.

Another specific example of the control Deloitte US had over DTTC, and the ChinaCast audit in particular, occurred in connection with DTTC's audit of the Company's financial statements for the year ending December 31, 2010. (*Id.* ¶ 54.) Deloitte US was directly involved in determining whether it was appropriate for the Company to write off certain pre-paid expenses in its financial statements that were to be submitted with the Company's 2010 Form 10-K, and specifically directed DTTC that the Company needed to take a particular write-off. (*Id.*) After the Company followed Deloitte US's direction and wrote off the pre-paid expenses, the SEC questioned the accounting treatment. (*Id.*) In response to the SEC's concerns, in the fall of 2011, Deloitte US's Washington, DC office – not DTTC, who was nominally the auditor – communicated directly with the SEC to address its concerns regarding the accounting issues

related to the write-off, among other issues.  (*Id.*)  Deloitte US also reviewed and approved an amendment to the 2010 Form 10-K to address the SEC's comments.  (*Id.*)  In addition to these specific examples, Deloitte US actively consulted and gave directions to DTTC throughout the Deloitte-ChinaCast engagement, and had the last word on all US GAAP-related issues.  (*Id.*)

The most plausible inference to be drawn from these allegations is that Deloitte US and DTTC managed the ChinaCast audit together.  Yes, DTTC was nominally the auditor of record – but Deloitte US was heavily involved with those audits and was required to sign off on anything ChinaCast or DTTC filed with the SEC (including DTTC's audit opinion letters).  DTTC could not certify ChinaCast's financial statements without Deloitte US's approval, and it (and ChinaCast) were required to address any issues that Deloitte US had with those financial statements before they were certified and filed with the SEC.  This requirement for sign-off by the US accounting firm makes perfect sense, because that is where the expertise on US GAAP and GAAS compliance lay within Deloitte's organization.  DTTC is not a US-based accounting firm and simply did not have the in-house expertise and qualifications to handle on its own the audit of a US-listed company required to file audited financial statements with the SEC.  For those reasons, Deloitte US had to be involved with, and retain control over, the ChinaCast audit.

Of course, before it could "sign off" on DTTC's audits of ChinaCast, Deloitte US had to perform its own audit procedures in order to gather sufficient evidential material to satisfy itself that DTTC's clean bill of health for ChinaCast's financial statements complied with US accounting and auditing standards.  That is why it communicated directly with ChinaCast in connection with numerous audit-related issues.  And, as occurred in connection with the expense write-off issue,[2] when push came to shove with the SEC over any US GAAP-related matter, it

---

[2]  It does not matter that this particular example of Deloitte's control over the ChinaCast audit occurred after the fraud was revealed.  (*See* Mov. Br. at 7 n.8.)  The incident illuminates the nature and extent of

was Deloitte US – not DTTC – who handled the dispute before the SEC.  These facts clearly support an inference that Deloitte US had "control" over DTTC and its audits of ChinaCast.

Deloitte US's simply labeling these allegations "conclusory" does not make them so.  (*See* Mov. Br. at 7, 10-11.)  As set forth above, Plaintiffs have made a number of detailed and specific allegations to substantiate their claim that Deloitte US had control over the ChinaCast audit.  Indeed, the Complaint explains quite clearly "how, when, [and] in what manner" Deloitte US exercised this control – by holding the power to veto DTTC's audit opinions on all ChinaCast SEC filings; issuing binding directions on ChinaCast financial statements that had to be addressed; directly communicating with ChinaCast's management concerning audit-related matters; having final say on all US GAAP-related issues; and handling all disputes that arose with the SEC over the accounting treatment in ChinaCast's financial statements.  (*See, e.g.*, Compl. ¶¶ 8, 32, 53, 54, 59, 219; Mov. Br. at 11.)  Without the benefit of discovery, one cannot get much more specific than that.  The Complaint is certainly sufficient to put Deloitte US on notice of the factual basis for Plaintiffs' claim.

The real source of Deloitte US's discontent appears to be that Plaintiffs have not pled ***evidence*** in support of these allegations.  But its criticism is misplaced, since a plaintiff never has the obligation to plead evidence in a complaint.[3]  Under Rule 8, a plaintiff need only plead enough facts to make the claim "plausible," to "raise a right to relief above the speculative level," and "to raise a reasonable expectation that discovery will reveal evidence" of the claim.

---

Deloitte US's involvement in ChinaCast's audits, and supports the inference that Deloitte US exercised control throughout the duration of its involvement with ChinaCast.  On a motion to dismiss, where Plaintiffs are accorded every reasonable favorable inference, this allegation supports Plaintiffs' assertion that Deloitte had a veto power over DTTC decision-making in connection with the ChinaCast audit – a prime indicator of control.

[3] *See also Zielinski v. DeFreest*, 12 CIV. 1160 JPO, 2013 WL 4838833, at *3 (S.D.N.Y. Sept. 10, 2013) (neither *Iqbal* nor *Twombly* require a complaint to include "specific evidence" beyond the factual allegations required by Rule 8); *accord Campanella v. County of Monroe*, 853 F.Supp.2d 364, 378 (W.D.N.Y. 2012) ("a plaintiff need not plead specific, admissible evidence in support of a claim").

