**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
　　　　　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　　　　　 )
SPECIAL SITUATIONS FUND III QP, L.P., *et al.*, )　Civil Action No. 1:13-cv-01094 (ER)
　　　　　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　*Plaintiffs*, )　ECF CASE
v.　　　　　　　　　　　　　　　　　　　　　 )　Electronically Filed
　　　　　　　　　　　　　　　　　　　　　　　 )
DELOITTE TOUCHE TOHMATSU CPA, LTD., *et* )
*al.*,　　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　 *Defendants*. )
　　　　　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　　　　　 )
---------------------------------------------------------------X


**DEFENDANT DELOITTE TOUCHE TOHMATSU CPA LTD.'s**
**MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**
**THE FIRST AMENDED COMPLAINT**


**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

## Contents

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT .........................................................................1

BACKGROUND ...............................................................................................3

ARGUMENT .....................................................................................................7

    I.    THE COMPLAINT DOES NOT STATE A CLAIM UNDER SECTION 10(b). ..8

        A.    The Complaint Does Not Allege With Particularity Facts Giving Rise To A Strong Inference of Scienter. ..............................................................8

            1.    The Most Compelling Inference To Be Drawn From The Complaint Is That DTTC Did Not Act With Fraudulent Intent.......9

            2.    Allegations That DTTC Had "Access" To Information That Would Have Revealed The Fraud Are Insufficient To Create A Strong Inference Of Scienter. ...................................................................13

            3.    Plaintiffs' Allegations That DTTC "Ignored" Three "Massive Red Flags" Do Not Support A Compelling And Cogent Inference That DTTC Acted With Scienter. ........................................................15

            4.    Plaintiffs' Allegations Are The Antithesis Of "No Audit At All."19

        B.    The Complaint Does Not Allege An Actionable Misrepresentation By DTTC. ..................................................................................................21

    II.    THE COMPLAINT DOES NOT STATE A CLAIM UNDER SECTION 18......24

        A.    The Complaint Does Not Plead With Particularity Any Misstatement Made Or Caused To Be Made By DTTC. .................................................25

        B.    The Complaint Fails To Plead That DTTC Subjectively Believed Any Statement To Be False. .............................................................................27

        C.    The Complaint Does Not Plead With Particularity That Plaintiffs Relied On Any Purported Misstatement. .............................................................28

    III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD. ..................................................................................................29

CONCLUSION.................................................................................................30

# TABLE OF AUTHORITIES

CASES                                                                    Page(s)

*Anwar v. Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010).................................................................2

*Armstrong v. Am. Pallet Leasing Inc.*,
    678 F. Supp. 2d 827 (N.D. Iowa 2009)..........................................................29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................7, 28, 29

*Bond Opportunity Fund v. Unilab Corp.*,
    2003 WL 21058251 (S.D.N.Y. May 9, 2003).................................................24

*Buttonwood Tree Value Partners, LP v. Sweeney*,
    2012 WL 2086607 (C.D. Cal. June 7, 2012) ................................................23

*Buttonwood Tree Value Partners LP v. Sweeney*,
    910 F. Supp. 2d 1199 (C.D. Cal. 2012) .........................................................20

*Citadel Equity Fund Ltd. v. Aquila, Inc.*,
    168 Fed. App'x 474 (2d Cir. 2006)................................................................2

*City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp.*,
    679 F.3d 64 (2d Cir. 2012) ..........................................................................23

*Deephaven Private Placement Trading, Ltd. v. Grant Thornton LLP*,
    454 F.3d 1168 (10th Cir. 2006) ..............................................................26, 27

*Dejesus v. HF Mgmt. Servs., LLC*,
    726 F.3d 85 (2d Cir. 2013)............................................................................7

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)......................................................................................9

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
    375 F.3d 168 (2d Cir. 2004).........................................................................29

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011) ...................................................................24, 27

*Fait v. Regions Fin. Corp.*,
    712 F. Supp. 2d 117 (S.D.N.Y. 2010)..........................................................24

*Gould v. Winstar Commc'ns, Inc.*,
    692 F.3d 148 (2d Cir. 2012)..........................................................20, 21, 22, 28

*Hanson v. Frazer, LLP*,
   2013 WL 5372749 (S.D.N.Y. Sept. 24, 2013).........................................................................3

*In re Adelphia Commc'ns. Corp. Sec. and Derivative Litig.*,
   2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007).......................................................................26

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)........................................................................7, 25, 27

*In re China Organic Sec. Litig.*,
   2013 WL 5434637 (S.D.N.Y. Sept. 30, 2013).........................................................................3

*In re China Valves Tech. Sec. Litig.*,
   __ F. Supp. 2d __, 2013 WL 5708570 (S.D.N.Y. Oct. 21, 2013)......................................2, 23

*In re ChinaCast Educ. Corp. Sec. Litig.*,
   2012 WL 6136746 (C.D. Cal. Dec. 7, 2012) .................................................................6, 7, 12

*In re ChinaCast Educ. Corp. Sec. Litig.*,
   No. 12-cv-04621, Dkt. 51 (filed Nov. 12, 2012) ..................................................................12

*In re Doral Fin. Corp. Sec. Litig.*,
   563 F. Supp. 2d 461 (S.D.N.Y. 2008), *aff'd*, *W. Va. Inv. Mgmt. Bd. v. Doral Fin.
   Corp.*, 344 Fed. App'x 717 (2d Cir. 2009) .........................................................................11

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
   540 F. Supp. 2d 800 (S.D. Tex. 2007) ............................................................................26, 28

*In re Fannie Mae 2008 Sec. Litig.*,
   742 F. Supp. 2d 382 (S.D.N.Y. 2010).................................................................................16

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005)....................................................................................7

*In re Lehman Bros. Sec. and ERISA Litig.*,
   799 F. Supp. 2d 258 (S.D.N.Y. 2011).................................................................2, 9, 16, 23

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
   910 F. Supp. 2d 561 (S.D.N.Y. 2012) ("*Longtop I*")..................................................... passim

*In re Longtop Fin. Techs. Ltd.*,
   939 F. Supp. 2d 360 (S.D.N.Y. 2013) ("*Longtop II*") ................................................... passim

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006)...................................................................................18

*In re Merkin*,
   817 F. Supp. 2d 346 (S.D.N.Y. 2011)...................................................................................21

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   273 F. Supp. 2d 351 (S.D.N.Y. 2003) ................................................................24

*In re Philip Servs. Corp. Sec. Litig.*,
   383 F. Supp. 2d 463 (S.D.N.Y. 2004) ................................................................22

*In re Stone & Webster, Inc., Sec. Litig.*,
   253 F. Supp. 2d 102 (D. Mass. 2003) ................................................................27

*In re Tremont Sec. Law, State Law and Ins. Litig.*,
   703 F. Supp. 2d 362 (S.D.N.Y. 2010) ................................................................14

*In re Winstar Commc'ns*,
   2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ......................................................21

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
   822 F. Supp. 2d 368 (S.D.N.Y. 2011) ...........................................................28, 29

*Iowa Public Employee's Retirement System v. Deloitte & Touche LLP*,
   919 F. Supp. 2d 321 (S.D.N.Y. 2013) ................................................................14

*Janus Capital Group, Inc. v. First Derivative Traders*,
   131 S. Ct. 2296 (2011) ...............................................................................22, 27

*Lattanzio v. Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007) ..............................................................................22

*Meridian Horizon Fund, LP v. KPMG (Cayman)*,
   487 F. App'x 636 (2d Cir. 2012) ................................................................. passim

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ..............................................................................12

*Oaktree Capital Mgmt., L.P. v. KPMG*,
   __ F. Supp. 2d __ , 2013 WL 4006437 (D. Nev. Aug. 5, 2013) .................16, 24, 27

*Perry v. Duoyuan Printing, Inc.*,
   No. 10 Civ. 7235(GBD), 2013 WL 4505199 (S.D.N.Y. Aug. 22, 2013) ............3, 23

*Reiger v. PricewaterhouseCoopers LLP*,
   117 F. Supp. 2d 1003 (S.D. Cal. 2000) ............................................................9, 12

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ................................................................................7

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000) ............................................................................9, 12

*Saltz v. First Frontier, LP*,
   782 F. Supp. 2d 61 (S.D.N.Y. 2010), *aff'd*, 485 F. App'x 461 (2d Cir. 2012) ......................19

*South Cherry Street, LLC v. Hennessee Group LLC*,
   573 F.3d 98 (2d Cir. 2009) ..............................................................................................12, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ..........................................................................................................8, 9

*United States v. Botefuhr*,
   309 F.3d 1263 (10th Cir. 2002) ............................................................................................30

*Vladimir v. Deloitte & Touche LLP*,
   1997 WL 151330 (S.D.N.Y. Mar. 31, 1997) ........................................................................17

STATUTES

15 U.S.C. § 78aa .......................................................................................................................30

15 U.S.C. § 78u-4(a)(1) ...............................................................................................................8

15 U.S.C. § 78u-4(b)(1) ...............................................................................................................8

15 U.S.C. § 78u–4(b)(2) ...............................................................................................................8

28 U.S.C. § 1367 ........................................................................................................................30

N.Y. Civ. Prac. Law § 302 ..........................................................................................................30

15 U.S.C. § 78r(a) ......................................................................................................................24

OTHER AUTHORITIES

17 C.F.R. § 240.13a-13(d) ...........................................................................................................27

Harold S. Bloomenthal & Samuel Wolff, 2 *Sec. Law Handbook* § 26:54 ....................................25

SEC Form 10-Q General Instructions § F, *available at*
   http://www.sec.gov/about/forms/form10-q.pdf. .................................................................27

Defendant Deloitte Touche Tohmatsu CPA Ltd. ("DTTC"), by its attorneys, respectfully submits this memorandum in support of its motion to dismiss the First Amended Complaint (the "Complaint" or "FAC") (attached as Ex. 1 to the Declaration of Gary Bendinger ("Bendinger Decl.")) as to DTTC with prejudice.