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 570 (2007).  Complaints "need not plead specific evidence" and need "only plead facts that make [the] claims plausible."  *Lieberman v. City of Rochester*, 07-CV-6316L, 2011 BL 114991, at *7 (W.D.N.Y. Apr. 29, 2011) (citing *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120-21 (2d Cir. 2010)).  Even when Rule 9(b) applies in securities litigation (which, as discussed below, is not true in this case), the Second Circuit "'do[es] not require the pleading of detailed evidentiary matter'" in a complaint.  *FHFA v. JP Morgan Chase & Co.*, 902 F. Supp. 2d 476, 484 (S.D.N.Y. 2012) (quoting *In re Scholastic Corp. Securities Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)).  And, of course, under either Rule 8 or Rule 9(b), the Court is "obliged" to "accept as true the facts alleged by the plaintiff," and to accord the plaintiff the benefit of all favorable reasonable inferences from the facts they have alleged.  *Id*. (citing *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 83 (2d Cir. 1999)); *see also In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009).

Deloitte US's criticism of the Complaint's supposedly "conclusory" allegations is also wide of the mark because the specific details of the two Deloitte entities' interactions with each other in connection with auditing ChinaCast are factual matters peculiarly within their knowledge.  Without the benefit of discovery, there is no simply no way for Plaintiffs to plead more specific details about those interactions.  Deloitte's mischaracterization of who the Plaintiffs are and what information they had access to does not change this fact.  (*See* Mov. Br. at 4-6.)  Virtually all of the Plaintiffs – including the two funds affiliated with Ned Sherwood, currently a ChinaCast independent director – are outside investors who bought stock in ChinaCast and had no role whatsoever in the Company's internal management.  These investors lost tens of millions of dollars on their stock purchases.  Sherwood, who is ***not*** a plaintiff in this litigation, as Deloitte well knows, was instrumental in ousting entrenched management (the ones

who had perpetrated massive fraud with the Deloitte entities' imprimatur) through a fiercely fought proxy contest that resulted *inter alia* in Plaintiff Douglas Woodrum stepping into the role of CFO.  In that role, **Woodrum** – unlike Deloitte US or DTTC – almost immediately acted on the multiple red flags and discovered that *for years* ChinaCast's audited financial statements had been riddled with fraud and had deceived investors into believing the Company had a real business and real assets.  Neither Sherwood nor Woodrum had any involvement in this fraud; their only involvement has been with cleaning up the mess left in the Deloitte entities' wake.[4]

Here is what Deloitte US and DTTC never told ChinaCast's investors:

### c.      The ChinaCast Fraud

ChinaCast's business did not make it a complicated company to audit.  (Compl. ¶ 4.)  In 2007, the Company's business and operations were limited, and its primary assets were cash and term deposits, *i.e.*, deposits placed with financial institutions with remaining maturities of greater than three months but less than one year when purchased.  (*Id*.)  In 2008, the Company started to pursue a strategic move into the "bricks and mortar" university business, resulting in the Company (reportedly) purchasing one university a year in each of 2008, 2009 and 2010. (*Id*.)  In the four years between 2007 and 2010, the Company had at most one or two major transactions per year.  (*Id*.)  Given the relative simplicity of the Company's business, Deloitte US and DTTC's failure to see the obvious signs of fraud is truly egregious.

The Deloitte entities failed to detect a series of massive frauds that occurred at ChinaCast, including:

---

[4]  Moreover, Deloitte US's suggestion that Plaintiffs have had access to a supposed treasure trove of documents in "ChinaCast's records" to help them plead their complaint is simply false.  Former management left the Company's records in shambles, with many documents destroyed or simply pilfered from the Company's premises.  New management has not yet successfully recovered anywhere near a critical mass of the Company's records.  In these circumstances, it is the height of chutzpah for Deloitte US to hide behind investors' supposed access to the "records" of a Company that was systematically looted for years under its watch.

-10-

- For each of the years 2007, 2008, 2009 and 2010, over 55% (and, in two of those years, over 60%) of the Company's total assets consisted of term deposits. However, *the Deloitte entities failed to disclose that in each of those years substantial portions (more than 76% in 2007; more than 94% in 2008; and more than 85% in 2010) of the term deposits had been pledged to secure the obligations of unrelated third parties with no legitimate business connections to ChinaCast.* Had Deloitte tested and confirmed with the financial institutions that held them that the term deposits were unencumbered, it would have learned of the pledges and could not have certified the total and/or current assets as reported for the years 2007, 2008, 2009 or 2010. (Compl. ¶ 5.) Creditors of the unrelated third parties ended up foreclosing on the bulk of these assets when the third parties failed to meet their obligations.