## PRELIMINARY STATEMENT

This case is nothing more than an attempt to blame auditors for a collusive management fraud that was concealed from both the auditors and the company itself.  Plaintiffs' Complaint alleges that a fraud was perpetrated by a primary wrongdoer, Ron Chan, the Chief Executive Officer of ChinaCast Education Corporation, Inc. ("ChinaCast" or the "Company"), in collusion with other high-ranking members of management, including the Company's Chief Financial Officer, Chief Accounting Officer and President International.

By Plaintiffs' own allegations, Mr. Chan and his C-Suite co-conspirators excelled in concealing the fraud.  Plaintiffs are sophisticated investors, yet did not unearth the fraud—even though two of the Plaintiff hedge funds had a representative on ChinaCast's board who served on the Audit Committee and had direct access to the Company and its management.  ChinaCast's independent directors, even after hiring a forensic accounting firm to conduct an independent review of the Company's cash balances, also did not find the fraud.  Plaintiffs now claim that these very "cash balances" were the focus of management's fraud and where DTTC, ChinaCast's auditor, should have discovered the fraud.

It is thus no surprise that DTTC also did not uncover management's scheme.  Indeed, in April 2012, when Mr. Chan's "questionable activities" came to light, the Company acknowledged in a public filing signed by one of the Plaintiffs here that Mr. Chan's "possible illegal conduct … may have led to the *frustration of the audit* of the Company's financial

statements."[1]  In the same filing, the Company acknowledged that Mr. Chan, as part of his

coverup, had "refused to provide the necessary financial information" to DTTC.  Plaintiffs' own

allegations and the record before the Court on the instant motion compel the conclusion that Mr.

Chan and his accomplices concealed their fraud from DTTC and others alike and that DTTC in

no way intended to aid in that fraud.

Any fraud claim against an auditor is subject to "especially stringent" pleading standards

that exceed those that apply to a company.  *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d

372, 450 (S.D.N.Y. 2010).  Here, that legal framework has special significance.  Another federal

court already has dismissed similar fraud claims against the Company and its independent

directors who did not uncover the fraud, even though they had more access to information than

DTTC did.  Where scienter cannot be alleged against the Company, it follows that Plaintiffs

cannot meet the demanding standard for pleading scienter against ChinaCast's auditor.

Plaintiffs' claims against DTTC thus fail in several critical respects.  Plaintiffs' claims

under Section 10(b) of the Securities Exchange Act and Rule 10b-5 require factual allegations

that the auditor's alleged misconduct "approximate[d] an actual intent to aid in the fraud."

*Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636, 640-41 (2d Cir. 2012)

(quotation omitted)), which the Complaint here fails to allege.  Moreover, each of DTTC's

statements at issue here are *opinions*, and therefore Plaintiffs must allege that DTTC did not

honestly hold its stated opinions.  *E.g.*, *In re Lehman Bros. Sec. and ERISA Litig.*, 799 F. Supp.

2d 258, 299-304 (S.D.N.Y. 2011).  Plaintiffs do not even attempt to do so here.[2]

---

[1] 4/2/2012 ChinaCast Form 8-K at Ex. 99.1 ("4/2/2012 ChinaCast Form 8-K") (emphasis added) (attached as Ex. 2 to Bendinger Decl.).  The Court may consider SEC filings in ruling on this motion to dismiss.  *See Citadel Equity Fund Ltd. v. Aquila, Inc.*, 168 Fed. App'x 474, 476 (2d Cir. 2006).

[2] In these respects, the Complaint is no different from numerous other claims asserted against auditors of Chinese companies that Judges in this District have dismissed.  *See, e.g.*, *In re China Valves Tech. Sec. Litig.*, __ F. Supp. 2d __, 2013 WL 5708570 at *10 (S.D.N.Y. Oct. 21, 2013); *In re Longtop Fin. Techs. Ltd.*, 939 F. Supp. 2d 360, 378

Plaintiffs' claim under Section 18 of the Exchange Act fares no better.  Section 18 claims are rarely brought against auditors, and even then routinely fail.  Under Section 18, plaintiffs need not plead scienter as an initial matter (though good faith is a defense), but they are required to plead actual, "eyeball" reliance on a false statement by the defendant.  Here, Plaintiffs have failed to do this.  Indeed, in carefully listing the statements on which they purportedly had relied for Section 18 purposes, Plaintiffs omit *any statement actually made by DTTC*.  Instead, Plaintiffs allege only that they relied on statements by the Company—which are not attributable to DTTC under long-standing precedent.  *Infra*, pp. 25-26 (citing cases).  And, again, Plaintiffs have failed to allege facts showing that DTTC did not honestly hold the opinions stated in its audit opinions.  Plaintiffs also have failed to allege any facts to establish reliance.

Plaintiffs' common law fraud claims fail for the same reasons.  And, in any event, the Court will lack jurisdiction over those claims once the federal claims are dismissed.

## BACKGROUND

ChinaCast is an educational services provider that has been "providing post-secondary education and e-learning services … in China" since 2000.  FAC ¶¶ 2, 41.  The Company provides "satellite interactive distance learning" services to universities, K-12 schools, and IT and management training centers in China.  *Id.* ¶¶ 42-43.  Starting in 2008, the Company also operated "bricks and mortar" universities.  *Id.* ¶¶ 4, 47-50.  There are no allegations that ChinaCast was a "sham" company without operations.  To the contrary, Plaintiffs allege that ChinaCast was a "real" company that fell victim to embezzlement by the former CEO and his co-conspirators, and some of the Plaintiffs themselves continue to work for ChinaCast today.

---

(S.D.N.Y. 2013) ("*Longtop II*"); *Perry v. Duoyuan Printing, Inc.*, 2013 WL 4505199, at *4-8 (S.D.N.Y. Aug. 22, 2013); *In re China Organic Sec. Litig.*, 2013 WL 5434637, at *6-10 (S.D.N.Y. Sept. 30, 2013); *Hanson v. Frazer, LLP*, 2013 WL 5372749, at *4-8 (S.D.N.Y. Sept. 24, 2013).

DTTC issued audit opinions on ChinaCast's financial statements for fiscal years 2007, 2008, 2009, and 2010, as well as opinions regarding ChinaCast's internal controls over financial reporting for fiscal years 2008, 2009, and 2010.  FAC ¶¶ 56-57, 70-71, 85-86, 109-10; 3/16/2011 ChinaCast Form 10-K at 46 ("2010 Form 10-K") (attached as Ex. 3 to Bendinger Decl.). ChinaCast included these opinions in its annual reports on Form 10-K, which were filed with the SEC.  *Id.*  Each of DTTC's audit opinions stated that DTTC "conducted [its] audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)," that DTTC "believe[d] that [its] audits provide a reasonable basis for [its] opinion," and that, "[i]n [DTTC's] opinion," ChinaCast's "consolidated financial statements present fairly, in all material respects, the financial position of the Company."[3]  Far from turning a blind eye to potential issues at ChinaCast, DTTC alerted investors that material weaknesses existed in ChinaCast's internal controls as of year-end 2010, *i.e.*, a "[l]ack of sufficient skilled resources in the finance team to meet the demands of rapidly expanded businesses" and "[l]ack of contemporaneous documentation of certain decisions made by the Board of Directors."[4]

In 2011, ChinaCast director Ned Sherwood initiated a proxy battle with ChinaCast management, then led by CEO Ron Chan.[5]  Mr. Sherwood, though not a plaintiff here, directs or controls multiple Plaintiff funds, served on ChinaCast's board as the designee of two other

---

[3] 3/31/2008 ChinaCast Form 10-KSB ("2007 Form 10-K") (attached as Ex. 4 to Bendinger Decl.) at F-2; 3/16/2009 ChinaCast Form 10-K ("2008 Form 10-K") (attached as Ex. 5 to Bendinger Decl.) at F-2; 3/29/2010 ChinaCast Form 10-K ("2009 Form 10-K") (attached as Ex. 6 to Bendinger Decl.) at F-2; 2010 Form 10-K at F-2.