- For each of the years ended December 31, 2007, 2008, 2009 and 2010, the Company's audited financial statements reported that the Company indirectly owned the vast majority of the stock of ChinaCast Technology (HK) Limited ("CCT HK"). As a result, DTTC, with Deloitte US's approval, certified ChinaCast's financial statements on a consolidated basis, including CCT HK. However, the representation was false and the consolidation violated GAAP, as the Company *never* had a majority ownership interest in CCT HK. Had Deloitte confirmed the ownership by simply reviewing records readily obtainable from the Hong Kong Companies Registry, it would have known that *since 2003, the Company has only owned only 49.25% of CCT HK*, with 50% owned personally by Ron Chan ("Chan"), the Company's now-discredited former CEO. (*Id.*)

- According to the audited financial statements for the year ended December 31, 2009, in December 2009, the Company consummated and received proceeds from a secondary offering of its stock in the U.S. in the amount of $44 million. Despite the significance of the transaction to the Company, the Deloitte entities failed to test and confirm (through a simple review of bank records) that the Company actually received the proceeds. In fact, *at least $35 million of the proceeds were almost immediately wired out to entities outside of ChinaCast*, which loss was not reflected in the 2009 audited financial statements. Had Deloitte obtained account statements from the banks and reviewed them, it would have seen that the majority of the offering proceeds had been immediately (and improperly) siphoned by management. (*Id.*)

- In connection with the audited financial statements for the year ended December 31, 2010, *Deloitte failed to confirm that any of the Company's bank accounts actually received a $5 million payment for stock* sold to a British Virgin Islands company owned 100% by Chan. Despite the fact that this transaction was a significant, related-party transaction at an above-market price, the Deloitte entities never even reviewed ChinaCast's bank records to confirm receipt of the funds. In fact, the supposed transaction was a complete sham. The Company issued the shares, but never received payment. (*Id.*)[5]

---

[5] The same thing happened with a separate stock sale to Wu Shi Xin, the purported sole stockholder of Wintown Enterprises Limited, for a total purchase price of $29.3 million. *The Deloitte entities never*

- In each of 2008, 2009 and 2010, the Deloitte entities failed to confirm (again, through the simple act of reviewing bank records) that ChinaCast actually made the massive cash payments it reported for three private "brick and mortar" universities it purportedly acquired during that time.  In fact, *the Company apparently did not use its cash (or have the cash) to pay the consideration for any of the university acquisitions in 2008, 2009, and 2010*.  The payments involved exceeded ChinaCast's available cash resources, a fact that should have been obvious to the Deloitte entities.  Rather than use cash resources it did not have, the Company apparently entered into massive undisclosed loans (at undisclosed interest rates) with third parties to pay for the universities, which then were used as collateral to secure the loans.  When the Company stopped making payments on the loans, the universities were effectively foreclosed, and their ownership transferred outside of the Company.  Thus, headliner assets of ChinaCast that investors believed the Company owned were in reality heavily mortgaged in favor of others.  (*Id.*)

- ChinaCast's trial balances provided directly to the Deloitte entities for purposes of the year-end audits in 2007, 2008, and 2009 revealed massive outflows of cash to (and unexplained inflows from) parties that had no legitimate business relationship to the Company.  The trial balances for one Company subsidiary showed *tens of millions of dollars of cash transfers to over one hundred individuals and entities.  Over ninety percent of these individuals and entities – including metal factories and a pawn shop (of all things) – were totally unrelated to the Company's business*.  No reasonable auditor could have concluded that these were legitimate transactions.  Rather, it is apparent that the Company was taking short term loans from random entities on an almost daily basis to conceal its financial condition.  (*Id.*)

Having pled these facts, Plaintiffs have stated valid claims against Deloitte US for

violations of Section 18 and 20(a) of the Exchange Act, as well as New York common law fraud.

## ARGUMENT

## I.    THE COMPLAINT PLEADS A CLAIM UNDER SECTION 18

Under Section 18 of the '34 Act, any person who purchases a security in reliance

on a false or misleading statement of a material fact included in any document filed pursuant to

the '34 Act may sue any person who made that statement or "caused" it to be made.  15 U.S.C. §

78r(a).  A plaintiff asserting a claim under Section 18 must plead that the defendant made or

caused to be made a false or misleading statement contained in a document filed pursuant to the

---

*undertook the simple task of reviewing bank records to confirm that ChinaCast actually received payment for the stock*.  In fact, it did not.  (Compl. ¶ 5.)

Exchange Act, that he actually relied on the false or misleading statement, and that his reliance caused the plaintiff to suffer a loss.  *See generally In re Alstom SA Secs. Litig.*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) (cited in Mov. Br. at 19).   Unlike a claim under Section 10(b) of the Exchange Act (which Plaintiffs have not asserted against Deloitte US), a Section 18 plaintiff "bears no burden of proving that the defendant acted with scienter or any particular state of mind."  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 283 (3d Cir. 2006); *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 193 (1st Cir. 2005); *In re Alstom*, 406 F. Supp. 2d at 480 ("Section 18, unlike Section 10(b), does not require a plaintiff to plead scienter.").[6]

Plaintiffs' Section 18 claim against Deloitte US is straightforward.  By virtue of the *de facto* control it exercised over ChinaCast's financial statements and DTTC's audit opinions, Deloitte US caused both of those entities to make false statements in ChinaCast's SEC filings (10-Ks and 10-Qs) on which Plaintiffs relied to their detriment.  (Compl. ¶¶ 234-247; *see also id.* ¶ 187.)  Deloitte US's challenge to this claim is correspondingly limited.  It argues that (i) it did not "cause" any false statements to be made, (ii) Plaintiffs have failed to allege actual reliance on the false statements, and (iii) there is no Section 18 liability for statements contained in Part I of ChinaCast's 10-Qs.  (Mov. Br. at 19-22.)  All of these arguments are meritless.