[4] 2010 Form 10-K at 46.  In September 2012, DTTC noted a third material weakness:  insufficient controls to ensure appropriate accounting for a prepaid service fee.  2/24/2012 Form 10-K/A of ChinaCast ("2010 Form 10-KA") (attached as Ex. 7 to Bendinger Decl.) at 40.

[5] *See* 12/9/2011 ChinaCast Schedule 14A Information (attached as Ex. 8 to Bendinger Decl.) at Ex. 1; 12/28/2011 ChinaCast Schedule 14A Information (attached as Ex. 9 to Bendinger Decl.); 1/4/2012 ChinaCast Schedule 14A Information (attached as Ex. 10 to Bendinger Decl.).

Plaintiff funds, and was a member of ChinaCast's Audit Committee.[6]  In January 2012, Mr.

Sherwood won election for himself and three other directors to the ChinaCast Board over Mr.

Chan's opposition, and Plaintiff Douglas Woodrum then was appointed by Plaintiff funds to

replace Mr. Sherwood as their board designee.[7]  In March 2012, with new directors in place, the

Board removed Mr. Chan, FAC ¶ 173, and the CFO (one of Mr. Chan's alleged co-conspirators)

resigned immediately thereafter.  Following the CFO's resignation, the Board appointed Plaintiff

Woodrum to serve as CFO—a position he holds to this day.[8]

In April 2012, the Company—under new management—disclosed that it had "uncovered

questionable activities and transactions" by Mr. Chan and other senior officers.  FAC ¶ 174

(quoting 4/2/2012 Form 8-K at Ex. 99.1).  Before the proxy fight, Mr. Chan had "absolute

control over the company," FAC ¶¶ 189, 193, including control of certain other officers and

directors, including the Company's then-CFO and the ostensibly independent director who

served as the SEC-required financial expert on the Company's audit committee, each of whom

had sworn a "loyalty pledge" to Mr. Chan.  FAC ¶¶ 189, 190-93 (listing individuals).

Mr. Chan and his accomplices had engaged in a collusive fraud to embezzle funds from

the Company.  FAC ¶¶ 177-79, 181-82.  As the Company disclosed, Mr. Chan's illegal contact

"may have led to the frustration of the audit of the Company's financial statements," and

included a "refus[al] to provide the necessary financial information so as to allow the Company's

---

[6] ChinaCast's 2010 proxy discloses, for example, that the shares held by ZS EDU L.P. are beneficially owned by Mr. Sherwood, that the shares owned by MRMP Managers LLC are for the benefit of Mr. Sherwood's children, and that Mr. Sherwood was the board designee of Plaintiff Fir Tree funds.  *See* 11/15/2011 Schedule 14 A Information (attached as Ex. 11 to Bendinger Decl.) at 5.

[7] 1/27/2012 ChinaCast Form 8-K (attached as Ex. 12 to Bendinger Decl.).

[8] 4/2/2012 ChinaCast Form 8-K.

auditors (Deloitte) access to the Shanghai offices in order to complete their field work."[9]  Even

after the discovery of the fraud, ChinaCast's directors "reiterate[d] that [ChinaCast] is a strong

company with great assets,"[10] and ChinaCast's directors continued to retain DTTC for more than

a year, not dismissing DTTC until *after* the Amended Complaint was filed in this case.[11]

Following the Company's disclosures, share prices declined.  FAC ¶ 172, 180, 183-84.

In May 2012, a class action lawsuit—in which Plaintiffs in this case were members of the

putative class—alleging federal securities laws violations was filed against, among others,

ChinaCast, Mr. Sherwood, and certain other directors (but not DTTC).  *In re ChinaCast Educ.

Corp. Sec. Litig.*, 2012 WL 6136746 (C.D. Ca. Dec. 7, 2012).  The complaint alleged that the

individual defendants had been aware of "several 'red flags'" regarding ChinaCast's financial

situation and vulnerability to fraud, yet signed false financial statements in the Company's SEC

filings.  *Id.* *3 (Dec. 7, 2012).  The district court dismissed the claim against the Company and

the individual defendants with prejudice (under the less demanding pleading standard than that

applicable to auditors), holding that the plaintiffs could not allege scienter.  As the court

explained, the plaintiff shareholders could not meet their burden to "'allege specific facts

indicating a level of reckless disregard that strongly suggests actual intent.'"  *Id.* at *6 n.5.  And

the court found that failure "particularly problematic in this case because the misrepresentations

and omissions relied on by Plaintiffs relate to an illegal scheme that Chan and his coconspirators

successfully concealed."  *Id.* at *6.  The court noted that the independent directors had even

engaged in "additional due diligence" by retaining an outside consultant, FTI, "to perform an

---

[9] 4/2/2012 ChinaCast Form 8-K at Ex. 99.1.  Mr. Chan and his co-conspirators also "remov[ed] or destr[oyed] a
substantial portion of the financial documents that were located in the finance offices of the Company's Shanghai
headquarters," 5/14/2012 ChinaCast Form 8-K (attached as Ex. 13 to Bendinger Decl.), and they "forcibly entered
the Company's Shanghai office and stole some of the computers believed to be utilized by its finance department."
4/19/2012 ChinaCast Form 8-K (attached as Ex. 14 to Bendinger Decl.) at 2.

[10] 4/2/2012 ChinaCast Form 8-K at Ex. 99.1.

[11] 3/25/2013 ChinaCast Form 8-K (attached as Ex. 15 to Bendinger Decl.).

independent analysis" of ChinaCast's cash position before the fraud was revealed—and FTI had uncovered no material deficiencies.  *Id.* at *4, *6 n.5, *7 n.7.

In February 2013, almost a year after "new management" took over ChinaCast and after the Company, Mr. Sherwood, and other directors had secured a dismissal of claims against them, Plaintiffs filed this suit against DTTC.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. … Pleadings that contain no more than conclusions ... are not entitled to the assumption of truth otherwise applicable to complaints in the context of motions to dismiss."  *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87-88 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678-79) (internal citations and marks omitted).

Because all of Plaintiffs' claims against DTTC sound in fraud, the Complaint also must comply with Rule 9(b) and "state with particularity the circumstances constituting fraud."  *See Rombach v. Chang*, 355 F.3d 164, 170-71 (2d Cir. 2004) (Rule 9(b) applies to claims "premised on allegations of fraud," regardless of whether fraud is an element of the claim); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 483 n.45 (S.D.N.Y. 2005) (applying Rule 9(b) to Section 18 claim).[12]

Plaintiffs' federal claims also must satisfy the PSLRA's "[e]xacting pleading requirements"

---

[12] Plaintiffs' attempt to "disclaim any allegation that could be construed as alleging fraud" for purposes of their Section 18 claim, FAC ¶ 235, does not alter the applicable pleading requirements.  Plaintiffs' Section 18 allegations "contain those words and imputations 'classically associated' with fraud," *Alstom*, 406 F. Supp. 2d at 483 n.45— such as, that "Defendants made or caused to be made false and misleading statements…," FAC ¶ 239.  The claims are therefore subject to Rule 9(b), regardless of Plaintiffs' purported "disclaimer."  *See Rombach*, 355 F.3d at 172; *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp 2d 595, 635 (S.D.N.Y. 2005) ("Plaintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness.").

for federal securities fraud cases.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313

(2007).  Under the PSLRA, "any private action arising under [the Exchange] Act" alleging a false

statement, including Plaintiffs' Section 10(b) and Section 18 claims, must "specify each statement

alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information and belief, the complaint

shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(a)(1),

(b)(1).  As explained below, the Complaint fails to meet these standards.

## I.     THE COMPLAINT DOES NOT STATE A CLAIM UNDER SECTION 10(b).

To plead a violation of Section 10(b) and Rule 10b-5, plaintiffs must allege that the

defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in

connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that

plaintiffs' reliance was the proximate cause of their injury."  *Meridian*, 487 F. App'x at 640

(quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005)) (quotation marks

omitted).  Plaintiffs have failed to allege either that DTTC acted with scienter or that DTTC made

any material misstatement.  Each deficiency is independently fatal to Plaintiffs' claim.

### A.     The Complaint Does Not Allege With Particularity Facts Giving Rise To A Strong Inference of Scienter.

Plaintiffs' Complaint fails to plead adequately that DTTC acted with scienter, a "mental

state embracing intent to deceive, manipulate or defraud."  *Tellabs*, 551 U.S. at 319 (quoting

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  Under the PSLRA, Plaintiffs must

"state with particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind."  15 U.S.C. § 78u–4(b)(2).  A "strong inference of scienter" is one that is

"more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong

in light of other explanations."  *Tellabs*, 551 U.S. at 323-24.