Although Deloitte US argues that Plaintiffs' Section 18 claim must comply with the pleading with particularity requirements of Rule 9(b) under the "sounds in fraud" doctrine (Mov. Br. at 19), that doctrine is irrelevant to the particular arguments Deloitte US advances in

---

[6] By way of an affirmative defense, to escape liability under Section 18, **the defendant** must prove that it acted in "good faith and has no knowledge that such statement was false or misleading."  *In re Stone & Webster*, 414 F.3d at 193 (citing 15 U.S.C. 78r(a)); *Ross v. A.H. Robins Co., Inc.*, 607 F.2d 545, 555-56 (2d Cir. 1979) ("A plaintiff seeking recovery under s 18 faces a significantly lighter burden [than under 10(b)].  He must merely plead and prove that a document filed with the Commission contains a material statement or omission.  If he can show reliance on that statement, liability is established, unless by the very terms of section 18, [t]he person sued shall prove that he acted in 'good faith and had no knowledge that such statement was false or misleading.'") (citation omitted).  Given this affirmative defense, the standard essentially is negligence.

support of its motion.  Rule 9(b) requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (internal quotation marks and citation omitted).  But Deloitte US does not contest the sufficiency of Plaintiffs' particularized allegations concerning the underlying false statements.  Nor does it claim that Plaintiffs were required to plead Deloitte US's scienter, since, as discussed above, scienter is not an element of a Section 18 claim. Nothing in Rule 9(b) requires that Plaintiffs plead with particularity how Deloitte US caused these false statements to be made, and Deloitte US does not cite a single case that says it does.[7]

### a.    The Complaint Pleads that Deloitte US Caused Misstatements

The only case in this Circuit to directly address what constitutes "causing" a false statement to be made is Judge McKenna's decision in *In re Adelphia Communications Corp. Securities & Derivative Litigation*, No. 03 MD 1529 (LMM), 2007 WL 2615928, at *12 (S.D.N.Y. Sept. 10, 2007), which held that an attorney does not cause false statements to be made in an SEC filing by merely rendering legal advice to the issue or assisting in the drafting of the document.  Instead, the Court held, the natural meaning of the "cause to be made" clause in Section 18 is that it "describe[es] actors who control the speaker in some way." *Id.*

---

[7] In any event, the "sounds in fraud" doctrine does not apply.  Although the conduct of ChinaCast was certainly fraudulent, the Deloitte entities' audit failures are cognizable in both fraud (through recklessness) and negligence.  Plaintiffs' Section 18 claim against Deloitte US is not scienter-based – as Plaintiffs explicitly disclaimed all allegations of fraud or intentional or reckless misconduct in connection with such claims.  (Compl. ¶ 235.)  Nothing in the "sounds in fraud" doctrine prevents Plaintiffs from pleading its claims in the alternative.  *See In re Suprema*, 438 F.3d at 273 (refusing to apply Rule 9(b) to claims under Sections 11 and 12 of the Securities Act that were pled with 10(b) claims where the "Section 11 and Section 12(a)(2) claims were expressly pled in, and limited to, negligence, with preceding allegations of fraud expressly disavowed in the context of those claims").  Nor do the Private Securities Litigation Reform Act's standards for pleading state of mind apply, as Section 18 does not require Plaintiffs to plead or prove that Defendants acted with a particular state of mind.  *See* 15 U.S.C. § 78u-4(b)(2) (standard applies only to claims "in which the plaintiff may recover money damages only upon proof that the defendant acted with a particular state of mind").

Plaintiffs' claim against Deloitte US easily satisfies that standard.  Deloitte US and DTTC conducted the audits of ChinaCast together.  Deloitte US had the final say on both DTTC's audit opinions and ChinaCast's SEC filings.  Any issues it had with these documents had to be addressed and resolved.  If Deloitte US did not approve an SEC filing or DTTC's clean audit opinion, it would not have gotten filed.  By allowing the shockingly false statements in ChinaCast's financial statements, as well as the blatantly unsupported "clean" audit opinions rendered by DTTC, Deloitte US caused those false statements to be made.  It was within Deloitte US's power to control the content of those statements, and it had *de facto* control over them. Deloitte US is thus responsible for them under Section 18.

*Deephaven Private Placement Trading, Ltd v. Grant Thornton & Co.*, 454 F.3d 1168, 1177 (10th Cir. 2006) (cited in Mov. Br. at 19-20), which is not binding in this Circuit, is not to the contrary.  The auditor escaped liability in that case because the plaintiffs did not plead that it specifically violated any applicable auditing standards.  *Id*. at 1176 ("But our review of the [complaint] reveals that Investors made no attempt to specify the reason or reasons why Grant Thornton's opinion was false or misleading in relation to the audits it performed."); *id*. at 1176 n.8 ("Our conclusion in this regard is buttressed by Investors' acknowledgment at oral argument that they did not plead Grant Thornton violated GAAS."); *see also Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 609 (S.D.N.Y. 2009) (distinguishing *Deephaven* on the grounds that "unlike in *Deephaven* . . . Plaintiffs do allege specific GAAS violations made by HB & M in conducting the audit").  Here, Plaintiffs have alleged substantial GAAS violations by Deloitte US – most obviously, its failure to review competent evidential matter (like bank statements) that would have revealed that ChinaCast's financial statements were replete with

falsities about the Company's assets and financial condition.  *See also Gould*, 692 F.3d at 160 (2d Cir. 2012) (reversing grant of summary judgment in favor of auditor on Section 18 claim).[8]