8

As this Court and others have recognized, the standard for pleading scienter with respect to an independent auditor, such as DTTC, is particularly high:  "[F]or recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter," it must "'approximate an actual intent to aid in the fraud being perpetrated by the audited company.'"  *Meridian*, 487 F. App'x at 640-41 (quoting *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000)); *see also In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 574-75, 581 (S.D.N.Y. 2012) ("*Longtop I*") (dismissing 10b-5 claims against DTTC).  Allegations of negligence or even gross negligence are not enough.  *See Ernst & Ernst*, 425 U.S. at 193 n.12.  This is because of a "lack of rational economic incentive for an independent accountant to participate in fraud, the client's central role in providing information to the accountant, and the complex professional judgment required to perform an audit."  *Reiger v. PricewaterhouseCoopers LLP*, 117 F. Supp. 2d 1003, 1008 (S.D. Cal. 2000).  Thus, allegations that an auditor did not perform an audit in accordance with professional standards do not state a claim for fraud.  *Lehman Bros.*, 799 F. Supp. 2d at 300-01. Likewise, "allegations that a company violated GAAP in preparing its financial statements are not sufficient, in and of themselves, to state a claim" against an auditor.  *Id.* at 303.  Here, Plaintiffs have failed to plead the facts necessary under this demanding standard.

           **1.**       **The Most Compelling Inference To Be Drawn From The Complaint Is That DTTC Did Not Act With Fraudulent Intent.**

Plaintiffs do not allege that DTTC actually knew of Mr. Chan's fraud or any inaccuracies in ChinaCast's financial reports when it issued its audit opinions.  Nor do they allege that DTTC had any motive to participate in the fraud.  Instead, Plaintiffs' theory is that DTTC turned a blind eye to Mr. Chan's fraud.  This theory, however, does not support a compelling or cogent inference that DTTC's mental state ever approximated an actual intent to aid in any fraud.  *See Tellabs*, 551 U.S. at 314; *Meridian*, 487 F. App'x at 640-41.  The far more cogent inference is

that Mr. Chan and his confederates successfully concealed their fraud from DTTC, just as they

concealed it from ChinaCast's independent directors, their forensic investigator, and the

Company itself.

### a.   Allegations that company management concealed a fraud from the auditor are inconsistent with an inference of scienter.

As the Complaint and the Company's SEC filings make clear, ChinaCast's CEO, CFO,

Chief Accounting Officer, and others engaged in a collusive fraud that they went to great lengths

to conceal.  *See generally* FAC ¶¶ 174-82, 189-93.  The Complaint is replete with allegations

that the transactions that Plaintiffs contend DTTC "recklessly" ignored were successfully

concealed from the Company itself.  *See, e.g.*, ¶¶ 177-79 (describing undisclosed loans and other

transactions that occurred "without the board's knowledge" or "authorization"); ¶ 182

(describing transactions allegedly undertaken "without the knowledge or consent of the

Company," "without the knowledge or consent of the Board," and only "recently learned" of by

the Company).  Moreover, the Company's SEC filings indicate that Mr. Chan may have

"frustrated" DTTC's audit and that, even after the fraud was revealed, Mr. Chan and others

continued to take further steps to conceal the full scope of the fraud—by, for example,

preventing DTTC's access to documentation necessary to perform its 2011 audit, stealing

computers, and destroying Company documents.  *See supra* pp. 5-6.

As PCAOB standards expressly recognize, a collusive fraud—including one by a

company's senior management—can cause even a properly planned and performed audit not to

detect material misstatements in a company's financial statements:

> For example, auditing procedures may be ineffective for detecting an intentional
> misstatement that is concealed through collusion among personnel within the entity
> and third parties or among management or employees of the entity.  Collusion may
> cause the auditor who has properly performed the audit to conclude that evidence
> provided is persuasive when it is, in fact, false.  In addition, an audit conducted in
> accordance with generally accepted auditing standards rarely involves

> authentication of documentation, nor are auditors trained as or expected to be experts in such authentication.

AU ¶ 230.12 (attached as Ex. 16 to Bendinger Decl.); *accord* AU ¶ 316.09-12 (attached as Ex. 17 to Bendinger Decl.); *Longtop I*, at 575-76 & n.97.  Where an auditor's work has been frustrated by management fraud, an auditor simply does not have the requisite scienter.  *See*, *e.g.*, *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 465 (S.D.N.Y. 2008), *aff'd*, *W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 Fed. App'x 717, 720 (2d Cir. 2009) ("Again, the more compelling inference arising from this constellation of facts is that Doral deceived Pricewaterhouse …, rather than that Pricewaterhouse was reckless in its audits."); *see also Meridian*, 487 F. App'x at 641 ("[W]e agree with the district court that 'the more compelling inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his scheme and deceiving the SEC and other financial professionals.'").

> **b.**  **Where a company and directors who failed to uncover fraud lack scienter, an auditor cannot be held to have scienter based on a failure to uncover the same fraud.**

Mr. Chan's concealment was successful enough to dupe Company directors, including those who are or control Plaintiffs to this litigation.  Both Plaintiff Doug Woodrum, the Fir Tree Plaintiffs' current board designee (and later CFO), and Ned Sherwood, who is a partner of Plaintiffs ZS EDU L.P. and MRMP Managers LLC, and the former Fir Tree board designee, *signed* certain of the SEC filings that Plaintiffs now contend are misleading.  *See* FAC ¶¶ 107, 110 (alleging that 2009 Form 10-K and 2010 Forms 10-K and 10-K/A are misleading); 2010 Form 10-K/A at 57; 2010 Form 10-K at 74; 2009 Form 10-K at 70.  Moreover, the California district court rejected—with prejudice—a claim that ChinaCast and its directors were liable for failing to

identify the same alleged fraud that is at issue here, even though those defendants had the same or better access to Company information as DTTC.  *See ChinaCast*, 2012 WL 6136746, at *6-9.[13]

These facts are highly telling.  Courts assessing securities fraud claims hold that scienter is more easily pled against a company and its officers and directors than against the company's independent auditor.  For example, in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000), the Second Circuit explained that while plaintiffs may plead recklessness by alleging that company insiders "failed to review or check information that they had a duty to monitor," "several important limitations" apply to claims of recklessness by an independent auditor:  "[T]here are limits to the scope of liability for failure adequately to monitor the allegedly fraudulent behavior of others. Thus, the failure of a non-fiduciary accounting firm to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability."  *Id.* at 308-09.  And in *Rothman*, the Second Circuit held that plaintiffs successfully alleged scienter against a company, but that the same allegations could not support an inference of scienter by the company's auditor.  220 F.3d at 98; *see also, e.g.*, *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 114 (2d Cir. 2009) (distinguishing between claim against company insiders and claim against non-fiduciary consultant).

In short, "because an independent accountant often depends on its client to provide the information base for the audit, it is almost always more difficult to establish scienter on the part of the accountant than on the part of its client."  *Reiger*, 117 F. Supp. 2d at 1007-08.  That statement has dispositive force here, where the transactions at issue were successfully concealed

---

[13] *Accord* Defs. ChinaCast Educ. Corp. and its Independent Directors' Reply Memorandum of Points and Authorities in Further Support of Their Motion to Dismiss the Consolidated Class Action Complaint, *In re ChinaCast Sec. Litig.*, No. 12-cv-04621, Dkt. 51 (filed Nov. 12, 2012) (attached as Ex. 18 to Bendinger Decl.) at 4 ("[T]he Rogue Employees' illegal scheme was one that the Rogue Employees underlying actively sought to conceal.") (emphasis in original); *id.* at 12 ("[T]he most compelling inference is that the Independent Directors took steps to ensure the accuracy of ChinaCast's financial statements, but like FTI and Deloitte, ChinaCast's auditor, did not uncover the looting until after Chan's termination from the Company.").

from the Company itself and its directors—and another district court already has held that the Company did not have the requisite scienter to engage in fraud.

>    **2.      Allegations That DTTC Had "Access" To Information That Would Have Revealed The Fraud Are Insufficient To Create A Strong Inference Of Scienter.**

Much of Plaintiffs' Complaint rests on the theory that (1) if DTTC had "conduct[ed] even the most perfunctory audit," FAC ¶ 116, it would have uncovered evidence of the fraud from outside sources, and (2) DTTC therefore must have acted recklessly. Such claims "are an archetypical example of impermissible 'allegations of fraud by hindsight.'" *Meridian*, 487 F. App'x at 640 (quoting *Novak*, 216 F.3d at 309); *see also Longtop I*, 910 F. Supp. 2d at 575 (dismissing Section 10(b) claim advancing the theory that "had DTTC performed a better audit, it would have uncovered Longtop's fraud").