Furthermore, Deloitte US cannot hide behind the alleged prohibition on "group pleading."  (Mov. Br. at 19.)  Plaintiffs separately reference Deloitte US at least 33 times in the Complaint.  *See, e.g.*, Compl. ¶¶ 3, 8, 32, 52, 53, 54, 59, 187, 218, 219, 252.  Plaintiffs separately reference DTTC directly at least 54 times in the Complaint.  *See, e.g.*, Compl. ¶¶ 3, 5, 6, 7, 8, 31, 32, 52, 53, 54, 57, 59, 133, 135, 151, 152, 162, 163, 164, 187, 207, 209, 212.  The fact is, as the Complaint makes clear, Deloitte US and DTTC *both* had roles in the ChinaCast audit – Deloitte US controlled the audit and DTTC took direction from Deloitte US.  *See, e.g., id.* ¶ 8, 32, 53, 54, 59, 219.  There is nothing impermissible about these allegations.  Plaintiffs have specifically pled that Deloitte US had sign-off authority on DTTC's audit opinions, that it could veto decisions of DTTC involving the SEC, and that it had the final word on US GAAP.  *Id.* ¶ 8, 32, 53, 54, 59, 219.  Because Deloitte US and DTTC are affiliated entities acting jointly in connection with the preparation of the ChinaCast audits, Plaintiffs need not specify their particular roles.  *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).  This is especially true here, given that the particulars of the two Deloitte entities' interactions with each other in connection with the ChinaCast audits are peculiarly within their knowledge.  *Id.* (citing *Luce v. Edelstein*, 802 F.2d 49, 54 n.1 (2d Cir. 1986)).  Plaintiffs have pled sufficient facts to support their allegations of Deloitte US's involvement in, and control over, the ChinaCast audits.

---

[8] It is no answer to contend that a corporation's financial statements are management's responsibility. (Mov. Br. at 20.)  While management certainly is liable for fraud in the company's financial statements, that does not give the auditors a free pass.  As public watchdogs, auditors owe a duty to the company's investors to ensure they have conducted a GAAS-compliant audit that thoroughly reviewed the company's books and records to confirm that the financial statements accurately reflected the company's financial condition under GAAP.  *See Arthur Young*, 465 U.S. at 817-18.  Where an auditor with control over the content of the company's financial statements fails in the most irresponsible way to do its job and perform a real audit, as was the case with Deloitte US here, it is liable for causing the resulting false statements under Section 18.

Nothing more is required at this stage of the case.  Plaintiffs have adequately pled that Deloitte

US caused false statements to be made by ChinaCast and DTTC and, accordingly, is liable to

Plaintiffs under Section 18.

b.  <b>The Complaint Pleads Reliance Necessary for a Section 18 Claim</b>

Section 18 "requires actual rather than constructive reliance upon a materially

false or misleading statement by one who has purchased or sold a security."  *Gould*, 692 F.3d at

161 (citing *Heit v. Weitzen*, 402 F.2d 909, 916 (2d Cir. 1968).  To satisfy this standard, Plaintiffs

were required "to plead facts probative of their actual reliance on [] specific false statements

contained" in the relevant SEC filings.  *In re Suprema*, 438 F.3d at 284.  Plaintiffs did so.  The

Complaint includes *eight pages* of detailed allegations indicating on which statements contained

in ChinaCast's SEC filings Plaintiffs relied and at what times.  (*See* Compl. ¶¶ 234-247.)  It also

alleges what resulted from that reliance – Plaintiffs' decision to purchase ChinaCast securities.

(*Id*. ¶ 242.)[9]  Deloitte's contention that Plaintiffs were required to plead highly-detailed facts

(which agent of the Plaintiffs read the statements, how they affected his decision to buy

ChinaCast stock, etc.) rests on a standard it has concocted out of whole cloth.  (Mov. Br. at 21.)

No case supports such a requirement.  Indeed, in *Gould*, the Second Circuit allowed a Section 18

claim to survive *summary judgment* where the plaintiff's employee could not even recall

whether she read the audit opinion at issue, but merely testified it was her "practice" to review

such documents in deciding to recommend stocks for purchase.  692 F.3d at 161.  If that was

enough to get by summary judgment, Plaintiffs have certainly alleged sufficient facts concerning

their reliance to survive a Rule 12(b)(6) motion.

---

[9] *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 386 (S.D.N.Y. 2011), relied upon by
Deloitte US (Mov. Br. at 21), is distinguishable.  In that case, the plaintiff's allegations of reliance,
spanning 2 short, nearly single-sentence paragraphs, were "incredibly broad, alleging reliance on entire
10–Ks for indefinite periods of time," without any indication as to what specific statements were at issue.