Plaintiffs' Complaint essentially proceeds as follows. First, Plaintiffs identify an alleged misrepresentation in ChinaCast's financial reports. *E.g.*, FAC ¶ 65 (alleging that representations in ChinaCast annual report "regarding term deposits and the absence of financial guarantees were blatantly false"). Plaintiffs then identify a particular audit procedure that, they speculate, "would have" revealed the fraud. *E.g.*, FAC ¶ 68 (encumbrances on the term deposits allegedly "would have been immediately apparent" if DTTC had reviewed "the actual instruments governing the term deposits"). From these premises, Plaintiffs conclude—without factual support—that DTTC must not have performed Plaintiffs' chosen audit procedure and therefore acted "recklessly" by not discovering the alleged inaccuracies in ChinaCast's financial statements. *E.g.*, FAC ¶ 68 ("Deloitte signed off on the Company's term deposit balances either knowing that the pledge agreements were not disclosed or recklessly failing to perform any actual independent audit of the term deposits"); *see also* FAC ¶¶ 74-77, 98-100, 126-29

(repeating similar allegations as to term deposits for later annual reports).[14]  These conclusory

assertions of "fraud by hindsight," routinely rejected by this and other courts, are insufficient.

In each instance, Plaintiffs allege that DTTC either knew *or* "recklessly" did *not* know of

the alleged inconsistency, thus admitting that they cannot allege *facts* to support an inference that

DTTC actually *knew* of the fraud.  Instead, Plaintiffs merely allege that DTTC had "access" to

relevant evidence.  That is fatal to Plaintiffs' claim:  "[M]erely alleging that the auditor had

*access* to the information by which it could have discovered the fraud is not sufficient."  *Longtop*

*II*, 939 F. Supp. 2d at 378 (emphasis added); *In re Tremont Sec. Law, State Law and Ins. Litig.*,

703 F. Supp. 2d 362, 370-71 (S.D.N.Y. 2010) (same).  "[A]uditor *access* is not tantamount to

auditor *awareness*."  *Iowa Public Employee's Retirement System v. Deloitte & Touche LLP*, 919

F. Supp. 2d 321, 332 (S.D.N.Y. 2013).

For example, Plaintiffs allege that DTTC's scienter is demonstrated because it did not

discover during its audit that, contrary to the Company's representation, ChinaCast used

undisclosed borrowed funds to pay for the acquisition of East Achieve college rather than paying

in cash, FAC ¶¶ 89-90, 94-96, and, in particular, that allegedly "the Company's bank statements

and accounts contain no evidence of any such [cash] payment."  FAC ¶ 187; *see also* FAC ¶¶ 81-

82, 89-92, 117-20, 186 (similar allegations in connection with acquisition of other universities).

But Plaintiffs do not allege that DTTC either was aware of this alleged absence of a cash

payment or was provided with any information that should have caused DTTC to look further.

And Plaintiffs' presumption that DTTC had access to all relevant information is worthless here,

where Plaintiffs allege that senior management of the Company was engaged in a massive cover-

up and *the Company itself* faced difficulties obtaining "bank record and legal documentation

---

[14] Plaintiffs advance analogous premises and unsupported conclusions in connection with a variety of purported misstatements in the Company's financial statements, including statements related to payment for a private share offering, FAC ¶¶ 113-15, and statements related to the Company's cash balance, FAC ¶¶ 130-32.

evidence" of allegedly fraudulent transactions even after the fraud had been revealed.  FAC ¶ 182.  Indeed, with respect to *this specific transaction*, the Company (and associated Plaintiffs) may not have become aware of it for months after the alleged fraud was discovered despite their then-unlimited access to ChinaCast records:  in his public report on the Company's investigation, some eight months after being appointed CFO, Plaintiff Doug Woodrum did not even identify the East Achieve transaction as an issue.  *Compare* FAC ¶ 187, *with* FAC ¶ 182 (citing 12/21/2012 ChinaCast 8-K, signed by Woodrum).

What is more, nearly all of the fraud schemes alleged in the Complaint concern misrepresentations of the Company's cash position—including cash balances, term deposits, cash payments, cash transactions represented in trial balances, and so on.  Yet DTTC is not the only independent entity that did not detect the fraud by review of the Company's cash position.  At certain Plaintiffs' request, the Company retained FTI Consulting "to perform an independent cash confirmation of its bank balances" in 2011.[15]  Yet despite being retained for the very purpose of examining the Company's cash position, FTI did not uncover the fraud.  The most compelling inference to be drawn is that Mr. Chan successfully concealed the fraud—from DTTC, FTI, the Company itself, and the Plaintiffs—not that DTTC engaged in any fraud.

### 3. Plaintiffs' Allegations That DTTC "Ignored" Three "Massive Red Flags" Do Not Support A Compelling And Cogent Inference That DTTC Acted With Scienter.

Plaintiffs also contend that DTTC ignored three specific purported "red flags" in conducting its audit of ChinaCast, relating to (1) trial balances, (2) share offering proceeds, and (3) transactions recorded in the bank accounts of Wintown and East Achieve colleges.  FAC

---

[15] 12/27/2011 ChinaCast Schedule 14A Information (attached as Ex. 19 to Bendinger Decl.) at 17.

¶¶ 158-60.  None of these purported "red flags" supports a finding that DTTC had scienter approximating an intent to aid in ChinaCast's fraud.[16]

*First*, Plaintiffs allege that DTTC ignored the "massive red flag" that the Company's "trial balances" for three years showed cash transactions involving a ChinaCast subsidiary (ChinaCast Technology (Shanghai) Limited ("CCT Shanghai")) and metal factories, pawn shops, and automobile part factories, which Plaintiffs contend are unrelated to CCT Shanghai's core mission of providing distance learning (*i.e.*, e-learning) services.  FAC ¶¶ 137-39, 158.  But the allegations do not establish any red flag, much less one of which DTTC was aware.

Critically, there is no allegation that DTTC actually saw each of the particular entries cited in the Complaint.  Auditors routinely review only a sample of transactions in conducting a proper audit.  *See* AU ¶ 350.07 (attached as Ex. 20 to Bendinger Decl.) ("the basic concept of sampling is well established in auditing practice").  Indeed, PCAOB standards specifically instruct auditors to "select" a sample of the audited company's journal entries for testing based on the auditor's "professional judgment."  AU ¶¶ 316.58(2), 316.61.  Here, Plaintiffs themselves acknowledge that the set of transactions they point to are no more than a "limited sample" of the transactions of CCT Shanghai, and allege no facts supporting an inference that DTTC was required to test the entries in their particular sample.  FAC ¶ 138.  The Complaint thus fails to allege that a proper audit conducted through sampling would have tested all or even most of the

---

[16] Plaintiffs attempt to spin these "red flags" as evidence that DTTC violated auditing standards by, *e.g.*, "failing to obtain even the most perfunctory audit evidence." FAC ¶¶ 157, 161, 169.  But Plaintiffs allege no specific facts supporting an inference that DTTC did not follow professional standards in conducting its 2007 through 2010 audits.  "[P]laintiffs must do more than simply recite a GAAS rule or procedure, claim that defendants failed to follow that rule, and point to adverse results down the road.  Plaintiffs must make specific allegations about the steps an auditor took, the way in which it planned its audit, and the procedures it employed."  *Oaktree Capital Mgmt., L.P. v. KPMG*, __ F. Supp. 2d, __, 2013 WL 4006437, at *20  (D. Nev. Aug. 5, 2013) (citation omitted).  Conclusory allegations of violations of audit standards—unsupported by facts—are inadequate to create an inference of scienter.  *E.g., Lehman Bros.*, 799 F. Supp. 2d at 300-01 & n.291 (allegation that auditor violated requirement to "adequately plan" did not support allegation that audit opinion was false when complaint did not "identify any planning deficiencies or, for that matter, what planning [the auditor] did that allegedly was insufficient"); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 412-13 (S.D.N.Y. 2010) (dismissing claim when plaintiff "fail[ed] to plead facts supporting a conclusion that Deloitte fraudulently violated GAAS").

"limited sample" of transactions that Plaintiffs point to. *See Vladimir v. Deloitte & Touche LLP*, 1997 WL 151330, at *8 (S.D.N.Y. Mar. 31, 1997) ("as an auditor is not required to make an examination of every record in the company's possession, these circumstances would not necessarily become apparent in a properly performed audit, and thus do not constitute allegations of fact showing Deloitte's notice and opportunity to commit fraud or strong circumstantial evidence of conscious misbehavior or recklessness") (citation omitted).  In this respect, what DTTC was required to review was quite different than what a *forensic* audit or investigation would review, so it is not a surprise—much less an indicator of fraud—that the Company's investigation, which *did* include a forensic audit, *see* 7/30/2012 ChinaCast Form 8-K (attached as Ex. 21 to Bendinger Decl.), unearthed facts of which DTTC was *unaware*.  Indeed, even the Company's prior forensic audit by FTI—which was focused squarely on the Company's cash balances—did not identify any issues with respect to these cash transfers.