-17-

### c.       The Complaint Pleads a Section 18 Claim Based on the 10-Q Filings

Deloitte US argues that there is no Section 18 liability for statements on Part I of Form 10-Q.  (Mov. Br. at 21.)  But this argument ignores the very text of the regulation at issue. 17 C.F.R. § 240.13a-13(d) states only that "the *financial information required* by Part I of Form 10-Q shall not be deemed to be 'filed' for the purpose of Section 18 of the [Exchange] Act or otherwise subject to the liabilities of that section of the Act . . . ." (emphasis added).   The regulation, by its plain language, expressly limits its safe harbor to only (1) financial information that is (2) required by Part I for Form 10-Q.  *See In re Alstom*, 406 F. Supp. 2d at 479 (noting rule only exempts "financial information").  The regulation does ***not*** exempt from Section 18 any other information contained in Part I of Form 10-Q.  *See generally In re Quebecor World (USA) Inc.*, 719 F.3d 94, 99-100 (2d Cir. 2013) (holding that courts construe a regulation in a manner that does not render parts of it superfluous).  And, each of the cases Deloitte cites involved misrepresentations solely of "financial information."  (Mov. Br. at 21-22.)  Here, Plaintiffs have alleged numerous false and misleading statements in ChinaCast's Form 10-Qs that fall outside of the category of "financial information." (*See, e.g.*, Compl. ¶ 197 (Form 10-Qs contained false statement regarding compliance with SEC regulations; Form 10-Qs omitted material risk factors; and Form 10-Qs contained false information regarding ChinaCast's ownership of universities).) As a result, Plaintiffs' Section 18 claims based on the 10-Qs are valid.

## II.       THE COMPLAINT PLEADS A CLAIM UNDER SECTION 20(A)

A claim for control person liability under Section 20(a) requires a plaintiff to plead (1) that the controlled person committed a primary violation of the Exchange Act, and (2) direct or indirect control of the primary violator by the defendant.  *See, e.g.*, *In re Worldcom, Inc.*

-18-

*Secs. Litig.*, 294 F. Supp. 2d 392, 414 (S.D.N.Y. 2003).[10]  Again, Plaintiffs' control person claim

against Deloitte US is straightforward.  Deloitte US had *de facto* control over DTTC, and in

particular the ChinaCast audits, and is accordingly liable under Section 20(a) for DTTC's

Section 10(b) and 18 violations in connection with those audits to the same extent that DTTC is

liable.  Deloitte US does not contest in this motion that Plaintiffs adequately pled primary

violations of the Exchange Act against DTTC.  (Mov. Br. at 11.)  The only elements at issue are

control and so-called culpable participation (which some courts have interpreted as requiring

allegations that the defendant acted with recklessness but which, as explained below, is not even

an element of a properly pled Section 20(a) claim).

### a.      The Complaint Sufficiently Pleads Control

The "control" element need only be pled in accordance with Rule 8(a)'s notice

pleading standard.  *Varghese*, 672 F. Supp. 2d at 611; *In re Refco, Inc. Secs. Litig.*, 503 F. Supp.

2d 611, 660 (S.D.N.Y. 2007); *STMicroelectronics v. Credit Suisse Grp.*, 775 F. Supp. 2d 525,

535-36 (E.D.N.Y. 2011) (quoting *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 639

(S.D.N.Y. 2010) ("To allege control, as with any other element, a 'plaintiff[] must plead only

sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its

face.'").  As defined by SEC regulation, "control" means "the power to direct or cause the

direction of the management and policies . . . whether through the ownership of voting securities,

by contract, *or otherwise*."  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996)

(quoting 17 C.F.R. § 240.12b-2) (emphasis added).  "For purposes of Section 20(a) liability,

actual control requires only the ability to direct the actions of the controlled person, and not the

---

[10] *See also* 15 U.S.C. § 78t(a) ("Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation hereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.").

active exercise thereof." *STMicroelectronics*, 775 F. Supp. at 536 (quoting *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 765 (S.D.N.Y. 2001) (internal quotation marks omitted).

    Plaintiffs have clearly alleged sufficient facts to state a plausible claim that Deloitte US controlled DTTC.  The two Deloitte entities had an arrangement between themselves and ChinaCast whereby Deloitte US had the final say on DTTC's audit opinions and the content of ChinaCast's SEC filings.  Deloitte US issued specific directions on these documents which DTTC had to follow (the pre-paid expense write-off issue in connection with the 2010 financial statements being only one specific example).  DTTC could not sign off on ChinaCast's financial statements without the approval of Deloitte US.  If that does not constitute "control," it is hard to see what would.  *See In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 298 (S.D.N.Y. 1999) (finding the requisite degree of control where "[p]laintiffs allege that the individual defendants influenced and controlled the decision-making of Quintel, 'including the content and dissemination of various statements which plaintiff contends are false and misleading.'").

    Deloitte US protests that it cannot be held liable for DTTC's bad audits merely because they are part of the same international accounting network operating under the Deloitte brand.  (Mov. Br. at 12-13 (citing *Nuevo Mundo Holdings v. PricewaterhouseCoopers LLP*, No. 03 Civ. 0613 GBD, 2004 WL 112948 (S.D.N.Y. Jan. 22, 2004); *In re Asia Pulp & Paper Sec. Litig.*, 293 F. Supp. 2d 391, 396 (S.D.N.Y. 2003)).)  Except that is not Plaintiffs' theory.  Deloitte US is liable under Section 20(a) for its ***own*** conduct specifically in connection with the ChinaCast audits, not because it and DTTC share the name "Deloitte."  As now Circuit Judge Chin explained in *Star Energy Corp. v. RSM Top-Audit*, No. 08 Civ. 00329 (DC), 2008 WL 5110919 (S.D.N.Y. Nov. 26, 2008) (cited in Mov. Br. at 13 n.10), there was no liability in *Nuevo Mundo* and *Asia Pulp* because "there were no allegations that the international organization was

-20-

'able to control or in any way influence the particular audits conducted or opinions offered by its individual member firms.'"  *Id*. at *4 (quoting *Asia Pulp*, 293 F. Supp. 2d at 396); *see also Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 372, 459 (S.D.N.Y. 2010) (rejecting common law respondeat superior claim against PwC International because there were no allegations it had "specific control of the Funds' audits") (cited in Mov. Br. at 13 n.10).  Here, Plaintiffs have specifically alleged, with supporting facts, that Deloitte US was "able to control" and "influence the particular audits conducted [and] opinions offered" by DTTC with respect to ChinaCast.  The very cases Deloitte US cites are enough to knock its straw-man down.