Moreover, the Complaint alleges no facts to establish that they were "red flags" in any event.  CCT Shanghai's business involved, among other things "the provision of technical services, … equipment or property leasing, … and system maintenance."  2010 Form 10-K/A at F-13.  Indeed, ChinaCast itself provided customers with "all the hardware" necessary to set up a satellite-based distance learning infrastructure.  *See, e.g.*, 2010 Form 10-K/A at 3.  Thus, a reasonable auditor could have concluded (for example) that a transaction involving a metal factory pertained to the manufacture of that "hardware" and that leased "equipment."  *See* FAC ¶¶ 141-45.  Similarly, ChinaCast operated several hundred vocational and job skills training centers.  2010 Form 10-K/A at 3.  Accordingly, a reasonable auditor could have concluded that ChinaCast's vocational programs required supplies from a wide variety of vendors.  *See, e.g.*, FAC ¶¶ 139 (manufacturer of parts for internal combustion engines), 146 (resale shop).

At the end of the day, Plaintiffs' claims require one to misconstrue the scope of an independent auditor's responsibility. Plaintiffs suggest that the trial balances demonstrate that the assertion in ChinaCast's 2010 Form 10-K that CCT "does not perform any activities or have any operations outside the scope of" satellite business was misleading, and that this assertion was supposedly "certified" by DTTC. FAC ¶ 135. But that assertion, which appears at page 10 of the 2010 Form 10-K, is not even included in the Company's *financial statements—i.e.*, the only piece of ChinaCast's Form 10-K as to which DTTC expressed any opinion. Thus, any error in ChinaCast's description of the scope of CCT Shanghai's business is not a basis for holding DTTC liable for securities fraud. *See In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 478 (S.D.N.Y. 2006) ("liability may not generally attach to a public auditor for unaudited public statements the company made") (quoting *In re The Warnaco Group, Inc. Sec. Litig.*, 388 F. Supp. 2d 307, 314 (S.D.N.Y. 2005)).

*Second*, Plaintiffs allege that DTTC "ignored the massive red flag presented by the fact that the cash proceeds of the Company's December 2009 share offering were wired to a Hong Kong subsidiary that was not majority-owned by the Company." FAC ¶ 159. But the Complaint's self-serving description omits material facts contained in documents publicly filed with the SEC refuting any potential inference of DTTC scienter. A 2004 filing[17] disclosed that CCT HK was partially owned by Mr. Chan, but that such ownership was *in trust for ChinaCast Technology (BVI) Limited*, ChinaCast's principal subsidiary, FAC ¶ 46. This ownership was fully disclosed to the public, as well as ChinaCast's directors, but none was tipped off by it to Mr. Chan's fraud. Therefore, "[l]ike [ChinaCast's directors] and the investing public, DTTC could have reasonably concluded that [CCT HK] was precisely what" it was presented as in the

---

[17] 9/22/2004 Form ARS of ChinaCast Communication Holdings Ltd. at 63 (excerpts attached as Ex. 22 to Bendinger Decl.).

financial statements:  majority-owned by ChinaCast.  *Longtop I*, 910 F. Supp. 2d at 577.  "This

raises the inference that these purported red flags are in fact red herrings."  *Id.*; *see also*

*Meridian*, 487 F. App'x at 640-41; *Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 72 (S.D.N.Y.

2010) ("inference of scienter based on publicly available red flags is simply not as cogent and

compelling as the opposing inference of nonfraudulent intent"), *aff'd*, 485 F. App'x 461 (2d Cir.

2012).

> *Third*, Plaintiffs allege that DTTC ignored a red flag presented by "hundreds of

transactions unrelated to university billing and collection that were recorded in bank accounts

used by the Company's Wintown and East Achieve Colleges."  FAC ¶ 160.  However, Plaintiffs

allege no facts to support the notion that the existence of "hundreds"—out of an unspecified total

number—of transactions for purposes other than billing and collection in the bank accounts of

two colleges "'would place a reasonable auditor on notice that the audited company was engaged

in wrongdoing to the detriment of its investors.'"  *Longtop II*, 939 F. Supp. 2d at 378.  Nor do

Plaintiffs allege that DTTC actually was aware of these transactions, as opposed to having

"access" to the information.  And finally, Plaintiffs do not allege that the transactions did not

occur, but rather that DTTC somehow should have known that the transactions were "unusual,"

without specifying how or why DTTC was supposed to be concerned that the Company had

engaged in a "substantial number of transactions with unrelated third parties."  FAC ¶ 124.

### 4.    Plaintiffs' Allegations Are The Antithesis Of "No Audit At All."

> Plaintiffs ultimately resort to the conclusory allegation that DTTC demonstrated

recklessness by performing "***no audit*** at all," FAC ¶ 188, but that conclusion is demonstrably

wrong.[18]  The Complaint and the Company's SEC filings confirm that DTTC did the opposite of

---

[18] Plaintiffs' claim that DTTC's audits amounted to "no audit at all" also is inconsistent with the conduct of their
then-Board designee, Mr. Sherwood.  As a member of ChinaCast's Audit Committee, Mr. Sherwood was

turning a blind eye to issues at ChinaCast.  For instance, the Complaint alleges that where DTTC was aware of accounting issues, it "made clear that those [issues] needed to be addressed before DTTC could approve the filings."  FAC ¶ 53.  Moreover, DTTC performed a sufficient audit to identify material weaknesses in the Company's internal controls.  2010 Form 10-K at 46.  And when DTTC identified those material weaknesses, it did not conceal them, but expressly disclosed them in an opinion submitted with the Company's SEC filings.  *Id.*  Indeed, the Company's own statements indicate that DTTC actually performed an audit that "may have [been] frustrate[ed]" by the efforts of Ron Chan and others.[19]  Thus, the Complaint alleges not only that DTTC in fact did engage in audit work, but that it alerted the Company, the Board, the SEC, and investing public of issues identified from that work.  There is no reason to think that DTTC would at certain times raise questions about the Company, but at others deliberately ignore a management fraud.  *See, e.g.*, *Buttonwood Tree Value Partners LP v. Sweeney*, 910 F. Supp. 2d 1199, 1207 (C.D. Cal. 2012).  At most Plaintiffs have attempted to piece together allegations of a deficient audit based solely on allegations that the financial statements contained alleged misrepresentations that DTTC supposedly "could have" detected.  Such hindsight-based allegations are not the hallmarks of "no audit at all."

The case on which Plaintiffs have primarily relied in their pre-motion letter—*Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 160 (2d Cir. 2012)—is not to the contrary.  Indeed, the contrast between Plaintiffs' allegations here and the evidence of scienter in *Gould* is striking.  In *Gould*, the Second Circuit recited extensive evidence that the auditor "learned of and advised

---

responsible for overseeing ChinaCast's audit process.  Plaintiffs' silence on any contemporaneous concerns of Mr. Sherwood is telling—certainly he did not conclude that DTTC was performing "no audit at all."  To the contrary, Mr. Sherwood publicly recommended as late as December 2011 that the shareholders reappoint DTTC as the Company's auditors.  12/21/2011 ChinaCast Schedule 14A at 8 (attached as Ex. 23 to Bendinger Decl.).

[19] 4/2/2012 ChinaCast Form 8-K at Ex. 99.1.

against the use of indisputably deceptive accounting schemes, but eventually *acquiesced* in the schemes by issuing an unqualified audit opinion." *Id.* at 160 (emphasis added).  That evidence—that the auditor actually knew of Winstar's deceptions, rather than having been duped by the efforts of company insiders to conceal them—distinguishes *Gould* from this case.  As the district court put it in *Gould*, "[h]ad the complaint revealed that Winstar insiders took action to conceal the allegedly fraudulent transactions and that [the auditor] failed to detect and disclose the fraud, scienter would not be established." *In re Winstar Commc'ns*, 2006 WL 473885, at *12 (S.D.N.Y. Feb. 27, 2006).  *See also Longtop II*, 939 F. Supp. 2d at 382 ("this case is distinguishable from *Gould*, where the auditor defendant knew that the audited company had committed serious accounting violations, but nevertheless issued clean audit opinions").  Here, unlike *Gould*, Plaintiffs have alleged no facts showing that DTTC knew of and ignored any deception by ChinaCast management.  To the contrary, where DTTC was aware of a problem, it insisted that accounting deficiencies be addressed before it submitted a clean audit opinion, FAC ¶ 53, and publicly identified material weaknesses in ChinaCast's internal controls, 2010 Form 10-K at 46.

In the end, Plaintiffs' claim is that DTTC should have done more as part of its audit.  Such allegations "are nothing more than an effort to recast negligence allegations as allegations of fraud" and are insufficient to state a Rule 10b-5 claim, and should be rejected.  *In re Merkin*, 817 F. Supp. 2d 346, 358 (S.D.N.Y. 2011); *see South Cherry Street*, 573 F.3d at 112 (2d Cir. 2009) (rejecting allegations that "if" defendant "had asked various questions earlier," it "would have" learned the truth).

### B.     The Complaint Does Not Allege An Actionable Misrepresentation By DTTC.

Plaintiffs' Section 10(b) claim also fails because Plaintiffs have not alleged that DTTC made a misrepresentation.  DTTC cannot be held liable for ChinaCast's alleged misrepresentations because, as a matter of settled law, DTTC did not "make" those statements.