Still more ridiculous is Deloitte US's claim that Plaintiffs' allegations amount to nothing more than "the provision of expertise, advice, or review."  (Mov. Br. at 14.)  Just to take one example (among many), how Deloitte US could possibly construe the allegation in paragraph 53 of the Complaint that "Deloitte US had the final word on all US GAAP matters *and its approval was required before DTTC signed any of the Company's filings with the SEC*" as contending that Deloitte US merely gave DTTC "advice" strains credulity well past the breaking point.  The Complaint quite clearly "demonstrate[s] that the Chinese firm was unable to make its own decisions about performing its own audits and issuing its own reports."  (Mov. Br. at 15.)  That is the point – Deloitte US, not DTTC, had the final word on DTTC's audits and ChinaCast's SEC filings.[11]  Typical of many defendants in securities cases, Deloitte US is simply pretending that Plaintiffs' allegations are something different from what they actually are.

---

[11] This example of veto control, along with the Complaint's numerous other factual allegations of control, make this case clearly distinguishable from *In re Blech Securities Litigation*, 961 F. Supp. 569, 587 (S.D.N.Y. 1997) (cited in Mov. Br. at 15), where the complaint contained solely conclusory statements and no examples of the kind of control that Plaintiffs' complaint has here.  Moreover, in *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 579 (S.D.N.Y. 2012) (cited in Mov. Br. at 16), the control exercised was in the form of a veto power *that terminated before the acts at issue*.  Here, Deloitte US's veto power over DTTC did not terminate at any time.

b.      **Culpable Participation is Not Required for a Section 20(a) Claim and, in Any Event, Has Been Adequately Alleged**

A plaintiff need not plead culpable participation to state a claim for control person liability under Section 20(a).  *E.g.*, *In re Initial Public Offering Secs. Litig.*, 241 F. Supp. 2d 281, 392-97 (S.D.N.Y. 2003); *In re Worldcom*, 294 F. Supp. 2d at 414-16; *In re Quintel*, 72 F. Supp. 2d at 298.)  In detailed opinions issued in the *IPO* and *Worldcom* cases, respectively, Judges Scheindlin and Cote thoroughly analyzed the relevant law and concluded that the view that particularized allegations of culpable participation are required at the pleadings stage is deeply misguided.  For one thing, it is inconsistent with the text of the statute, which clearly makes proof of good faith and lack of inducement of the primary violation an affirmative defense that defendants bear the burden of proving.  *In re Worldcom*, 294 F. Supp. 2d at 414; *In re Initial Public Offering*, 241 F. Supp. 2d at 396; *see* 15 U.S.C. § 78t(a) (imposing liability on control person "***unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts*** constituting the violation or cause of action.") (emphasis added).

For another, the cases requiring allegations of culpable participation rest on a misreading of the Second Circuit's decision in *First Jersey* as equating "culpable participation" with "scienter" even though the *First Jersey* opinion does not say that and the Second Circuit has never so held.  *In re Initial Public Offering*, 241 F. Supp. 2d at 394-96 and nn.182 and 184 (finding it far more likely that the Second Circuit believed Section 20(a) requires only negligence).  Indeed, as Judge Scheindlin has pointed out, in *First Jersey* itself, "allegations of control coupled with an underlying violation sufficed to plead a Section 20(a) claim."  *Id*. at 395; *see also In re Worldcom*, 294 F. Supp. 2d at 415 (noting that "most other Circuit Courts of Appeals, including those that have a culpable participation test, have not required a plaintiff to plead, or, in establishing liability to prove, a defendant's culpable state of mind in connection

with a Section 20(a) claim").   Subsequent Second Circuit decisions have included "culpable participation" when listing the elements of a Section 20(a) claim, but not in a context where it mattered.   *See, e.g.*, *ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (listing culpable participation requirement but holding that control person claims failed because there was no underlying primary violation) (cited in Mov. Br. at 17).   Even Deloitte US admits the Second Circuit's statements on this subject are, at most, dicta.   (Mov. Br. at 17.)[12] The Court should follow the far better-reasoned opinions of Judges Scheindlin and Cote and hold that Plaintiffs need not plead culpable participation to state a control person liability claim.

In any event, Plaintiffs have adequately alleged Deloitte US's culpable participation, with scienter, in DTTC's fraudulent audits of ChinaCast.   Under Supreme Court precedent, a "strong inference" of scienter under the Private Securities Litigation Reform Act is one that a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).   Allegations of recklessness, defined as conduct which is highly unreasonable and an extreme departure from the standards of ordinary care, are sufficient to meet the "strong inference" test.   *See, e.g.*, *Novak*, 216 F.3d at 308; *Gould*, 692 F.3d at 158-59 (denying summary judgment to auditor on Section 10(b) claim).   In the case of auditors, recklessness is established by facts demonstrating that "[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts."