And the statements DTTC did make—its audit opinions—are strictly *opinions*, which can be deemed false only if DTTC did not believe them at the time they were made.  Plaintiffs allege no facts to support such a conclusion.

First, the only statements DTTC is alleged to have made are its audit opinions included in ChinaCast's 2007, 2008, 2009, and 2010 annual reports.  As a matter of law, only these statements—and not *the Company's* statements in its SEC filings—can support any claim against DTTC.  *See Gould*, 692 F.3d at 160 n.11 (2d Cir. 2013) (only auditor's audit opinion "forms the basis for its liability under Section 10(b)"); *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 154 (2d Cir. 2007); *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 472 n.5 (S.D.N.Y. 2004) (auditor "can be held liable under Section 10(b) only for its own misrepresentations concerning [the defendant's] financial statements").  This is fully consistent with the Supreme Court's recent pronouncement that only those who actually *make* a statement can be liable for it—*i.e.*, for company filings, the company itself and whoever signed it.  *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011) (assisting with the preparation of SEC filings does not constitute "making" a statement within the meaning of Section 10(b)).

Plaintiffs thus must allege that DTTC's audit opinions themselves are misstatements, but they cannot do so here.  In its opinions, DTTC stated that it "conducted [its] audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)" and that DTTC "believe[d] that [its] audits provide a reasonable basis for [its] opinion."[20]  DTTC stated that "*[i]n [its] opinion*" ChinaCast's financial statements "present fairly, in all material respects, the financial position of the Company… in conformity with accounting principles generally

---

[20] 2007 Form 10-K at F-2; 2008 Form 10-K at F-2; 2009 Form 10-K at F-2; 2010 Form 10-K at F-2.

accepted in the United States of America."[21]  Plaintiffs now allege that those audit opinions were false because "ChinaCast's financial statements for fiscal years 2007 through 2010 were materially misstated and were not presented in conformity with GAAP."  FAC ¶ 52.

DTTC's audit opinions are the end-product of countless professional judgments and subjective assessments, including what audit procedures should be performed under the facts and circumstances, how those audit procedures should be designed and tailored to the audit client, whether the audit evidence obtained is sufficient and what conclusions should be drawn from the evidence obtained during the audit.  *Lehman Bros.*, 799 F. Supp. 2d at 299-304; PCAOB Auditing Standard AU 230 at ¶ 230.11 (describing auditors' exercise of "judgment regarding [] the areas to be tested and the nature, timing, and extent of the tests to be performed," as well as "in interpreting the results of audit testing and evaluating audit evidence").  They are, therefore, properly analyzed as opinions for purposes of determining whether they are misstatements under the federal securities laws, as numerous courts here and elsewhere have held in recent years.  *See*, *e.g.*, *Longtop I*, 910 F. Supp. 2d at 580 (determining that audit opinions were in fact opinions); *Lehman Bros.*, 799 F. Supp. 2d at 299-304 (same); *see also China Valves*, 2013 WL 5708570 at *10; *Duoyuan Printing*, 2013 WL 4505199 at *5; *Buttonwood Tree Value Partners, LP v. Sweeney*, 2012 WL 2086607, at *2 (C.D. Cal. June 7, 2012) ("An auditor's report is a statement of professional opinion, not fact.").

The Second Circuit recently reaffirmed that a fraud claim based on supposed misstatement in an opinion requires factual allegations that "plausibly allege that defendants did not believe the statements … at the time they made them."  *City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67 (2d Cir. 2012) (management's estimates of

---

[21] *Id.* (emphasis added).

goodwill were a matter of opinion) (quoting *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 112 (2d Cir. 2011)); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 372 (S.D.N.Y. 2003) ("the only challenge that may be made to a statement of opinion is that the speaker did not actually hold the opinion"); *Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003) ("Plaintiffs who charge that a statement of opinion, including a fairness opinion, is materially misleading, must allege 'with particularity' 'provable facts' to demonstrate that the statement of opinion is both objectively and subjectively false.") (quoting *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1093-98 (1991)); *see also Fait v. Regions Fin. Corp.*, 712 F. Supp. 2d 117, 125 n.55 (S.D.N.Y. 2010) (citing "abundant case law in this Circuit" that statements of opinion constitute actionable misrepresentations only if they are subjectively false), *aff'd*, 655 F.3d 105.

Here, there are no allegations that DTTC did not actually believe the opinions expressed in its audit opinions.  Although Plaintiffs generally allege that DTTC should have conducted its audit differently, and would have reached a different opinion if it had done so, those allegations are insufficient.  *See Oaktree Capital Mgmt.*, 2013 WL 4006437, at *20 ("Allegations in the form of 'had defendant auditor done x, they would have unveiled y, and because the court can infer that y occurred from a, b, and c, defendant must not have done x' have been specifically rejected by a number of courts.").  In short, Plaintiffs do not and cannot allege that DTTC did not believe the opinions it actually expressed.  Thus, Plaintiffs' Section 10(b) claim must be dismissed.

## II.   THE COMPLAINT DOES NOT STATE A CLAIM UNDER SECTION 18.

Plaintiffs also attempt to assert a claim against DTTC under Section 18 of the Exchange Act, 15 U.S.C. § 78r(a).  To state a claim under Section 18, a plaintiff must plead that (1) a false or misleading statement was contained in a document filed pursuant to the Exchange Act, (2) defendant made or caused to be made the false or misleading statement; (3) plaintiff relied on

the false statement, and (4) the reliance caused loss to the plaintiff.  *Alstom*, 406 F. Supp. at 478

(S.D.N.Y. 2005).  Section 18 claims are rare, perhaps because it has been deemed "largely an

ineffective remedy," Harold S. Bloomenthal & Samuel Wolff, 2 *Sec. Law Handbook* § 26:54, in

that—unlike Section 10(b)—it requires plaintiffs to prove "actual, or what has sometimes been

referred to as 'eyeball,' reliance. … Constructive reliance is not sufficient."  *Alstom*, 406 F.

Supp. 2d at 479 (citing *Heit v. Weitzen*, 402 F.2d 909, 915-16 (2d Cir. 1968)).  Here, Plaintiffs

have failed to plead either that DTTC made or caused to be made a false or misleading statement,

or that Plaintiffs relied on any purported misstatement of DTTC.

### A.    The Complaint Does Not Plead With Particularity Any Misstatement Made Or Caused To Be Made By DTTC.

Plaintiffs are evidently aware of the requirements specific to pleading a Section 18 claim,

and their Complaint is carefully designed in an attempt to meet those requirements.  For

example, only certain Plaintiffs assert the Section 18 claim, only certain Company statements in

certain Company reports are cited in support of the Section 18 claim, and the Complaint does not

incorporate by reference the allegations made elsewhere in the Complaint.  But what Plaintiffs

have not done, with their painstaking pleading, is point to *any* statement by DTTC (*i.e.*, any

DTTC audit opinion) on which the Section 18 Plaintiffs supposedly had "direct eyeball reliance."

FAC ¶¶ 240-41.  DTTC did not "make" any of the statements in ChinaCast's financial

statements on which the Section 18 Plaintiffs purport to have relied.  Auditors speak through

their audit opinions and only through those opinions.  *See supra* p. 23.  This is the end of the

matter—Plaintiffs' own, carefully drafted listing of the statements they allegedly relied upon *do*

*not include* any statement made by DTTC.

Plaintiffs may suggest that DTTC somehow "caused" the Company to make the

statements listed in paragraphs 240 and 241 of the Complaint.  But the sole actors who "cause" a

statement to be made in a company's SEC filings are those "who control the speaker in some way." *In re Adelphia Commc'ns. Corp. Sec. and Derivative Litig.*, 2007 WL 2615928, at *12 (S.D.N.Y. Sept. 10, 2007); *see generally In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 800, 813-14 (S.D. Tex. 2007) (courts have interpreted actors who "cause" a statement to be made to encompass the issuer's officers and directors) (collecting cases).  Those merely advising a corporation as to a statement, or "assisting in its drafting," cannot "be understood to 'cause' the statement to be made." *Adelphia*, 2007 WL 2615928, at *12.

In particular, independent auditors reviewing a company's financial statements do not "cause" the company to make any statement.  Auditors do not "by virtue of auditing a company's financial statements, somehow make, own or adopt the assertions contained therein.  Rather, the end product of an audit is the audit report." *Deephaven Private Placement Trading, Ltd. v. Grant Thornton LLP*, 454 F.3d 1168, 1174 (10th Cir. 2006) (citations and footnote omitted). Indeed, auditors are and must remain *independent* from Company management.  *See* AU § 220.02 (attached as Ex. 24 to Bendinger Decl.) ("This standard requires that the auditor be independent").  In view of the "relationship auditors have with a company's financial statements," auditors do not "cause" the audited company to make the statements included in the financial statements.  *Deephaven*, 454 F.3d at 1177.  Thus, Plaintiffs' theory here—that auditors somehow "certify" particular line items in the financial statements and therefore "cause" those statements—is just wrong.