---

[12] Even assuming Deloitte US is correct that the majority of courts in this district require a plaintiff to plead culpable participation to state a valid Section 20(a) claim (Mov. Br. at 17), the majority rule is not always the correct one.  The Second Circuit recently reversed the majority rule in this district concerning *American Pipe* tolling as applied to statutes of repose.  *See Police & Fire Ret. Sys. of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95 (2d Cir. 2013).

*In re Refco*, 503 F. Supp. 2d at 658 (quoting *S.E.C. v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)) (internal quotation omitted); *Varghese*, 672 F. Supp. 2d at 609-10.

Plaintiffs easily satisfy this test here.  The fraud at ChinaCast was hiding in plain sight.  Simple reviews of ChinaCast's bank statements, documentation and trial balances by Deloitte US – basic tasks that are routinely performed during an audit – would have revealed that (i) the Company's CEO siphoned $35 million in proceeds from a stock offering out of the Company, (ii) the Company never received payment for more than $30 million worth of stock it sold in private placements, (iii) substantial portions of its term deposits were pledged to cover the debts of unrelated third parties, (iv) massive amounts of cash were flowing in and out of the Company to and from third parties with no legitimate business relationship to ChinaCast, and (v) the Company never made the payments it claimed to have made for three of its brick and mortar universities – rather significant assets, one would say – which meant it did not own these assets (contrary to what it told its investors).

Given that ChinaCast was not a complicated company and engaged in only a few major transactions per year, and the sheer magnitude of the fraud, Deloitte US's failure to conduct even the most basic steps of an audit is nothing less than shocking.  There was no meaningful audit performed on this Company.  That is more than enough to satisfy the recklessness standard.  *See, e.g.*, *Gould*, 692 F.3d at 159-60 (genuine issue of material fact as to auditor's scienter where it "repeatedly failed to scrutinize serious signs of fraud"); *In re WorldCom, Inc. Secs. Litig.*, No. 02 Civ. 3288 (DLC), 2003 WL 21488087, at *6-8 (S.D.N.Y. June 25, 2003) (holding that "the enormous amounts at stake coupled with the detailed allegations regarding the nature and extent of WorldCom's fraudulent accounting and Andersen's failure to conduct a thorough and objective audit create a strong inference" of

Andersen's recklessness);  *In re Refco*, 503 F. Supp. 2d at 657-60; *In re Suprema*, 438 F.3d at 279-81 (denying auditor's motion to dismiss and detailing numerous red flags overlooked by auditor of cheese company, one of whose divisions was a total sham); *In re Complete Mgmt. Inc. Secs. Litig.*, 153 F. Supp. 2d 314, 333-35 (S.D.N.Y. 2001).

### III.    THE COMPLAINT PLEADS A CLAIM FOR COMMON LAW FRAUD

Plaintiffs have clearly stated a valid claim for common law fraud against Deloitte US under New York law.  Deloitte US's arguments to the contrary are easily dispensed with. (Mov. Br. at 22-23.)  *First*, Deloitte US is liable for causing false statements to be made by ChinaCast and DTTC, regardless of whether it made those statements itself.[13]  *Second*, as discussed in connection with Plaintiffs' Section 20(a) claim, the Complaint adequately pleads facts giving rise to a strong inference that Deloitte US acted with scienter.  *Third*, as is also the case with their Section 18 claim, Plaintiffs have adequately alleged that they relied on the false and misleading statements that Deloitte US caused ChinaCast and DTTC to make.[14]

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Deloitte US's motion to dismiss in its entirety.

---

[13] *See, e.g.*, *Tuosto v. Philip Morris USA Inc.*, 672 F. Supp. 2d 350, 359 (S.D.N.Y. 2009) ("Alleged misrepresentations need not be made directly by the defendant, *for if defendant authorized and caused the statement to be made it is the same as though he made it himself*.") (citations and quotations omitted) (emphasis added); *Woori Bank v. RBS Sec., Inc.*, No. 12 Civ. 4254 (HB), 2012 WL 6703352, at *4 (S.D.N.Y. Dec. 27, 2012) ("A party may be liable for fraud if it 'made' a misrepresentation or 'authorized' or 'caused' a misrepresentation to be made."); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1186 (C.D. Cal. 2011) ("New York has embraced a broader scheme of liability [compared to the federal securities laws] for those who make, authorize, or cause a misrepresentation to be made." (citation omitted)); *Kuelling v. Roderick Lean Mfg. Co.*, 183 N.Y. 78, 85 (1905).

[14] To the extent the Court is inclined to grant any portion of Deloitte US's motion, Plaintiffs respectfully request leave to re-plead, as their investigation of this Defendant's misconduct is ongoing.

Dated: December 20, 2013
        New York, New York

                                 LOWENSTEIN SANDLER LLP


                            By: /s/ Lawrence M. Rolnick
                                 Lawrence M. Rolnick
                                 Amiad M. Kushner
                                 1251 Avenue of the Americas
                                 17th Floor
                                 New York, NY  10020
                                 Tel. 212.262.6700

                                 -and-

                                 Sheila A. Sadighi (*pro hac vice*)
                                 65 Livingston Avenue
                                 Roseland, NJ  07068
                                 Attorneys for Plaintiffs