Plaintiffs allege nothing unique about DTTC's relationship with ChinaCast or the Company's financial statements that would lead to a different conclusion here.  To be sure, DTTC is alleged to have suggested changes to ChinaCast's draft SEC filings and to have influenced their preparation, FAC ¶ 53, but the ultimate content of ChinaCast's SEC filings

remained under the control of ChinaCast—not DTTC—according to controlling precedent.

*Janus Capital Group*, 131 S. Ct. at 2302 (one who "merely suggest[s] what to say" does not

control the content of a statement; "[e]ven when a speechwriter drafts a speech, the content is

entirely within the control of the person who delivers it").[22]

**B.    The Complaint Fails To Plead That DTTC Subjectively Believed Any Statement To Be False.**

For the reasons set forth above, Plaintiffs have failed to plead that DTTC's audit opinions

were false because they have failed to allege that DTTC did not believe the opinions it

expressed.  *See supra* pp. 21-24.  Significantly, the requirement that plaintiffs plead *subjective*

falsity when claiming that a statement of opinion is misleading exists quite apart from any

scienter requirement.  *Fait*, 655 F.3d at 112 n.5 (explaining that "a requirement that a plaintiff

plausibly allege that defendant misstated his truly held belief" is distinct from a scienter

requirement; dismissing claims under Sections 11 and 12, which have no scienter element, for

failure to plead subjective falsity).  As with their Section 10(b) claim, Plaintiffs can adequately

plead that DTTC's stated opinions are false in the context of a Section 18 claim only by alleging

that DTTC did not hold those opinions.  *Id.*; *see also Deephaven*, 454 F.3d at 1176-77; *Oaktree*

*Capital Mgmt.*, 2013 WL 4006437, at *24.  But, as set forth above, Plaintiffs do not and cannot

make such an allegation.  This provides an independent ground for dismissal.

---

[22] Plaintiffs' Section 18 claim based on financial information included in ChinaCast's Forms 10-Q fails as a matter of law for yet another reason:  By SEC regulation, "the financial information required by Part I of Form 10-Q shall not be deemed to be 'filed' for the purpose of Section 18 of the [Exchange] Act or otherwise subject to the liabilities of that section of the Act…."  17 C.F.R. § 240.13a-13(d).  The SEC's instructions for completion of Form 10-Q make clear that the regulation applies to "the information presented in satisfaction of the requirements of Items 1, 2 and 3 of Part I" of Form 10-Q.  *See* SEC Form 10-Q General Instructions § F, p. 2, *available at* http://www.sec.gov/about/forms/form10-q.pdf.  Each of the 10-Q statements on which Plaintiffs' Section 18 claim is premised were included in response to Items 1, 2, and 3 of Part I of ChinaCast's Form 10-Q.  *See* Am. Compl. ¶¶ 240-41.  Those statements therefore cannot support liability under Section 18.  *E.g.*, *Alstom*, 406 F. Supp. 2d at 479; *In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 135 (D. Mass. 2003).

**C.    The Complaint Does Not Plead With Particularity That Plaintiffs Relied On Any Purported Misstatement.**

As noted above, to plead reliance for purposes of Section 18, Plaintiffs also must allege facts showing "actual reliance, *i.e.*, 'that they actually read and relied on the filed document.'" *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 385 (S.D.N.Y. 2011).  Plaintiffs here allege no such facts.  Instead, they offer "threadbare recitals" of the reliance element of a Section 18 claim, which "do not suffice" to state a claim.  *Iqbal*, 129 S. Ct. at 1949.

Plaintiffs list a series of purported misstatements in various Forms 10-K and 10-Q that ChinaCast filed with the SEC, and allege in conclusory fashion that "the Section 18 Plaintiffs actually read, and had direct eyeball reliance on" those statements in making investment decisions over the course of approximately two years.  FAC ¶¶ 240-41.  But "conclusory, general statements are not sufficient to satisfy Rule 9(b)'s particularity requirement.  Plaintiffs need to make *specific factual allegations* describing *each Plaintiff's reliance* on the statements in these documents and allege a causal connection between the statements and that Plaintiff's purchase of [company] securities."  *Enron*, 540 F. Supp. 2d at 830 (emphases added).

Here, Plaintiffs allege no facts probative of their supposed reliance.  Most notably, they do not allege which Plaintiffs read or relied on which misstatements, much less identify any particular individual who actually set "eyeballs" on the challenged documents.  *See id.* (Section 18 requires allegations as to "each Plaintiff's reliance").[23]  Nor do they allege facts showing any causal nexus between the purported misstatements and Plaintiffs' investments—*i.e.*, how DTTC's supposed misstatements, as opposed to other information, influenced the Section 18 Plaintiffs to purchase ChinaCast securities.  *Int'l Fund Mgmt.*, 822 F. Supp. 2d at 386

---

[23] Plaintiffs' Complaint is distinguishable from the Section 18 claim that survived summary judgment in *Gould*. There, plaintiffs offered evidence that a specific, individually named employee had a routine practice of "actively review[ing]" the audit opinions themselves "in deciding whether to recommend certain stocks."  692 F.3d at 161.

(dismissing Section 18 claim that lacked "supporting factual matter indicating how plaintiffs relied on the alleged misrepresentations"); *Armstrong v. Am. Pallet Leasing Inc.*, 678 F. Supp. 2d 827, 868-70 (N.D. Iowa 2009) (Section 18 claim failed where plaintiffs alleged specific misrepresentations in SEC filings that they allegedly "'received, reviewed, actually read, and relied upon,'" but "fail[ed] to plead *facts* probative of actual reliance on any specific false statements" and lacked "allegations to show the requisite causal nexus between their purchase of securities and specific statements contained in the SEC filings") (emphasis added).  Nor do Plaintiffs allege—beyond broad, yearlong stretches of time—*when* any of them read or acted in reliance upon the alleged misstatements.  *See Int'l Fund Mgmt.*, 822 F. Supp. 2d at 386 (Plaintiffs failed to plead reliance when they included only "incredibly broad" factual allegations, alleging reliance "for indefinite periods of time").

In short, Plaintiffs allege no facts to support their claim of reliance.  They liberally pepper their Section 18 claim with the label "direct eyeball reliance," but such conclusory labels do not satisfy the pleading requirements of Rule 8, much less Rule 9(b).  *See Iqbal*, 129 S. Ct. at 1949.

## III.   THE COMPLAINT FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD.

The same deficiencies in Plaintiffs' federal securities claims defeat their common law fraud claim.  Under New York law, the elements of fraud are that: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004) (quoting *Banque Arabe et Internationale d'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)).  Again, Plaintiffs have failed to plead that DTTC made any false misrepresentation, *see supra* pp. 21-24; that DTTC acted with scienter,

see supra pp. 8-21; or that Plaintiffs acted in reliance upon any purported DTTC misstatement,

see supra pp. 28-29.  For each of these reasons, Plaintiffs' common law fraud claim fails.

Additionally, if the federal claims are dismissed, the fraud claim also must be dismissed

for lack of personal jurisdiction and subject matter jurisdiction.  Because Plaintiffs have no claim

against DTTC under the federal securities laws, they cannot rely on 15 U.S.C. § 78aa to establish

personal jurisdiction, and they do not (and cannot) allege that New York's long-arm statute, N.Y.

Civ. Prac. Law § 302, provides a basis for personal jurisdiction over DTTC. *See United States v.*

*Botefuhr*, 309 F.3d 1263, 1274 (10th Cir. 2002). Additionally, the Court should decline to

exercise supplemental jurisdiction as to Plaintiffs' state law claim under 28 U.S.C. § 1367.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.[24]


Dated:  January 24, 2014

Michael D. Warden
Elizabeth L. Howe
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202)-736-8080
mwarden@sidley.com
ehowe@sidley.com

Respectfully submitted,

/s/ *Gary F. Bendinger*
Gary F. Bendinger
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 839-5300
gbendinger@sidley.com

David A. Gordon
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
dgordon@sidley.com

*Attorneys for Defendant Deloitte Touche Tohmatsu CPA Ltd.*

---

[24] At the pre-motion conference, Plaintiffs declined to accept the invitation to amend their Complaint to overcome the deficiencies identified in this motion, 12/13/13 Conf. Tr. at 16 (attached as Ex. 25 to Bendinger Decl.), and likewise did not request amendment in their letter in advance of the conference, Ltr. from A. Kushner to the Court (Dec. 6, 2013) (attached as Ex. 26 to Bendinger Decl.).  Plaintiffs, by virtue of (among other things) Mr. Woodrum being CFO, have had access to all of the Company's financial and other information since early 2012, and they simply cannot offer any more detail than what they have alleged here.  Dismissal with prejudice is appropriate.