UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SPECIAL SITUATIONS FUND III QP, L.P.;
SPECIAL SITUATIONS CAYMAN FUND, L.P.;
COLUMBIA PACIFIC OPPORTUNITY FUND,
L.P.; FIR TREE VALUE MASTER FUND, L.P.;
FIR TREE CAPITAL OPPORTUNITY MASTER
FUND, L.P.; LAKE UNION CAPITAL TE FUND
L.P.; ASHFORD CAPITAL MANAGEMENT,
INC.; ZS EDU L.P.; MRMP MANAGERS LLC;
WHI GROWTH FUND QP, LP; DOUGLAS N.
WOODRUM; ROBERT A. HORNE; HOWARD S.
BERL; BRIGHTLIGHT CAPITAL PARTNERS
LP; and TORTUS CAPITAL MASTER FUND, LP,

               Plaintiffs,

        – against –

DELOITTE TOUCHE TOHMATSU CPA, LTD.;
DELOITTE & TOUCHE LLP; ANTONIO SENA;
JUSTIN TANG; YIN JIANPING; RICHARD XUE;
MICHAEL SANTOS; JOHN AND JANE DOES 1-
10; and ABC CORPS. 1-10,

               Defendants.

                                **ORDER**

                          13 Civ. 1094 (ER)

---

Ramos, D.J.:

    This case arises from allegations of an independent auditor's alleged failure to detect

fraud at ChinaCast Education Corporation, Inc. ("ChinaCast" or the "Company"), an educational

services company in the People's Republic of China ("China").  ChinaCast entered the U.S.

capital markets through a reverse merger in 2006, and for several years, its common stock was

traded on the NASDAQ.  In 2012, the Company disclosed that, unbeknownst to its investors, and

without consent from its Board of Directors, certain rogue employees, led by the Company's

former Chairman and CEO, Ron Chan, had engaged in wide-ranging fraudulent activities,

including, *inter alia*, misappropriation of proceeds from a stock offering, misrepresentation of ChinaCast's ownership interests, and pledging substantial portions of the Company's term deposits to cover debts of third parties.  After a series of public announcements revealing the fraud, ChinaCast's stock price plummeted.  Am. Compl. ¶¶ 5, 6, 45, 172-84, Doc. 4.

Plaintiffs in this action consist of an assortment of investors who, in the aggregate, purchased more than 20 million shares of common stock issued by ChinaCast.  *Id.* ¶ 6.  But rather than sue the Company, Plaintiffs contend that ChinaCast's Shanghai-based outside auditor, Deloitte Touche Tohmatsu CPA, Ltd. ("DTTC"), and its U.S. affiliate, Deloitte & Touche LLP ("Deloitte U.S.") (collectively, "Deloitte Defendants"), as well as certain former ChinaCast officers and directors (the "Individual Defendants"),[1] violated provisions of the Securities Exchange Act of 1934 (the "Exchange Act") and committed common law fraud by issuing and approving false statements in ChinaCast's public filings with the U.S. Securities and Exchange Commission ("SEC").  Plaintiffs claim that ChinaCast's audited financial statements "carried the imprimatur of Deloitte – one of the 'Big Four' global accounting firms – whose name investors rely on as an independent auditor and gatekeeper of accurate financial reporting." *Id.* ¶ 1.  Yet, "[h]ad Deloitte done even the most basic of audits," they "would have known that ChinaCast was a house of cards."  *Id.* ¶ 10.

Plaintiffs assert causes of action for:  violations of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against DTTC and Individual Defendants (First and Third Causes of Action); violations of Section 20(a) of the Exchange Act against Deloitte U.S.

---

[1] The Individual Defendants—Antonio Sena, Justin Tang, Yin Jianping, Richard Xue, and Michael Santos—have not yet been served or appeared in this action.  Am. Compl. ¶¶ 222-233.  In addition, Plaintiffs have sued twenty unnamed entities:  ten John and Jane Does and ten ABC Corporations.  *Id.* ¶¶ 31-38.

(Second Cause of Action); violations of Section 18 of the Exchange Act against all Defendants

(Fourth Cause of Action); and common law fraud under New York law against Deloitte

Defendants (Fifth Cause of Action).  *Id.* ¶¶ 51-171, 70, 85, 208.

Before the Court are Deloitte Defendants' respective motions to dismiss Plaintiffs' claims

under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Docs. 14, 32.  For the reasons set

forth below, the motions are GRANTED; however, the Court dismisses the First Amended

Complaint ("FAC") *without* prejudice.

## I.      BACKGROUND[2]

### A.  The Parties

#### 1.  Plaintiffs

Plaintiffs are a group of investment funds, entities and individuals who purchased

ChinaCast securities between March 31, 2008 through and including March 30, 2012.[3]  Am.

Compl. ¶ 1.  Some of the Plaintiffs are closely associated with ChinaCast's current management.

Individual Plaintiff Doug Woodrum is the Chief Financial Officer ("CFO") of ChinaCast.

Bendinger Decl. Ex. 2 (Apr. 2, 2012 Form 8-K), Doc. 34.  In addition, ChinaCast Board Member

Ned Sherwood co-founded and manages ZS Fund L.P., the general partner of Plaintiff ZS EDU

---

[2] The following facts are based on the allegations in the FAC, which the Court accepts as true for purposes of the instant motions.  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court also considers documents of which it may take judicial notice, including legally required public disclosure documents filed with the SEC; documents incorporated into the FAC by reference; and documents upon which Plaintiffs relied in bringing this suit, which were possessed by and known to Plaintiffs.  *See Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533 (KBF), 2012 WL 3205062, at *1 (S.D.N.Y. Aug. 8, 2012).  The Court limits its discussion of the factual allegations to those relevant to the instant motions.

[3] Plaintiffs include:  Special Situations Fund III QP, L.P.; Special Situations Cayman Fund, L.P.; Columbia Pacific Opportunity Fund, L.P.; Fir Tree Value Master Fund, L.P.; Fir Tree Capital Opportunity Master Fund, L.P.; Lake Union Capital Fund, L.P.; Lake Union Capital TE Fund L.P.; Ashford Capital Management Inc.; ZS EDU L.P.; MRMP Managers LLC; WHI Growth Fund QP, LP; Douglas N. Woodrum; Robert A. Horne; Howard S. Berl; Brightlight Capital Partners LP; and Tortus Capital Master Fund, LP.  *See* Am. Compl. ¶¶ 15-30.

L.P.; Mr. Sherwood beneficially owns shares held by Plaintiff ZS EDU L.P.; shares owned by

Plaintiff MRMP Managers LLC are for the benefit of Mr. Sherwood's children; and Mr.

Sherwood was the ChinaCast board designee of Plaintiff Fir Tree Funds.  Bendinger Decl. Ex. 11

(Nov. 15, 2011 Schedule 14A Information at 5).

Plaintiffs claim that, collectively, they invested more than $96 million on more than 20

million shares of ChinaCast stock and, as a result of the Defendants' conduct, suffered "tens of

millions" of dollars in investment losses.  Am. Compl. ¶ 6.

### 2.  Deloitte Defendants

"Deloitte" holds itself out as a global accounting firm comprised of member and network

firms that conduct "integrated cross-border audits."  *Id.* ¶ 51.  Deloitte U.S. is a Delaware limited

liability partnership located in New York, New York.  *Id.* ¶ 32.  DTTC is a Chinese auditing firm

with headquarters in Shanghai, China.  *Id.* ¶ 31.

### B.  Factual Allegations

### 1.  ChinaCast Expands Its Business

ChinaCast is a Delaware corporation with principal offices in China, and has described

itself as "a leading for-profit, post-secondary education and e-learning services provider in

China."  Bendinger Decl. Ex. 2 (Apr. 2, 2012 Form 8-K).  The Company was initially formed as

a special purpose acquisition company called Great Wall Acquisition Corporation ("Great Wall")

on August 20, 2003.  Am. Compl. ¶ 39.  In 2006, Great Wall identified ChinaCast

Communications Holdings Limited ("CCH"), an e-learning company incorporated in Bermuda

and listed on the Stock Exchange of Singapore ("SGX"), as a desirable acquisition target.  *Id.* ¶

40.  Starting in 2000, the Chinese Ministry of Education granted licenses to approximately 68

universities to conduct undergraduate and post-graduate courses by distance learning.  By 2003,

CCH signed with more than 15 universities to use its satellite interactive distance learning network, serving over 50,000 students nationally.  Thereafter, CCH expanded its business by signing additional K-12, IT and management training customers.  Bendinger Decl. Exs. 3, 6 (2009 and 2010 Form 10-Ks at 2).  On December 22, 2006, Great Wall obtained a majority of the outstanding shares of CCH and subsequently changed its name to ChinaCast Education Corporation.  Am. Compl. ¶ 45.  In 2007, ChinaCast acquired all remaining outstanding shares of CCH and terminated the SGX listing, effecting a "reverse merger" onto the NASDAQ exchange.  *Id.* ¶¶ 4, 45; *see also* Bendinger Decl. Exs. 3, 6 (2009 and 2010 Form 10-Ks at 2).

Plaintiffs allege that "ChinaCast's business did not make it a complicated company to audit."  Am. Compl. ¶ 4.  ChinaCast's financial statements report that it majority-owns approximately twenty-five subsidiaries and variable interest entities.  Its principal subsidiary is ChinaCast Technology (BVI) Limited, which, since 1999, has provided funding for satellite broadband Internet services through the satellite operating entities ChinaCast Company Ltd.—Beijing Branch and ChinaCast Li Xiang Co. Ltd. ("CCLX").[4]  Bendinger Decl. Ex. 3 (2010 Form 10-K at F-10-13).  In 2007, ChinaCast engaged in limited business operations, and its primary assets were cash and term deposits.  Am. Compl. ¶ 4.  ChinaCast exclusively provided "distance learning" services from its inception until it acquired its first physical university in 2008.  *Id.* ¶ 47.  Between 2007 and 2010, the Company completed only "one or two major transactions per year."  *Id.*  In its 2008 Form 10-K, ChinaCast reported that, on April 11, 2008,

---

[4] CCLX is a variable interest entity owned by three ChinaCast employees, not the Company itself.  ChinaCast operates "substantially all of its satellite broadband business activities" through CCLX because ChinaCast, as a Delaware corporation, is a foreign legal person, and Chinese law restricts foreign ownership of telecommunications business entities.  However, CCLX and ChinaCast's subsidiary CCT Shanghai entered into a series of contractual agreements that transfer economic benefits to CCT Shanghai, and provide CCT Shanghai "effective control over CCLX."  Bendinger Decl. Ex. 3 (2010 Form 10-K at F-13); *see also id.* at 6 (corporate structure diagram).

its wholly owned subsidiary, Yu Pei Information Technology (Shanghai) Limited ("YPSH"), acquired an 80% interest in Hai Lai Education Technology Limited ("Hai Lai"), which, in turn, owned the Foreign Trade Business College of Chongqing Normal University ("FTBC"), a traditional brick and mortar university.  *Id.* ¶ 78.

After procuring Hai Lai in 2008, ChinaCast organized itself into two distinct groups:  (1) the e-learning and training service group, encompassing all of the Company's business prior to the acquisition; and (2) the traditional university group, which offered bachelor and diploma programs to Chinese students.  *Id.* ¶ 48; Bendinger Decl. Exs. 2-3 (Form 10-Ks at 2-3).

During the next two years, ChinaCast acquired two additional fully accredited universities:  Lijang College of Guangxi Normal University ("Lijang College") and Hubei Industrial University Business College ("Hubei Industrial University").  Am. Compl. ¶¶ 49-50. ChinaCast's 2009 Form 10-K reported that, on October 5, 2009, the Company completed the acquisition of East Achieve Limited, the holding company which beneficially owned 100% of Lijang College.  *Id.* ¶ 89.  ChinaCast's 2010 Form 10-K reported that, on August 23, 2010, the Company completed the acquisition of Wintown Enterprises Limited, the holding company that beneficially owned 100% of Hubei Industrial University.  *Id.* ¶ 117.

ChinaCast's 10-K and 10-Q filings state that the Company paid a majority of the consideration for the acquisition of each of its three physical universities.  *Id.* ¶¶ 79-81, 90-91, 118-19.  These payments represented some of the most, if not the most, significant transactions on the Company's annual cash flow statements.  *Id.* ¶¶ 82, 92, 118-20.

### 2.  DTTC Audits ChinaCast's Financial Statements, 2007-2010

As of 2010, DTTC had worked with ChinaCast and its predecessor entity for more than ten years.  *Id.* ¶ 31.  Between 2007 and 2010, DTTC served as ChinaCast's independent public

auditor of record. *Id.* ¶ 51. DTTC's duties included reviewing the Company's condensed financial information for each fiscal quarter and performing integrated audits of ChinaCast's consolidated financial statements in accordance with U.S. Public Company Accounting Oversight Board ("PCAOB") standards and Generally Accepted Accounting Principles ("GAAP"). *Id.* ¶¶ 2, 31.

In making their decisions to invest in ChinaCast, Plaintiffs "read, reviewed and relied on" ChinaCast's public filings with the SEC, "including but not limited to its quarterly reports on Form 10-Q … [and] annual reports on 10-KSB and 10-K, which included its audited year-end financial statements." *Id.* ¶¶ 9, 57, 70. Plaintiffs claim that "Defendants knew that Plaintiffs purchased ChinaCast securities in direct, eyeball reliance on" ChinaCast's audited financial statements, 10-Q and 10-K filings. *Id.* Particularly because ChinaCast's operations occurred abroad, Plaintiffs relied upon the fact that Deloitte, a "top global accounting firm," had a long-term relationship with ChinaCast and, through DTTC, represented that its audits comported with U.S. accounting standards; they trusted the Deloitte "stamp of approval." *Id.* ¶¶ 2-3, 9.

### a. Statements Regarding Compliance with Accounting Principles and Standards; Financial Condition of Company

DTTC certified ChinaCast's audited financial statements and issued unqualified audit opinions for fiscal years 2007 through and including 2010, filed with the SEC on Form 10-K. *Id.* ¶ 8. In each of its audit opinions, DTTC stated (1) that it conducted its audit in accordance with PCAOB standards; and (2) that, in its opinion, "the consolidated financial statements present fairly, in all material respects, the financial position of the Company … and the results of its operations and its cash flows," in conformity with GAAP. *Id.* ¶¶ 52, 56, 70, 85, 109; *see also, e.g.*, Bendinger Decl. Ex. 3 (2010 Form 10-K at F-2).

7

### b.  Statements Regarding Internal Controls

DTTC was not engaged to perform an audit of the Company's internal controls over

financial reporting for the 2007 fiscal year.  Bendinger Decl. Ex. 4 (2007 Form 10-K at F-2).  For

fiscal years 2008 and 2009, DTTC made, *inter alia*, the following representations regarding

ChinaCast's internal controls in the Company's Form 10-K filings:

- "We conducted our audit in accordance with the standards of the [U.S. PCAOB].  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.  …  We believe that our audit provides a reasonable basis for our opinion."

- "Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management of override controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis."

- "In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of [the end of the year]…."

- "We have also audited, in accordance with [PCAOB standards], the consolidated financial statements and financial statement schedule [for the year]… [and] express[] an unqualified opinion on those financial statements and financial statement schedule."

Bendinger Decl. Ex. 5 (2008 Form 10-K at 29-30); Ex. 6 (2009 Form 10-K at 44); Am. Compl.
¶¶ 70, 85.[5]

DTTC expressed an adverse opinion on the Company's internal control over financial

reporting as of December 31, 2010 based on a "[l]ack of sufficient skilled resources in the

finance team to meet the demands of rapidly expanded businesses" and "[l]ack of

---

[5] In its 2008 audit report, DTTC specified that its audit excluded verification of internal control over financial reporting at Hai Lai and its subsidiaries, which the Company acquired on April 11, 2008, "and whose financial statements constitute 48% and 52% of net and total assets, respectively."  Bendinger Decl. Ex. 5 (2008 Form 10-K at 30).  Likewise, DTTC's 2009 audit report included a disclaimer stating that, because "management excluded from its assessment the internal control over financial reporting at East Achieve Limited and its subsidiaries … which were acquired on October 5, 2009 and whose financial statements constitute 9% and 18% of net total assets, respectively," "our audit did not include the internal control over financial reporting at East Achieve."  Bendinger Decl. Ex. 6 (2009 Form 10-K at 44).

contemporaneous documentation of certain decisions made by the Board of Directors."
Bendinger Decl. Ex. 3 (2010 Form 10-K at F-2, 46).

### c.  Deloitte U.S.'s Role

Plaintiffs claim that Deloitte U.S. may be held responsible for DTTC's audit opinions, as well as ChinaCast's audited financial statements, because DTTC would not sign, and the Company did not submit, any SEC filings until Deloitte U.S. reviewed and approved them.  Am. Compl. ¶¶ 32, 53-54.  Deloitte U.S. controlled DTTC's audits of ChinaCast because it "had final authority over all U.S. GAAP matters," "directly communicated with ChinaCast's audit committee on key issues," provided consultation and "was involved in" all of ChinaCast's financial filings.  *Id.* ¶¶ 32, 53, 187.  Deloitte U.S.'s "involve[ment] in" making the decision to direct ChinaCast to write-off certain pre-paid expenses during the audit of its financial statements for the 2010 fiscal year exemplifies the manner in which Deloitte U.S. provided directions to DTTC throughout the "Deloitte-ChinaCast engagement."  *Id.* ¶ 54.  In that instance, Deloitte U.S.'s Washington, D.C. office "was directly involved in" communicating with and responding to concerns voiced by the SEC regarding the write-off, and it reviewed and approved an amendment to ChinaCast's 2010 Form 10-K addressing the SEC's comments.  *Id.*

### 3.  New Management Exposes the Fraud

Ron Chan, not sued herein, was appointed CEO of CCH in 1999 at CCH's inception.  In connection with the CCH acquisition, the Company and CCH had agreed that Chan and certain other individuals would serve as directors of ChinaCast.   ChinaCast appointed Mr. Chan to the position of Chairman and CEO on February 2, 2007.  On the same date, ChinaCast appointed Daniel Tseung and Individual Defendants Yin Jianping, Justin Tang and Richard Xue to serve as directors.  Bendinger Decl. Ex. 4 (2007 Form 10-K at 27).

After a highly contentious proxy battle initiated by Ned Sherwood in December 2011,

ChinaCast's shareholders voted to elect a new slate of directors in early 2012.  The new board

included two inside directors (Mr. Chan and Individual Defendant Santos) and four outside

directors (Mr. Sherwood, Daniel Tseung, Derek Feng and Stephen Markscheid) (the "Board").

Bendinger Decl. Ex. 2 (Apr. 2, 2012 Form 8-K).  On March 26, 2012, the Board removed Ron

Chan from his position as the Chairman and CEO and replaced him with Derek Feng.  Am.

Compl. ¶ 173.  Individual Defendant Sena, who had signed a "loyalty pledge" to Chan, resigned

from his position as CFO on the same day.  *Id.* ¶¶ 189, 193.  On March 29, 2012, the Board also

removed Xiangyuan Jiang, the Company's former chief investment officer and president-China,

another close ally of Mr. Chan.  Bendinger Decl. Ex. 14 (Apr. 19, 2012 Form 8-K).

In an open letter to shareholders issued on April 2, 2012, the Board revealed that Mr.

Chan and his cohorts had mounted "significant resistance" to the implementation of changes to

the management team.  Bendinger Decl. Ex. 2 (Apr. 2, 2012 Form 8-K).  As further explained in

the letter, Ron Chan's contumacious conduct—which included thwarting the 2011 audit of the

Company's financial statements—left the Board with no choice but to terminate him:

> Ron Chan and his accomplices have refused to provide the necessary financial
> information so as to allow the Company's auditors (Deloitte) access to the
> Shanghai offices in order to complete their field work and enable the Company to
> issue its 2011 audited financial statements within the time periods required by the
> SEC.   Additionally, this group of uncooperative managers has improperly
> declined to pay outstanding invoices for the services of Deloitte and various other
> outside advisors and service providers.  Despite repeated efforts … it became
> clear last week that there would be no cooperation forthcoming.  Consequently,
> our Board had to take extraordinary measures by terminating Ron Chan.

*Id.*  Perhaps unsurprisingly, Mr. Chan and other terminated executives "chose[] to unlawfully

resist their terminations by refusing to return key company property, including corporate chops

necessary to run the business in China," and Chan told Derek Feng that "he had no intention to relinquish the corporate chops."[6]  *Id.*

The Board further reported that it had "uncovered questionable activities and transactions which raise the specter of possible illegal conduct by Ron Chan and his accomplices and may have led to the frustration of the audit of the Company's financial statements."  *Id.*; Am. Compl. ¶ 174.  In addition to initiating legal action against Ron Chan, the Company reported that it notified the SEC and the NASDAQ of these incidents.  Notwithstanding the gravity of Mr. Chan's misdeeds, the Company concluded its letter by reiterating that ChinaCast "is a strong company with great assets, a dedicated employee base and a skilled and independent Board of Directors."  Bendinger Decl. Ex. 2 (Apr. 2, 2012 Form 8-K).

NASDAQ suspended trading in ChinaCast's stock on the same day, due to the Company's failure to file an annual report for 2011. Am. Compl. ¶ 174; *see also* Complaint, *SEC v. Chan Tze Ngon and Jiang Xiangyuan*, No. 13 Civ. 6828 (TPG) (S.D.N.Y. Sept. 26, 2013). Trading did not resume until more than two months later, on June 25, 2012.  *Id.*; Am. Compl. ¶ 180.

On April 19, 2012, the Company issued a statement confirming that ChinaCast had fallen victim to financial fraud, and provided progress reports on its internal investigation during the following months.  Am. Compl. ¶ 177.  Among other things, the Company relayed that Ron Chan and his allies "remov[ed] or destr[oyed] a substantial portion of the financial documents

---

[6] The use of corporate chops date back to 1,000 B.C.  They are signature stamps commonly used by Chinese companies to verify the authenticity of corporate documents, and the presence of a chop on a document binds the company's legal representative.  Mere possession of a corporate chop is considered adequate proof of a person's authority to bind the company; "that little stamp grants great power."  *See* Deb Weidenhamer, *Mastering the Chinese Chop System*, N.Y. TIMES, Dec. 17, 2013, *available at* http://boss.blogs.nytimes.com/2013/12/17/mastering-the-chinese-chop-system/?_php=true&_type=blogs&_r=0.

that were located in the finance offices of the Company's Shanghai headquarters," and that they "stole some of the computers believed to be utilized by the finance department" after forcibly gaining entry.  Bendinger Decl. Ex. 13 (May 14, 2012 Form 8-K); Ex. 14 (Apr. 19, 2012 Form 8-K at 2).[7]  Additionally, the Company noted that current management did not have access to all of the Company's accounts, and that it was trying to obtain access to additional bank records in order to investigate the transfer of approximately $120 million from two of ChinaCast's subsidiaries, CCT Shanghai and YPSH, from July 2011 to April 2012, without the Board's knowledge or consent.  Bendinger Decl. Ex. 13 (May 14, 2012 Form 8-K at 4).

Ultimately, on December 21, 2012, ChinaCast "instructed investors to no longer rely on the Company's audited financials for 2009 and 2010."  Am. Compl. ¶¶ 177-82.  The Company reported that it had uncovered the following fraudulent activities (*see id.*):

- **Non-bank borrowings.**  Without the Board's knowledge or consent, the Company took out a series of short-term, high-interest rate loans from a number of companies, friends and family members related, and unrelated, to prior management.  As a result, previously issued financial statements understated borrowings on "various dates" from at least the fourth quarter of 2009 to the third quarter of 2011.  Some individuals also filed claims against the Company for non-repayment of debts that the Company's previously issued financial statements failed to disclose.  The Company reported that it was only able to obtain bank records and legal documentation to corroborate some of these undiscovered borrowings, and had not determined the volume of loans that remained outstanding.

- **Interest in a purported majority-owned subsidiary.**  ChinaCast's financial statements previously reported that it had a majority indirect ownership interest in CCT HK, but according to documents obtained from the Hong Kong Companies Registry, Ron Chan has owned 50% of CCT HK since 2003.  The Company only owns an approximately 49.2% indirect equity interest in CCT HK; thus, it should not have been consolidated as a

---

[7] According to disclosures in the Company's Form 8-K filed on May 14, 2012, CCT Shanghai and YPSH filed lawsuits against Ron Chan in the People's Court of Pudong New District in Shanghai, seeking to recover, *inter alia*, the companies' respective chops and "financials records."  Although the companies obtained an order from the court directing that the subsidiaries preserve their financial records, "the Company discovered that most of the financial records in its Shanghai finance department offices had already been removed or destroyed."  Bendinger Decl. Ex. 13 (May 14, 2014 Form 8-K at 2-5).

majority-owned subsidiary in the Company's previously issued financial statements.  The Company reported that it was continuing to investigate how Mr. Chan acquired his ownership stake in CCT HK without the Board's knowledge or consent.

- **December 2009 stock offering proceeds.**  Without the Board's knowledge or consent, Ron Chan transferred at least $35 million of the $44 million in proceeds from the Company's 2009 public common stock offering to entities outside the Company's group structure (i.e., CCT HK).

- **2009 and 2010 year-end cash equivalents and term deposits.**  Without the Board's knowledge or consent, prior management pledged at least $36 million of the $75 million classified as term deposits on its year-end 2009 balance sheet to guarantee the debts of various third parties, many of whom appear to operate outside of the scope of ChinaCast's business.  Correcting for these secret pledges, the cash available from term deposits as of December 31, 2009 would have been reduced from $75 million to $38 million or less.  Similarly, without the Board's knowledge or consent, prior management pledged at least $91 million of the $107 million classified as term deposits on the Company's 2010 year-end balance sheet to cover the debts of various third parties.  Adjusting for these pledges, the cash available from term deposits as of December 31, 2010 would have been reduced from $107 million to $16 million or less.

- **January 2010 stock issuance proceeds.**  The Company's previously issued financial statements reported that Thriving Blue Limited, a BVI company owned by Ron Chan and Individual Defendants Sena and Santos, paid $5 million to purchase 692,520 shares of common stock, but new management was unable to confirm from statements for the Company's known bank accounts that it ever received the $5 million.

- **College Acquisitions.**  The Board reported that it would be continuing to investigate its suspicions that ChinaCast never made the payments that it claimed to have spent on the acquisition of its three brick and mortar universities.

ChinaCast's stock price dropped dramatically after the news of the fraud emerged:  in early 2012, it traded at more than $6.00 per share; on December 21, 2012, it closed at ten cents per share; and on March 15, 2013 it closed at 14 cents per share.  *Id.* ¶¶ 6, 172, 183.

On March 25, 2013, the Company announced that its financial statements in annual and quarterly reports for fiscal years 2007 through 2010, and the first three quarters of 2011, should not be relied upon, and that, effective March 19, 2013, the Board dismissed DTTC from its position as the Company's independent accountant.  Bendinger Decl. Ex. 15 (Mar. 25, 2013

13

Form 8-K).  Internal and government investigations regarding the extent of the fraud perpetrated by Ron Chan and his accomplices remain ongoing.[8]

### C.  Plaintiffs' Claims

Plaintiffs filed the FAC on March 15, 2013.  Doc. 4.  Plaintiffs assert claims against DTTC for violations of Section 10(b), Rule 10b-5 and Section 18 of the Exchange Act, as well as a common law fraud claim under New York law.  Proceeding on the theory that Deloitte U.S. controlled DTTC's audits, Plaintiffs assert similar claims against Deloitte U.S. for violations of Section 18 and Section 20(a) of the Exchange Act, as well as common law fraud.

At bottom, Plaintiffs contend that, had the Deloitte Defendants performed any audit at all, they would have discovered the rampant fraud at ChinaCast much earlier.  The FAC describes a number of failures to comply with PCAOB and GAAP standards, as well as "red flags" that should have placed the Deloitte Defendants on notice of the fraud.  Consequently, Plaintiffs assert that DTTC's statements for the years 2007 through 2010, that it conducted its audits in accordance with PCAOB standards and that ChinaCast's audited financial statements were GAAP compliant, and for the years 2008 and 2009, that the Company's internal controls over financial reporting were effective, were materially false.  *See* Bendinger Decl. Exs. 3-6 (2007-2010 Form 10-Ks at F-2); Ex. 5 (2008 Form 10-K at 30); Ex. 6 (2009 Form 10-K at 44-45). Plaintiffs also seek to impose liability under Section 18 for false statements in ChinaCast's 10-K

---

[8] On September 26, 2013, the SEC charged Ron Chan with stealing tens of millions of dollars from investors in a U.S. public offering, and charged another executive with illegally dumping his stock in the company after he helped steal valuable company assets.  *See* Complaint, *SEC v. Chan Tze Ngon and Jiang Xiangyuan*, No. 13 Civ. 6828 (TPG) (S.D.N.Y. Sept. 26, 2013).

On April 2, 2014, NASDAQ again suspended trading in ChinaCast; the Company was subsequently delisted and now trades in over-the-counter ("OTC") markets.  *Id.*; ChinaCast Education (CAST) Shareholder Alert (Jun. 2, 2014), *available at* http://www.nasdaq.com/press-release/chinacast-education-cast-shareholder-alert--the-law-firm-of-andrews--springer-llc-announces-an-20140602-00350.

and 10-Q filings that Deloitte Defendants allegedly "caused to be made."  Am. Compl. ¶¶ 234-47.

### a.  Violations of Accounting Standards

PCAOB standards include generally accepted accounting standards ("GAAS"), the "authoritative standards" with which auditors must comply.  *Id.* ¶ 153.  Plaintiffs claim that Deloitte Defendants "knowingly or recklessly" violated basic rules and principles found in the interpretive "Statements on Auditing Standards," known within the accounting industry as "AU,"[9] which provide as follows:

- "The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."  (AU § 110.2);

- "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  (AU § 150.02);[10]

- "Due professional care requires the auditor to exercise professional skepticism. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence."  (AU § 230.07);

- "The auditor's assessment of the risks of material misstatement due to fraud should be ongoing throughout the audit.  Conditions may be identified during fieldwork that change or support a judgment regarding the assessment of the risks, such as . . . [d]iscrepancies in the accounting records, including . . . [u]nsupported or unauthorized balances or transactions."  (AU § 316.68);

- "The books of original entry, the general and subsidiary ledgers, related accounting manuals, and records such as work sheets and spreadsheets supporting cost allocations, computations, and reconciliations all constitute evidence in support of the financial statements."  "[W]ithout adequate attention to the … accuracy of the underlying accounting data, an opinion on financial statements would not be warranted."  (AU § 326.16);

---

[9] *See S.E.C. v. KPMG LLP.*, 412 F. Supp. 2d 349, 356 n.2 (S.D.N.Y. 2006) (describing "AU").

[10] Plaintiffs also allege that the Deloitte Defendants failed to follow the "best practice" to prevent fraud in China, which is to physically visit banks and directly observe the bank personnel printing bank statements.  Am. Compl. ¶ 131.

- "The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly."  (AU § 326.21(c));

- "During the performance of confirmation procedures, the auditor should maintain control over the confirmation requests and responses.  Maintaining control means establishing direct communication between the intended recipient and the auditor to minimize the possibility that the results will be biased because of interception and alteration of the confirmation requests or responses."  (AU § 330.28); and

- Representations from management "are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit."  (AU §333.02).

In addition, Plaintiffs assert that Deloitte Defendants "knowingly or recklessly" violated the following fundamental GAAP principles (*see id.* ¶¶ 155-56):

- Financial reporting should be reliable in that it represents what it purports to represent;

- A company's financial statements must be reliable, transparent, truthful, and accurately reflect the financial performance of the company;

- Nothing should be left out of the information that may be necessary to ensure that it validly represents underlying events and conditions;

- Conservatism should be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered;

- Companies must accurately present the financial results of the corporation's operations, and disclose net income as a reflection of all items of profit and loss recognized during the period;

- Companies must accurately state the income received by the corporation in a reported period, according to standards for the reporting of comprehensive income and its components in a full set of general-purpose financial statements; and

- Revenue recognized by a corporation in its financial statements must accurately reflect business operations of the company.

16

### b.  "Red Flags"

Had Deloitte Defendants complied with basic accounting principles, Plaintiffs assert that they would have discovered the following "red flags" symptomatic of fraud:

**First,** from 2007 through 2010, more than half of ChinaCast's total assets consisted of term deposits, and, for each year, ChinaCast failed to disclose that it had pledged a substantial portion of such term deposits to secure the obligations of third parties that lacked any legitimate business relationship with ChinaCast.  DTTC's failure to verify the unencumbered nature of ChinaCast's term deposits violated "at least" GAAS standards AU §§ 150.02, 330.28 and 333.02.  Plaintiffs deem the "encumbered nature of the term deposits" a "massive red flag that DTTC could not possibly have missed had it undertaken procedures to verify these assets," such as by contacting the banks that held them.  Am. Compl. ¶¶ 5, 153, 165, 169; Pls.' Opp. DTTC Mot. 9, Doc. 38.

**Second,** Plaintiffs claim that DTTC falsely certified ChinaCast and CCT HK's financial statements on a consolidated basis, in violation of GAAS standards AU §§ 150.02 and 333.02, because if DTTC had confirmed the ownership of CCT HK "by simply reviewing records readily obtainable from the Hong Kong Companies Registry," it would have discovered that Ron Chan personally owned 50% of CCT HK since 2003.  Am. Compl. ¶ 5; Pls.' Opp. DTTC Mot. 9.

**Third,** with respect to the audited financial statements for the year ending December 31, 2009, Plaintiffs claim that DTTC failed to confirm that the Company actually received the proceeds from a $44 million stock offering.  A "simple review" of account statements from the banks that held ChinaCast's proceeds would have revealed that Ron Chan looted the majority of the proceeds from this offering ($35 million) by "almost immediately" wiring them to CCT HK, which the Company did not majority-own.  Am. Compl. ¶¶ 103-05.  In turn, Chan transferred the

17

money outside of CCT HK in December 2009.  *Id.* ¶ 104.  This "red flag" would have been exposed if DTTC had complied with GAAS standards §§ 150.02, 330.28 and 333.02.  *Id.* ¶¶ 153, 159, 170; Pls.' Opp. DTTC Mot. 10.

**Fourth**, with respect to ChinaCast's audited financial statements for the year ending December 31, 2010, Plaintiffs claim that DTTC violated GAAS by failing to confirm that the Company actually received a $5 million payment for stock sold to a BVI company owned by Ron Chan (Thriving Blue Limited).  Although "this transaction was a significant, related-party transaction at above-market price," DTTC failed to review ChinaCast's bank records to confirm the receipt of funds and as a result, failed to discover that the Company never received payment for its shares.  Plaintiffs assert that DTTC similarly failed to confirm that any of the Company's bank accounts received a $29.3 million payment from Wu Shi Xin, the purported sole stockholder of Wintown Enterprises Limited, for a stock purchase agreement entered on June 2, 2010.  Am. Compl. ¶ 5; Pls.' Opp. DTTC Mot. 10.

**Fifth**, Plaintiffs allege that for fiscal years 2008 to 2010, DTTC failed to uncover the fact that ChinaCast never made any of the "massive cash payments" that it reported as consideration paid for the acquisition of each of its three universities.[11]  These "'red flags' would have been obvious to any auditor who reviewed the Company's bank statements," but because of DTTC's

---

[11] Plaintiffs further assert that ChinaCast's inability to pay for the universities ultimately resulted in the transfer of its interests in two of the universities to unauthorized persons outside of the Company; however, these "unauthorized transfers" did not occur until 2012, after Ron Chan lost control of the Company.  On May 14, 2012, ChinaCast reported that its interest in the holding company for Hubei Industrial University was transferred outside of the Company on March 7, 2012, without the Board's authorization.  Bendinger Decl. Ex. 13 (May 14, 2012 Form 8-K at 3).  With respect to Lijang College, ChinaCast reported that "Shenzhen AIC company search records"—presumably a reference to records held by China's State Administration for Industry and Commerce ("SAIC")—do not identify the date of the unauthorized transfer, but the Company believes that, in March or April 2012, Lijang College was also transferred outside of the Company's group structure to Zheng Qiquan, an employee of the Company based at Lijang College.  *Id.* at 4.  The Company reported that its investigations into both incidents remained ongoing.

failure to obtain sufficient audit evidence to support its opinions, the lack of payment escaped

DTTC's notice.  Am. Compl. ¶¶ 161-64; Pls.' Opp. DTTC Mot. 11.

 **Sixth**, Plaintiffs claim that ChinaCast's trial balances reveal massive outflows of cash to,

and unexplained inflows from, parties that had no legitimate business relationship to the

Company, such as metal factories and a pawn shop.  Trial balances for one ChinaCast subsidiary

show tens of millions of dollars of cash transfers to "more than one hundred" individuals and

entities, most of which lacked any relationship to the Company's business.  The gist of this

allegation is that DTTC's failure to review ChinaCast's trial balances—which were provided

directly to DTTC for purposes of year-end audits in 2007, 2008 and 2009—amounts to "total

audit failure."  Am. Compl. ¶¶ 5, 133-49, 153, 158, 160; Pls.' Opp. DTTC Mot. 11.

### D.  The Instant Motions

 On November 1, 2013, Deloitte U.S. moved to dismiss all claims asserted against it on

several grounds, including:  (1) with respect to all claims, the FAC impermissibly utilizes group

pleading and conclusory allegations; (2) with respect to Section 20(a), Plaintiffs fail to plead the

elements of control and culpable participation; (3) with respect to Section 18, Plaintiffs fail to

plead reliance, and cannot hold Deloitte U.S. liable because it did not "cause" ChinaCast to make

any statement; and (4) with respect to common law fraud, Plaintiffs fail to adequately plead their

claim.  *See* Deloitte U.S. Mem. L. Supp. Mot. Dismiss, Doc. 15 ("Deloitte U.S. Mot. Dismiss").

 On January 24, 2014, DTTC also moved to dismiss Plaintiffs' suit.  DTTC contends that:

(1) with respect to Section 10(b) and Rule 10b-5, Plaintiffs fail to establish an inference of

scienter and fail to allege an actionable misrepresentation by DTTC; (2) with respect to Section

18, Plaintiffs fail to plead with sufficient particularity that DTTC made any misstatement, that

DTTC subjectively believed any of its opinions to be false, or that Plaintiffs actually relied on

any misstatement by DTTC; and (4) with respect to common law fraud, Plaintiffs fail to state a

claim.  *See* DTTC Mem. L. Supp. Mot. Dismiss, Doc. 34 ("DTTC Mot. Dismiss").  In particular,

DTTC emphasizes that the most compelling inference from Plaintiffs' allegations is that Chan

successfully concealed the fraud from the Company's auditors as well as the Board.  *Id.*

## II.   LEGAL STANDARD

### A.  Rule 12(b)(6) Motions to Dismiss:  General Legal Standard

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all

factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's

favor.  *Koch*, 699 F.3d at 145; *see also, e.g.*, *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d

Cir. 2008).  However, the Court is not required to credit "mere conclusory statements" or

"threadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing

*Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a complaint must contain sufficient

factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting

*Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff

must allege sufficient facts to show "more than a sheer possibility that a defendant has acted

unlawfully."  *Id.*  Federal Rule of Civil Procedure 8 "marks a notable and generous departure

from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of

discovery for a plaintiff armed with nothing more than conclusions."  *Id.* at 678-79.  If the

plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the]

complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

### B.  Heightened Pleading Standard under Rule 9(b) and the PSLRA

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") by stating the circumstances constituting fraud with particularity.  *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319-20 (2007)). These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim.  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Fed. R. Civ. P. 9(b)) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'").

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify:  (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent.  *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170). Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally, however.  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)).  Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); *see also, e.g.*, *Slayton v. Am. Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010).[12]

---

[12] Second Circuit courts have long-interpreted Rule 9(b) to require securities fraud plaintiffs to plead "facts that give rise to a strong inference of fraudulent intent" with particularity.  *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 469 (S.D.N.Y. 2004) (collecting cases).  Because the PSLRA merely imposed the Second Circuit's pleading

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, No. 13 Civ. 4596 (KBF), 2014 WL 1569500, at *9 (S.D.N.Y. Apr. 18, 2014) (citing *ECA & Local 134 IBEW*, 553 F.3d at 196).

## III.   DISCUSSION

### A.  Group Pleading

Deloitte U.S. first argues that Plaintiffs' use of the term "Deloitte" to refer collectively to Deloitte U.S. and DTTC fails to provide notice as to which allegations pertain to which Deloitte entity.  Deloitte U.S. Mot. Dismiss 9.  Plaintiffs claim that their allegations need not separate the particular roles of the Deloitte entities because they have adequately pleaded that Deloitte U.S. had involvement in, and control over, DTTC's audits of ChinaCast.  Pls.' Opp. Deloitte U.S. Mot. 16-17, Doc. 25.  Plaintiffs also note that the FAC supplements widespread use of "Deloitte," which is a term that the FAC defines to include both DTTC and Deloitte U.S., with at least 33 individualized references to Deloitte U.S. and 54 individualized references to DTTC.  *Id.* at 16.

The Court finds that, while the term "Deloitte" is imprecise, the complaint nonetheless makes sufficiently clear that Plaintiffs' object is to hold Deloitte U.S. liable principally on a theory of vicarious liability for the actions of DTTC.  Am. Compl. ¶¶ 8, 32, 53, 54, 59; *In re*

---

standard nationwide, this Circuit's pre-PSLRA precedent may be used to assess the sufficiency of the Plaintiffs' allegations of scienter in the instant matter.  *Id.* (citing *Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 104 (2d Cir. 2003); *Kalnit*, 264 F.3d at 138; *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) ("[W]e hold that the PSLRA adopted our 'strong inference' standard … Therefore, in applying this standard, district courts should look to the cases and factors" already established by the Circuit.)).

*Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 288-89 (S.D.N.Y. 2005) (describing defendant accounting firms' objections to group pleading as "well-taken," but determining that complaint gave sufficient notice of theory of liability as to each member accounting firm).

Cases such as *Rocker Management, LLC v. Lernout & Hauspie Speech Products N.V.*, No. 00 Civ. 5965 (JCL), 2005 WL 1365772, at *8 (D.N.J. Jun. 8, 2005), cited by Deloitte U.S., are distinguishable.  While *Rocker* held that "lumping together" distinct offices of another global accounting firm, KPMG, violated Rule 9(b)'s particularity requirements, in that case, the plaintiffs failed to allege that the U.S.-based KPMG entity issued any audit opinions or made any statements regarding the subject audits.  *Id.*  Here, Plaintiffs allege that DTTC was required to obtain sign-off from Deloitte U.S. for all of ChinaCast's SEC filings, and on at least one occasion, Deloitte U.S. directed DTTC to write off certain pre-paid expenses from the Company's 10-K, then directly communicated with the SEC regarding the write-off.  Am. Compl. ¶ 54.  Plaintiffs' pleadings, although suboptimal, apprise each Deloitte entity of the nature of their participation in the alleged fraud.  Thus, the Court will not dismiss Plaintiffs' claims against Deloitte Defendants on the grounds of group pleading.  *In re Parmalat*, 375 F. Supp. 2d at 288-89; *see also In re MF Global Holdings Ltd. Sec. Litig.*, No. 11 Civ. 7866 (VM), 2013 WL 5996426, at *23 (S.D.N.Y. Nov. 12, 2013) (describing goals of Rule 8(a), Rule 9(b) and PSLRA) (citation omitted).

### B. Section 10(b) and Rule 10b-5 (First Cause of Action; All Plaintiffs against DTTC)

#### 1. Applicable Law

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing, "in connection with the purchase or sale of any security ... any manipulative or deceptive device or

contrivance," 15 U.S.C. § 78j(b) (1934), while SEC Rule 10b–5, promulgated thereunder, creates

liability for a person who makes "any untrue statement of a material fact or to omit[s] to state a

material fact ... in connection with the purchase or sale of any security."  *In re OSG Sec. Litig.*,

971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5 (1951)).

      To state a private civil claim under Section 10(b) and Rule 10b-5, a plaintiff must plead

that:  (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a

wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the

plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss.  *Dura*,

544 U.S. at 341–42; *see also, e.g.*, *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d

Cir. 2007); *Kalnit*, 264 F.3d at 138.

      DTTC challenges the adequacy of Plaintiffs' allegations concerning whether it (1) made a

material misrepresentation or omission or (2) acted with scienter.  The Court constrains its

discussion accordingly and, for organizational clarity, addresses scienter first.

### 2.  Discussion

#### a.  Pleading Requirements for Scienter

      "[W]hile § 10(b) has been described and may have been contemplated as a 'catchall'

provision, 'what it catches must be fraud.'"  *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F.

Supp. 2d 371, 413 (S.D.N.Y. 2001) (quoting *Chiarella v. U.S.*, 445 U.S. 222, 234–35 (1980)).

Section 10(b) and Rule 10b-5 require plaintiffs to allege a state of mind demonstrating "an intent

to deceive, manipulate or defraud," also known as scienter.  *Ganino v. Citizens Utils. Co.*, 228

F.3d 154, 168 (2d Cir. 2000) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)); *see

also, e.g.*, *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 469 (S.D.N.Y. 2004).  To

satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege facts with

particularity that would give rise "to a strong inference that the defendant acted with the required state of mind." *ECA & Local 134 IBEW*, 553 F.3d at 198.   As Supreme Court precedent dictates, a "strong inference" that a defendant acted with a certain intent is one that is "more than merely plausible or reasonable—it must be cogent and *at least as compelling as* any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314 (emphasis added).  This inquiry goes beyond the ordinary Rule 9(b) framework and requires courts to consider "not only inferences urged by the plaintiff … but also competing inferences rationally drawn from the facts alleged." *Id.*  "The relevant inquiry for the Court 'is whether *all* of the facts alleged, taken collectively, give rise to a *strong* inference of scienter, not whether any *individual* allegation, scrutinized in isolation, meets that standard.'" *In re Magnum Hunter Res. Corp. Sec. Litig.*, No. 13 Civ. 2668 (KBF), 2014 WL 2840152, at *17 (S.D.N.Y. June 23, 2014) (emphasis in original) (citing *Tellabs*, 551 U.S. at 322-23).

A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006); *see also, e.g.*, *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 574 (S.D.N.Y. 2012).  When a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's recklessness "must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal citations omitted); *accord S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).  Here, Plaintiffs solely proceed on the theory that DTTC acted recklessly with respect to the falsity of its statements.

To state a claim based on recklessness, plaintiffs may either specifically allege defendants' knowledge of facts or access to information contradicting defendants' public

25

statements, or allege that defendants failed to check information that they had a duty to monitor. *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 574 (S.D.N.Y. 2012) ("*Longtop I*") (citing *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009)). To the extent that plaintiffs assert that defendants had access to contrary facts, the complaint must "specifically identify the reports or statements containing this information." *Id.* at 574-75 (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 197 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309)); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483-84 (S.D.N.Y. 2008). Nonetheless, it is well-settled that "fraud by hindsight" is not a cognizable theory of relief; "fraud is always obvious in retrospect, but it is not reckless to lack clairvoyance." *Longtop I*, 910 F. Supp. 2d at 579; *see also, e.g.*, *Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636, 640-41 (2d Cir. 2012) (summary order).

The pleading requirements for auditor scienter are particularly stringent. *In re Advanced Battery Technologies, Inc. Sec. Litig.*, No. 11 Civ. 2279 (CM), 2012 WL 3758085, at *15 (S.D.N.Y. Aug. 29, 2012) ("*ABAT I*") ("Courts in this District have repeatedly recognized [that] "[t]he standard for pleading auditor scienter is demanding."); *see also, e.g.*, *Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 571–72 (S.D.N.Y. 2011); *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 488 (S.D.N.Y. 2006) (quoting *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000)). As the Second Circuit described in *Rothman*,

> For recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.

220 F.3d at 98.

26

Allegations of a negligent or "shoddy audit" fail to establish fraudulent intent.  *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 518 (S.D.N.Y. 2011); *In re Puda Coal Sec. Inc., Litig.*, No. 11 Civ. 2598 (KBF), 2014 WL 2915880, at *13 (S.D.N.Y. Jun. 26, 2014) ("Facts merely supporting an inference that an audit could have been done better constitute 'fraud by hindsight' and do not support the requisite scienter.").  Rather, a plaintiff must allege that the auditor employed accounting practices "so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts."  *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007) (citation omitted) (alteration in original); *Marsh & Mclennan*, 501 F. Supp. 2d at 488-89 (quoting *S.E.C. v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)).  "This standard requires more than a failure to follow GAAP."  *In re Scottish Re*, 524 F. Supp. 2d at 385.  Allegations of  "'accounting practices amounting at best to a pretended audit, or of grounds supporting a representation so flimsy as to lead to the conclusion that there was no genuine belief back of it,'" may support a finding of auditor scienter.  *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 254 (S.D.N.Y. 2012) (citations omitted).

"A complaint might reach [the] 'no audit at all' threshold by alleging that the auditor disregarded specific 'red flags,'" which are facts that "would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors."  *Longtop I*, 910 F. Supp. 2d at 574-75 (citation omitted); *see also, e.g.*, *In re IMAX*, 587 F. Supp. 2d at 483-84.  A plaintiff must allege that the auditor had actual awareness of the red flags, "either because they are alleged to have had actual knowledge or because the red flags were so obvious

that the auditor must have been aware of them." *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 622-23 (S.D.N.Y. 2010), *aff'd on other grounds sub nom. Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618 (2d Cir. 2012); *see also MRU Holdings*, 769 F. Supp. 2d at 518-19.  It is insufficient to simply allege that the auditor had access to the information by which it could have discovered the fraud.  *Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 413 (S.D.N.Y. 2010).  "Notably, if an auditor is 'not aware of facts indicating that a transaction was suspicious, or part of a fraud, the auditor's failure to investigate the transaction—even if negligent—does not provide a basis for a fraud claim.'"  *Iowa Pub. Employee's Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 332 (S.D.N.Y. 2013) (quoting *In re CBI Holding Co., Inc.*, 419 B.R. 553, 566–67 (S.D.N.Y. 2009)) ("auditor *access* is not tantamount to auditor *awareness*" (emphasis in original)), *reconsideration denied*, 973 F. Supp. 2d 459 (S.D.N.Y. 2013), *aff'd*, 558 F. App'x 138 (2d Cir. 2014).

As one court observed, "[a]n auditor is a watchdog, not a bloodhound.  As a matter of commercial reality, audits are performed in a client-controlled environment."  *Whalen v. Hibernia Foods PLC*, No. 04 Civ. 3182 (HB), 2005 WL 1799370, at *3 (S.D.N.Y. Aug. 1, 2005) (quoting *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 834 P.2d 745, 762 (Cal. 1992)).  Accordingly, the law imposes limits on § 10(b) liability for failure to uncover fraud perpetrated by others.  *Novak*, 216 F.3d at 309 ("the failure of a non-fiduciary accounting firm to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability").

Blanket allegations of accounting irregularities or failure to follow GAAP, standing alone, cannot pass muster; it is well-established that such allegations must be coupled with "red flags" in order to support a strong inference of scienter.  *Id.*; *see also, e.g.*, *W. Va. Inv. Mgmt. Bd.*

28

*v. Doral Fin. Corp.*, 344 F. App'x 717, 720 (2d Cir. 2009) (summary order); *In re SAIC, Inc.*

*Sec. Litig.*, No. 12 Civ. 1353 (DAB), 2013 WL 5462289, at *8 (S.D.N.Y. Sept. 30, 2013), *on*

*reconsideration*, No. 12 Civ. 1353 (DAB), 2014 WL 407050 (S.D.N.Y. Jan. 30, 2014); *In re*

*Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 511

(S.D.N.Y. 2011); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 610

(S.D.N.Y. 2009); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 657-58 (S.D.N.Y. 2007).

Likewise, on its own, the magnitude of an alleged fraud fails to establish scienter.  *Pennsylvania*

*Pub. Sch. Employees' Ret. Sys. v. Bank of America Corp.*, 874 F. Supp. 2d 341, 362-63

(S.D.N.Y. 2012).  Courts may infer circumstantial evidence of scienter from an auditor's failure

to uncover a large-scale fraud, "just as failing to detect a large boulder in front of your face

qualifies as circumstantial evidence of blindness," *Longtop I*, 910 F. Supp. 2d at 578, but

"scienter is not sufficiently alleged simply because an audit failed to detect a fraud." *ABAT I*,

2012 WL 3758085, at *16.

### b.  Plaintiffs' Allegations Fail to Establish Scienter

Plaintiffs contend that DTTC "recklessly" issued (1) unqualified audit opinions certifying

that ChinaCast's financial statements were prepared in accordance with GAAP and that DTTC

conducted the audits in accordance with PCAOB standards for fiscal years 2007 through 2010

and (2) unqualified opinions on the Company's internal controls over financial reporting for

fiscal years 2008 and 2009.  Am. Compl. ¶¶ 52, 83, 85, 151-52, 207-08; DTTC Mot. Dismiss 22-

23 (citing 2007-2010 Form 10-Ks at F-2).[13]  The Court can infer that DTTC made these

---

[13] DTTC argues that Plaintiffs' 10(b) and 10b-5 claims must be dismissed to the extent that they are based on
statements in ChinaCast's SEC filings other than DTTC's audit opinions, because DTTC did not "make" any false
statements or material omissions in such filings—ChinaCast did.  DTTC Mot. Dismiss 21-22.  In their briefing,
Plaintiffs only appear to assert Section 10(b) liability based on DTTC's audit opinions.  Pls.' Opp. DTTC Mot. 18-
20.  To the extent that the FAC can be construed otherwise, the Court finds that DTTC's audit opinions are the only

statements with fraudulent intent, Plaintiffs claim, because DTTC effectively performed "no audit at all." Pls.' Opp. DTTC Mot. 5-9, 12. Plaintiffs argue that their allegations create an inference of recklessness based on (1) "red flags" and basic accounting failures; (2) the magnitude of the alleged fraud; and (3) the fact that new management quickly discovered the fraud by looking at "the very same records" that DTTC had in its possession. *Id.*

The Second Circuit has held that a "reckless disregard for the truth" signifies "conscious recklessness—*i.e.*, a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*." *S. Cherry St.*, 573 F.3d at 109 (emphasis in original). Viewed collectively, Plaintiffs' allegations come close, but ultimately fall short of this especially stringent standard.

### i.   "Red flags" and Accounting Violations

Plaintiffs argue that the auditor *need not actually have seen* the red flags if they instead establish that a reasonable auditor would have recognized them during a properly-conducted audit. Pls.' Opp. DTTC Mot. 5 (citing, *e.g.*, *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 Civ. 214 (HB), 2014 WL 285103, at *6 (S.D.N.Y. Jan. 27, 2014); *Whalen*, 2005 WL 1799379, at *3). However, the law is clear that "[a]n unseen red flag cannot be heeded," *Stephenson*, 768 F. Supp. 2d at 573, and, as another court put it, "the fact that 'a person has broad access to every book in a library does not mean that the person has read and chosen to ignore facts contained in a particular book in the library.'" *Athale v. SinoTech Energy Ltd.*, No. 11 Civ. 0531 (AJN), 2014 WL 687218, at *7 (S.D.N.Y. Feb. 21, 2014) (quoting *In re aaiPharma Inc. Secs. Litig.*, 521 F. Supp. 2d 507, 513 (E.D.N.C. 2007)).

---

potential basis for its liability under Section 10(b) and Rule 10b-5 because they are the only statements over which DTTC had ultimate authority. *See Janus Cap. Grp., Inc. v. First Derivative Traders*, -- U.S. --, 131 S. Ct. 2296, 2302, 180 L. Ed. 2d 166 (2011) (holding that, in the context of Rule 10b-5, "the maker of a statement is the entity or person with ultimate authority over the statement, including its content and whether and how to communicate it"); *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 160 n.11 (2d Cir. 2012); *In re Philip Servs.*, 383 F. Supp. 2d at 472 n.5 (auditor can only be held liable under Section 10(b) for its own misrepresentations).

The cases cited by Plaintiffs are not to the contrary.  In *Whalen*, the court found that the complaint raised an inference that the auditor "knew or should have known about the company's alleged fraudulent accounting practices" based on plaintiffs' specific allegations of awareness of suspicious facts:  a former finance manager *directly told* PwC that the audited company's "cash situation had become so severe [that] the Managing Director … was paying suppliers out of his personal bank account," and the audited company fell behind on payments *to the auditor itself*, causing PwC to delay its audit—evidence of cash flow problems in the auditor's "own backyard."  2005 WL 1799370, at *4.  Here, the Company's financial filings show only that ChinaCast failed to pay outstanding bills to DTTC after the fraud became public.

Similarly, in *Longwei*, the Court determined that the plaintiffs adequately alleged the auditors' scienter based on their pleading of red flags, the massive scale of the fraud, auditors' failure to follow GAAS, and "the fact that the[] [auditors] had been rebuked for audit deficiencies in the past by the [PCAOB]."  2014 WL 285103, at *5.  The Court also identified specific indicia known to the auditors—record revenues far outpacing competitors, the revenues' sudden upward trajectory, and a particular investment—which "should have prompted further investigation."  *Id.*

As with all allegations at the motion to dismiss stage, courts must view allegations of red flags "in the aggregate."  *In re Refco*, 503 F. Supp. 2d at 658 (citing *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 562 (2d Cir. 1985)).  Taken as a whole, Plaintiffs' allegations here amount to a theory that, had DTTC performed a higher quality audit, i.e., one that complied with GAAS and PCAOB standards, it would have unearthed red flags indicative of ChinaCast's pervasive wrongdoing.  Yet, it is well-established that an accusation that a defendant "merely ought to have known" is insufficient to allege recklessness.  *Kuriakose v. Fed. Home Loan Mtg.*

31

*Corp.*, 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012); *Athale*, 2014 WL 687218, at *7; *Iowa Pub. Emps. Ret. Sys.*, 919 F. Supp. 2d at 332; *Perry v. Duoyuan Printing, Inc.*, No. 10 Civ. 7235 (GBD), 2013 WL 4505199, at *7 (S.D.N.Y. Aug. 22, 2013); *ABAT I*, 2012 WL 3758085, at *16; *Stephenson*, 768 F. Supp. 2d at 568.  Pleading the existence of red flags does not amount to an allegation that the facts and circumstances at issue would have put a reasonable auditor on notice of potential fraud.  *Longtop I*, 910 F. Supp. 2d at 576.

Of Plaintiffs' red flags, only one involves an allegation that DTTC had possession of the source documents evidencing suspicious activity:  the allegation that ChinaCast's trial balances for the years 2007 through 2009 reveal "massive outflows" of cash to, and unexplained inflows from, parties that had "no legitimate business relationship" to the Company.  Am. Compl. ¶ 5. Plaintiffs allege that the trial balances for CCT Shanghai, one of its subsidiaries, reveal transactions with non-education related businesses and thus render false the Company's statement in its Form 10-K filings that "CCT Shanghai does not perform any activities or have any operations outside the scope of" its satellite business.  *Id.* ¶ 135.  However, DTTC correctly notes that this statement did not appear in the Company's financial statements—the portion of the 10-K audited by DTTC.  DTTC Mot. Dismiss 18.

Additionally, the Court finds persuasive DTTC's argument that, in accordance with professional accounting standards, auditors routinely employ sampling procedures.  *Id.* at 16 (citing AU ¶ 350.07).  Because Plaintiffs do not allege that DTTC was required to test the specific CCT Shanghai trial balances that they identify, their allegations amount to no more than an allegation of a lapse in professional judgment.  "PCAOB standards specifically instruct auditors to 'select' a sample of the audited company's journal entries for testing based on the auditor's 'professional judgment.'"  *Id.* (citing AU ¶¶ 316.58(2), 316.61).  Plaintiffs only allege

that a "limited sample" of the CCT Shanghai trial balances revealed dealings with a pawn shop (Am. Compl. ¶ 138), and generally claim that the trial balances "include" evidence of other transactions with unrelated parties (*id.* at ¶¶ 143-47, *e.g.*), but fail to state what proportion of the trial balances such records comprise, or why a failure to sample these particular trial balance entries represents a highly unreasonable or "extreme departure from ordinary care" approximating an actual intent to defraud. *In re Scottish Re*, 524 F. Supp. 2d at 385; *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 302-03 (S.D.N.Y. 2011). *Cf. In re Livent*, 151 F. Supp. 2d at 428-29 (denying in part motion to dismiss where, based upon its random sampling of company records, Deloitte *actually concluded* "that the supporting documentation indicated that there had been fraudulent classification of construction costs in many cases," but thereafter, the audited company repeatedly ignored and failed to comply with Deloitte's requests for substantiation of the suspicious transactions, and Deloitte stopped asking for back-up documentation and failed to expand sampling—reflecting an "egregious refusal to investigate the doubtful.").

Moreover, ChinaCast's business includes "provision of technical services … equipment or property leasing … and system maintenance." DTTC Mot. Dismiss 17 (citing 2010 Form 10-K/A at F-13, 3). Plaintiffs allege no reason why transactions with businesses providing non-education services, such as hardware and equipment leasing, would constitute clear indicia of wrongdoing. *Iowa Pub. Emps. Ret. Sys.*, 919 F. Supp. 2d at 336 (a claim premised on audit failure may survive only if *no reasonable auditor* with access to the same type of information would have opted to issue a clean audit report); *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008)) (finding that outside auditor's failure to follow up on purported discussions of weaknesses in Company's internal controls, revealed by reports at audit meeting,

33

"[a]t most ... may raise an inference that [the auditor] was negligent in not following up on such discussions, but it certainly [did] not show the conscious turning away from the true facts required for recklessness."); *In re Priceline.com Inc. Sec. Litig.*, 342 F. Supp. 2d 33, 57 (D. Conn. 2004) ("[T]he red flags are not so egregious as to render [the auditor's] audit a farce."). And, although the "pawn shop" entries in the trial balances—if seen—should likely have caused an auditor to investigate further, standing alone, this flag is not so grave as to establish that DTTC acted recklessly in a manner suggestive of intent to aid in fraud. *Hanson v. Frazer*, Nos. 12 Civ. 3166 (JSR) and 12 Civ. 4222 (JSR), 2013 WL 5372739, at *5 (S.D.N.Y. Sept. 24, 2013) ("The failure to acknowledge a relatively tangential discrepancy, without more, at best supports a claim of negligence"); *Vladimir v. Deloitte & Touche LLP*, No. 95 Civ. 10319 (RPP), 1997 WL 151330, at *8 (S.D.N.Y. Mar. 31, 1997) (a "properly performed audit" does not necessarily entail "examination of every record in the company's possession").

As for the balance of the red flags, Plaintiffs repeatedly allege access to records that would have revealed suspicious activity, not awareness of facts that would inspire any reasonable auditor to investigate, and only state, in a conclusory fashion, that DTTC's accounting violations rise to the level of "no audit at all."  For example, Plaintiffs claim that, during the course of its audit, DTTC should have obtained records from the Hong Kong Companies Registry, which would have revealed that Ron Chan majority-owned CCT HK since 2003.  However, in the absence of any allegation that DTTC had a reason to suspect that CCT HK was not majority-owned by the Company, this red flag is no different from an allegation that DTTC failed to comply with GAAP and PCAOB standards. *See also ABAT I*, 2012 WL 3758085, at *21-*22 (where audited company's financial statements for 2004-2008 represented that the company fully owned a subsidiary, but then, in 2009, the company publicly disclosed that its then Chairman and

CEO and other investors were and always had been the subsidiary's true owners, court concluded that, even in combination with numerous other alleged GAAP and GAAS violations, the auditor's failure to investigate ownership interests after 2009 was not "sufficiently egregious" to raise an inference that the entire audit was a sham); *accord In re Advanced Battery Techs., Inc. Sec. Litig.*, No. 11 Civ. 2279 (CM), 2013 WL 3784134, at *3 (S.D.N.Y. Jul. 18, 2013) ("*ABAT II*").  Moreover, red flags embedded in publicly available documents do not support an inference of scienter.  *Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 72 (S.D.N.Y. 2010); *see also Athale*, 2014 WL 687218, at *7 (finding that third party's ability to discover alleged fraud without access to company's internal documents failed to establish auditor awareness; "while such discovery 'certainly provides valuable evidence as to the nature and extent of the illegal activity ... it does not constitute evidence that [the auditor] noticed the activity and chose to ignore it.'").

Likewise, Plaintiffs' allegation that, for fiscal year 2009, DTTC should have confirmed with various banks that the Company actually received the proceeds from a $44 million stock offering, because if it had, it would have realized that Ron Chan diverted $35 million outside of the Company is not truly a red flag, because Plaintiffs have not alleged any facts suggesting that DTTC knew, or should have known, that Ron Chan majority-owned CCT HK, the entity into which he diverted the $35 million.  *Dobina*, 909 F. Supp. 2d at 256 (rejecting as insufficient allegations that [Ernst & Young] would have learned the truth" about the audited company's taxes if it "had performed the due diligence it promised").  Indeed, ChinaCast's December 2012 reports indicate that the Company did not know, and was continuing to investigate, how Chan managed to obtain majority ownership of CCT HK without their knowledge or consent.  Am. Compl. ¶ 182.

35

Judge McMahon rejected precisely this type of allegation in *In re Advanced Battery Technologies*, another case arising from a purportedly reckless audit of a Chinese company that entered U.S. markets through a reverse merger.  *ABAT II*, 2013 WL 3784134, at *9-*10.[14] There, Judge McMahon found that, notwithstanding the defendant-auditor EFP's  arguable "duty to familiarize itself with the particulars" of a related-party transaction "in light of the fact that EFP audited ABAT's 2010 financial statements," the plaintiffs' argument boiled down to:  had the auditor "done the bare minimum and obtained the underlying documentation for Shenzhen [the related-party transaction], it would have observed that Defendant Zhiguo Fu, the Company's Chairman and CEO, was involved in the transaction and profiting mightily from it."  *Id.* at *9- *10.  This logic, she concluded, "amount[s] to no more than allegations of professional negligence or shoddy auditing, and therefore do[es] not support a strong inference of auditor scienter."  *Id.* at *11; *see also Hanson*, 2013 WL 5372749, at *5 (where complaint alleged red flag that proceeds of a $9.9 million loan did not go to the designated borrower, and bank wire advice stated that the disbursement was for "raw material expenses," not a loan, the court found that "while the bank wire advice might have suggested a conflict that required further investigation, there is no allegation that the banks saw this conflict and recklessly disregarded it … without the conflict between the wire advice and the purpose of the loan, [the auditor's]

---

[14] The plaintiffs in *ABAT II* alleged, *inter alia*, that:

> Had EPF Rotenberg conducted the most basic of audit duties with professional skepticism it was required to apply, for instance, reviewing the relevant documentation concerning the transaction and verified actual counterparties to the Shenzhen transaction, it would have easily uncovered that ABAT had in fact acquired Shenzhen from Defendant Fu, who had himself acquired the company in 2008 for millions less than what ABAT was paying now to acquire it, and that the Shenzhen "acquisition" was in fact a related party transaction designed to siphon millions of dollars from ABAT to Defendant Fu.

*ABAT II*, 2013 WL 3784134, at *4-*5.

alleged failure to investigate the fact that the funds went to a different entity from the borrower is insufficient to support an inference of recklessness.").

Similarly, Plaintiffs' allegations that *had* DTTC requested confirmation from banks regarding ChinaCast's term deposits, they would have discovered the red flag of their encumbered nature; *had* DTTC confirmed that ChinaCast actually received $5 million from the BVI company owned by Chan, they would have realized that the money never came in; and *had* DTTC confirmed that ChinaCast paid the consideration for its brick-and-mortar universities, it may have uncovered suspicious activity, fall short of alleging that DTTC *must* have reviewed the documents containing these red flags, and then disregarded them.  These types of allegations, again, are merely consistent with a failure to follow PCAOB and GAAS standards.  *See, e.g.*, *Iowa Pub. Emps. Ret. Sys.*, 919 F. Supp. 2d at 332.[15]

Unlike circumstances under which courts have found that an auditor knew of a red flag, this is not a case where the company's own filings "explicitly disclosed problems with internal controls," *Stephenson*, 768 F. Supp. 2d at 579 (citing *Varghese*, 672 F. Supp. 2d at 602, 610), where the auditor possessed "all the paperwork associated with the claimed bogus transactions," *id.* (citing *In re Winstar Commc'ns*, No. 01 Civ. 3014 (GBD), 2006 WL 473885, at *11 (S.D.N.Y. Feb. 27, 2006)), where the auditor directly knew of the suspect transactions, *id.* (citing *In re Philip Servs.*, 383 F. Supp. 2d at 475), or where the auditor actively played a role in developing the company's deficient accounting practices.  *Id.* (citing *In re IMAX*, 587 F. Supp.

---

[15] While Plaintiffs attempt to distinguish cases cited by DTTC, such as *Iowa Public Employees*, 919 F. Supp. 2d at 332, and *In re Tremont Securities Law, State Law & Insurance Litigation*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010), on the grounds that the alleged flags in those cases were only apparent from records of non-client entities, "this is not a difference that makes a difference" because Plaintiffs here likewise allege that DTTC had access to documents that may have revealed the fraud, but do not assert that DTTC must have reviewed such documents. *ABAT I*, 2012 WL 3758085, at *19.

2d at 484).  *See also In re Livent*, 151 F. Supp. 2d at 428-29 (finding allegations of auditor

scienter sufficient where plaintiffs established, among other things, that Deloitte *knew* of

numerous questionable practices performed by audited company, but failed to expand its

sampling, and, despite Deloitte's own expressed concerns about the audit, "continually changed

the account officers in charge … to new, inexperienced staff"); *S.E.C. v. Gold*, No. 05 Civ. 4713

(JS) (MLO), 2006 WL 3462103, at *5 (E.D.N.Y. Aug. 18, 2006) (finding "more than a

negligently performed audit" where auditor allegedly (1) *knew* "selling prices were below their

inventory cost, thereby resulting in a loss," yet did not undertake testing that otherwise would

have been required; (2) was *aware* of blatantly false financial information, but failed to

investigate, then certified that financials complied with GAAP; and (3) "attempted to conceal the

deficiencies of their work" by fabricating backdated statements).

In the aggregate, Plaintiffs' red flags and alleged accounting violations thus fail to tip the

scale from negligence to recklessness.  As discussed *infra*, at this juncture, the Court finds more

forceful the competing inference that Ron Chan effectively concealed the fraud.

### ii.  Magnitude of Alleged Fraud

Courts have repeatedly held that even fraud of Madoff proportions does not, in and of

itself, justify an inference of scienter in the absence of allegations of awareness of red flags.  *In

re Tremont Sec. Law, State Law & Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010)

(rejecting plaintiffs' allegations that auditors were "complicit in Madoff's fraud because they

ignored various 'red flags' and failed to uncover the Ponzi scheme despite having unfettered

access to the funds' records" because plaintiffs failed to allege that the auditors "were aware of

any facts indicative of Madoff's fraud that they consciously disregarded"); *ABAT I*, 2012 WL

3758085, at *10 ("[T]he far more suspicious success of Bernard Madoff s investment fund has been found by several Judges of this District not to constitute a 'red flag' for outside auditors.").

Here, the scale of the alleged fraud "does raise questions regarding [DTTC's] performance of its audits," but ultimately fails to support a strong inference of scienter.  *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 217 (S.D.N.Y. 1999).  ChinaCast is no Potemkin village:  Plaintiffs do not dispute that the Company occupies real offices run by real employees providing real educational services to customers throughout China.  As of March 1, 2010, ChinaCast employed 2,300 people, including 1,600 full-time employees.  Bendinger Decl. Ex. 3 (2010 Form 10-K at 13-14).  Even after the discovery of the fraud, the Board "reiterate[d] that [ChinaCast] is a strong company with great assets, a dedicated employee base and a skilled and independent Board of Directors."  *Id.* at Ex. 2 (Apr. 2, 2012 Open Letter).  Additionally, Individual Plaintiff Woodrum and Ned Sherwood signed the 2010 Form 10-K/A containing purportedly fraudulent statements in February 2012.  *Id.* at Ex. 7 (2010 Form 10-K/A at 57)).  That the Company's own high-ranking executives remained in the dark about the fraud suggests that it was not so open and notorious.  *Cf. Longwei*, 2014 WL 285103, at *2 (finding that facts supported strong inference of scienter where Chinese petroleum company's record sales, which far outstripped its competition, constituted a "red flag," and fraud was "obvious to even a casual observer":  rail tracks supposedly used to deliver fuel showed overgrowth and rust, facilities allegedly visited by executives were dormant for years, and locals knew that facilities were idle).

### iii.  New Management Quickly Unearthed Fraud; Simplicity of Fraud

To the extent that Plaintiffs argue that new management quickly unearthed the fraud, and thus it was easily discoverable, this argument suffers from hindsight bias.  The Company's

public filings suggest that the proxy battle culminating in Ron Chan's termination was crucial to the discovery of the fraud. *In re Livent*, 78 F. Supp. 2d at 220 (holding that "the speed with which the fraud was discovered after the Lynx investment and the change in corporate leadership [was] deceptive:"  the fraud was not unearthed during due diligence, and "the alleged orchestrators of the fraud … had been removed from their managerial positions").  In addition, the Company did not uncover the extent of the fraud perpetrated by Chan immediately, admits that it did not even have access to all of ChinaCast's bank accounts (*see* Bendinger Decl. Ex. 13 (May 14, 2012 Form 8-K)), and indeed the investigation remains ongoing—facts suggestive of a more complicated fraud than Plaintiffs describe. *Longtop I*, 910 F. Supp. 2d at 579 ("Fraud is always obvious in retrospect, but it is not reckless to lack clairvoyance.").

### iv.  Plausible Opposing Inference

Even where a complaint alleges facts sufficient to support a strong inference of recklessness, a court may nonetheless dismiss the plaintiff's federal securities claims if "a reasonable person would [not] deem the inference of scienter ... at least as compelling as ... opposing inference[s] one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  When determining whether the facts alleged by a plaintiff support a "strong inference" of scienter, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24.  The critical inquiry is:  "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326.

The Court finds that, based upon the information allegedly available to DTTC or information that it should have known, rather than recklessness, the more compelling inference is that Ron Chan deceived DTTC, or that DTTC was "merely negligent in the exercise of

40

professional duties they owed to [ChinaCast]."  *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp.

2d 372, 451-54 (S.D.N.Y. 2010).  Plaintiffs' own allegations indicate that for years, Chan and his

cohorts effectively concealed their dealings from the ChinaCast board; the fraud was a "tightly-

held secret."  *Doral Fin. Corp.*, 344 F. App'x at 720 (finding plaintiffs' allegations that auditor

should have uncovered clandestine side agreements undermined by allegation that "these

agreements were a tightly-held secret," only known to a few top-level managers; because "these

agreements were kept secret even from Doral's employees, it seems more plausible that [the

audited company's] managers concealed them from Pricewaterhouse than that Pricewaterhouse

recklessly failed to discover them."); *In re Tremont*, 703 F. Supp. 2d at 371 ("[T]he more

compelling inference as to why Madoff's fraud went undetected for two decades was his

proficiency in covering up his scheme and eluding the SEC and other financial professionals.").

Chan and his allies also engaged tactics to undermine DTTC following their termination,

including failing to pay DTTC, stealing the corporate chops and thwarting the 2011 audit.  These

actions belie an inference that DTTC had an actual intent to aid Chan in fraud.  *Longtop I*, 910 F.

Supp. 2d at 579.

Moreover, at the audit committee's request, FTI consulting performed an "independent

cash confirmation" of the Company's bank balances in 2011, yet did not raise any questions or

concerns to the audit committee or DTTC regarding the Company's cash balances.  DTTC Mot.

Dismiss 15 (citing Bendinger Decl. Ex. 19 (Dec. 27, 2011 Schedule 14A Information at 17)).

While the Court cannot assume that the 2011 balances were the same as the 2007-2010 balances,

FTI's failure to detect fraud provides further circumstantial support for the inference of concealment.[16]

DTTC's motion to dismiss Plaintiffs' First Cause of Action is therefore GRANTED.[17]

### c.   Misstatements or Omissions of Material Fact

While the Court has found that the First Cause of Action fails for failure to adequately plead scienter, Plaintiffs also failed to adequately plead the first element, a material misstatement or omission.

To bring a fraud claim based on a supposed misstatement in an opinion, a plaintiff must assert plausible allegations that "defendants did not [subjectively] believe the statements … at the time they made them."  *City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67 (2d Cir. 2012); *see also Freidus v. Barclays Bank PLC*, 734 F.3d 132, 141 (2d Cir. 2013) (quoting *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011)).  DTTC submits that Plaintiffs fail to allege an actionable misrepresentation by DTTC because the FAC is devoid of any assertion that DTTC *subjectively* believed its opinions to be false.  DTTC Mot. Dismiss 21-22, 24.  "Subjectively falsity" requires a plaintiff to allege specific facts that, if true, would permit a conclusion that "the auditor 'either did not in fact hold that opinion or knew that it had

---

[16] While Plaintiffs argue that FTI's conclusions are "more complex than DTTC lets on," they have not provided additional publicly available documents or SEC filings to support their claim, and the FAC does not mention the FTI report.  Pls.' Opp. DTTC Mot. 16 n.14.  Thus, the Company's 14A disclosures, included as an exhibit to the Bendinger Declaration, are the only materials before the Court on this point.  *Rothman*, 220 F.3d at 88.

[17] The Court notes that it does not premise its holding on DTTC's arguments concerning the outcome of *In re ChinaCast Educ. Corp. Sec. Litig.*, 2012 WL 6136746 (C.D. Cal. Dec. 7, 2012), in which the California court found the inference that Chan successfully concealed fraud from ChinaCast's outside directors more persuasive than an inference of fraudulent intent on the part of the directors.  DTTC Reply Br. 4-5, Doc. 40.  Whether plaintiffs in a separate action adequately alleged scienter as to the Company's outside directors is a separate inquiry from whether facts actually exist to support an inference of either director or auditor scienter.

no reasonable basis for it.'"  *Longtop I*, 910 F. Supp. 2d at 580 (quoting *Lehman Bros.*, 799 F.

Supp. 2d at 302); *accord Hanson*, 2013 WL 5372739, at *7.

Whereas DTTC posits that the pleading requirements for "subjective falsity" are, if

anything, more demanding than the recklessness standard for scienter (DTTC Reply Br. 11),

Plaintiffs argue that, because they have adequately alleged scienter, they necessarily have also

adequately alleged subjective falsity.  This is so, Plaintiffs claim, because pleading standards for

subjective falsity are less demanding than those for scienter.  Pls.' Opp. DTTC Mot. 19-20.  In

support of their position, Plaintiffs rely upon *Freidus v. Barclays Bank PLC*, 734 F.3d at 141,

wherein the Second Circuit noted that "the pleading required for beliefs and opinions 'does not

amount to requirement of scienter.'"  (quoting *Fait*, 655 F.3d at 110)).[18]

The Court notes that, at a minimum, Plaintiffs have not plausibly alleged subjective

falsity with respect to DTTC's statements and opinions that ChinaCast's financial statements

complied with accounting standards and fairly presented the Company's financial position for

the 2010 fiscal year.  DTTC expressed an *adverse* opinion on the Company's internal control

over financial reporting as of December 31, 2010.  Bendinger Decl. Ex. 3 (2010 Form 10-K at F-

2 (audit report)).  The Court finds persuasive Judge Rakoff's logic in *Hanson v. Frazer*:  this

---

[18] Courts have taken a more nuanced approach to analyzing "subjective falsity" than either party suggests.  While district courts within the Second Circuit have characterized the scienter analysis as "substantially the same" as the "stated basis" analysis for subjective falsity in the context of material misstatements (*Lehman Bros.*, 799 F. Supp. 2d at 302; *Hanson*, 2013 WL 5372749, at *8; *Longtop I*, 910 F. Supp. 2d at 581), as Judge Scheindlin has observed, the seriousness of the underlying audit failure determines the weight of the showing that courts have required.  *Longtop I*, 910 F. Supp. 2d at 580.  In some cases, a plainly deplorable audit will render unnecessary additional allegations of an audit opinion's subjective falsity.  *Id.*; *see also McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 134 (S.D.N.Y. 2013) (finding that plaintiffs adequately alleged the falsity of the defendant's opinion—there also, DTTC—given that DTTC subsequently disclaimed the audit report at issue and the "strength of the allegations").  In other cases, courts have required plaintiffs to supplement their pleadings with circumstantial allegations of subjective falsity due to the inherently subjective nature of the underlying accounting violations, such as valuation of goodwill.  *Fait*, 655 F.3d at 110.

would be an "odd fact" for an auditor to publicly admit if it subjectively lacked faith in its

ultimate conclusion that the audited financial statements for the year presented the Company's

financial position fairly.  2013 WL 5372749, at *7 (deeming allegations of subjective falsity of

audit opinions insufficient where auditor pointed out that the audited company had not

maintained effective internal control over financial reporting).

### C.  Section 20(a) (Second Cause of Action; All Plaintiffs against Deloitte U.S.)

#### 1.  Applicable Law

Section 20(a) of the Exchange Act provides as follows:

> Every person who, directly or indirectly, controls any person liable under any
> provision of [the Exchange Act] or of any rule or regulation thereunder shall also
> be liable jointly and severally with and to the same extent as such controlled
> person to any person whom such controlled person is liable, unless the controlling
> person acted in good faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C. § 78t(a).

#### 2.  Plaintiffs' Allegations Fail to Establish A Primary Violation

It is axiomatic that liability for a Section 20(a) violation is derivative of liability for a

Section 10(b) violation.  *See, e.g.*, *In re OSG Sec. Litig.*, No. 12 Civ. 7948 (SAS), 2014 WL

1678915, at *5 (S.D.N.Y. Apr. 28, 2014) (citing *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d

266, 297–98 (S.D.N.Y. 2006)) (in the absence of a primary violation, "control person" liability

under Section 20(a) cannot exist); *McIntire*, 927 F. Supp. 2d at 121-23 (citation omitted) (same).

In light of Plaintiffs' failure to adequately plead a primary violation against DTTC, their Section

20(a) claims against Deloitte U.S. cannot stand.  Deloitte U.S.'s motion to dismiss Plaintiffs'

Section 20(a) claim is therefore GRANTED.

44

### 3.  Plaintiffs Fail to Plead Culpable Participation with Particularity

In any event, the Court finds that Plaintiffs have failed to plead culpable participation with particularity.  The pleading requirements for Section 20(a) claims have long been a source of contention among the Courts of Appeals.  *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 399 n.179 (S.D.N.Y. 2003) (surveying Circuit split).  It is well-established that, to state a claim for "control person" liability under Section 20(a), a plaintiff must, at a minimum, plead:  (1) a primary violation by the controlled person and (2) control of the primary violator by the defendant.  However, as the parties acknowledge (Pls.' Opp. Deloitte U.S. Mot. 23), district courts within the Second Circuit disagree on the question of whether Section 20(a) plaintiffs must also allege "culpable participation" as a third element of their claim, or, alternatively, "whether section 20(a) created a burden-shifting framework where plaintiffs must only plead a primary section 10(b) violation and control, with defendants allowed to raise a good faith defense in their answer that can later be rebutted by plaintiffs."  *See, e.g., Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 245 (S.D.N.Y. 2006) (Karas, J.) (collecting cases).

 Although the Second Circuit has not formally adopted a rule requiring parties to plead the element of "culpable participation," the majority of district courts in this Circuit have required Section 20(a) plaintiffs to allege "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."[19]

---

[19] *See, e.g., McIntire.*, 927 F. Supp. 2d at 121 (Marrero, J.); *In re Satyam Comp. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 482-83 (S.D.N.Y. 2013) (Jones, J.); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165-66 (S.D.N.Y. 2012) (Pauley, J.); *Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*, No. 09 Civ. 3708, 2012 WL 6168151, at *1 (S.D.N.Y. Dec. 11, 2012) (Griesa, J.); *Bayerische Landesbank, New York Branch v. Barclays Capital, Inc.*, 902 F. Supp. 2d 471, 474-75 (S.D.N.Y. 2012) (Stanton, J.); *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 498 (S.D.N.Y. 2011) (Batts, J.), *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012); *In re UBS Auction Rate Sec. Litig.*, No. 08 Civ. 2967 (LMM), 2010 WL 2541166, at *13 (S.D.N.Y. June 10, 2010) (McKenna, J.); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 548 (S.D.N.Y. 2009) (Sullivan, J.); *Lapin*, 506 F. Supp. 2d at 246 (Karas, J.) (collecting cases); *Burstyn v. Worldwide Xceed Grp., Inc.*, No. 01 Civ. 1125 (GEL), 2002 WL 31191741, at *7 (S.D.N.Y. Sept. 30, 2002) (Lynch, J.); *Mishkin v. Ageloff*,

Starting with *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997), the Second Circuit has repeatedly included "culpable participation" where it has had occasion to state the elements of a *prima facie* Section 20(a) case. *See, e.g.*, *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014); *Solow v. Citigroup, Inc.*, 507 F. App'x 81, 83 (2d Cir. 2013); *Ross v. Lloyds Banking Grp., PLC*, 546 F. App'x 5, 12 (2d Cir. 2013); *ATSI*, 493 F.3d at 108, *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998); *see also Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*, No. 09 Civ. 3708 (TPG), 2012 WL 6168151, at *1 (S.D.N.Y. Dec. 11, 2012) ("Although the requirement has indeed only been articulated in dicta, it is clearly worded and has been reiterated without reservation in at least five recent Second Circuit opinions…"). While district courts tend to frame the debate as "whether 'culpable participation' is a required element of a Section 20(a) claim," the debate is more "properly understood" as a disagreement over the *meaning* of culpable participation. *In re Philip Servs.*, 383 F. Supp. 2d at 486 n.13 (citing *Boguslavsky*, 159 F.3d at 720). A small number of district courts have maintained that the Second Circuit's decision to include "culpable participation" as an element of a *prima facie* case fails to convert it into a pleading requirement for a Section 20(a) claim because culpable participation is a less demanding standard than scienter. *See, e.g.*, *In re Tronox*, 2010 WL 2835545, at *15; *WorldCom*, 294 F. Supp. 2d at 415. However, this Court finds more persuasive the line of cases holding that "culpable participation" is an element of a Section 20(a) claim that

No. 97 Civ. 2690 (LAP), 1998 WL 651065, at *22-*25 (S.D.N.Y. Sept. 23, 1998) (Preska, J.). *Contra In re Tronox, Inc. Sec. Litig.*, No. 09 Civ. 6220 (SAS), 2010 WL 2835545, at *15 (S.D.N.Y. June 28, 2010) (Scheindlin, J.) ("While recognizing that other courts in this Circuit have held that proof of recklessness is a necessary element of Section 20(a), and thus, must meet the PSLRA's pleading requirements, I continue to hold that "scienter is not an essential element of a Section 20(a) claim."); *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 439-41 (S.D.N.Y. 2006) (Kaplan, J.); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415, 420 (S.D.N.Y. 2003) (Cote, J.) ("Although previous opinions of this Court have imposed a greater burden on plaintiffs at the pleading stage, this Court now finds that plaintiffs need not meet the PSLRA's heightened pleading standard in alleging a violation of Section 20(a), or separately allege culpable participation.").

must be pleaded with the same particularity as scienter. Because Section 20(a) liability requires

an "individualized determination ... of the defendant [control person's] particular culpability," it

stands to reason that an allegation of "culpable participation" requires "particularized facts of the

*controlling person's* conscious misbehavior or recklessness." *Lapin*, 506 F. Supp. 2d at 246-47

(citing *Boguslavsky*, 159 F.3d at 720) (emphasis added); *Pennsylvania Pub. Sch. Employees' Ret.*

*Sys.*, 939 F. Supp. 2d at 453; *McIntire*, 927 F. Supp. 2d at 121-23 (citing *In re Livent*, 151 F.

Supp. 2d at 414–17) ("[R]ecklessness is the appropriate minimum standard of culpability that

plaintiffs must plead under § 20(a)."); *In re Satyam*, 915 F. Supp. 2d at 482 (citing cases).[20]

Thus, this Court interprets the law in this Circuit, as well as the PSLRA, to require Section 20(a)

plaintiffs to plead "culpable participation," meaning, they must allege facts indicating "that the

controlling person knew or should have known that the primary violator, over whom that person

had control, was engaging in fraudulent conduct." *Burstyn*, 2002 WL 31191741, at *8.

Plaintiffs claim that, to the extent that the Court requires them to plead culpable

participation, they have satisfied their burden. They argue that, because they have pleaded

recklessness by the controlled entity, DTTC, they have also alleged culpable participation by the

*control person*, Deloitte U.S. *See* Pls.' Opp. Deloitte U.S. Mot. 22-24. This argument fails.

Plaintiffs' alleged theory of control is that Deloitte U.S. had the final word on DTTC's

audits and ChinaCast's SEC filings. *Id.* at 21; Am. Compl. ¶ 218. In terms of specific actions

---

[20] As articulated by Judge Preska, given that "a section 20(a) plaintiff must *ultimately* establish a defendant's state of mind, the PSLRA requires a plaintiff, at the pleading stage, to allege particular facts that give rise to a 'strong inference' of the requisite state of mind." *Mishkin*, 1998 WL 651065, at *22-*25; *see also Lapin*, 506 F. Supp. 2d at 247; *In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546 (WHP), 2004 WL 2190357, at *16 (S.D.N.Y. Sept. 30, 2004). Because the PSLRA "specifically links its heightened pleading standard to any cause of action where a particular state of mind is an element of a plaintiff's case, regardless of the stage at which that element must be proven," with respect to culpable participation, it eliminates the usual distinction between elements of a claim that must be pleaded and those which need not be proven until trial. *Mishkin*, 1998 WL 651065, at *23-*24 (citing section 78u–4(b)(2)).

performed by Deloitte U.S., however, Plaintiffs only allege that Deloitte U.S.'s involvement in preparation of the Company's 2010 Form 10-K is emblematic of its role throughout the DTTC-ChinaCast engagement, and explain that, in that instance, Deloitte U.S. directly communicated with the SEC regarding a particular write-off that it had directed ChinaCast to make.  Yet, Plaintiffs do not suggest that the write-off at issue was improper or suspicious, nor does this example amount to an allegation of conscious misbehavior; at most, it is a more detailed allegation of involvement.  Deloitte U.S. Mot. Dismiss 7 n.8.  Thus, even viewing the FAC in the light most favorable to them, Plaintiffs fail to provide specific facts from which the Court might conclude that Deloitte U.S. culpably participated in fraud.  *McIntire*, 927 F. Supp. 2d at 121-23; *Bayerische*, 902 F. Supp. 2d at 474-75; *cf. Pennsylvania Pub. Sch. Employees' Ret. Sys.*, 939 F. Supp. 2d at 449 (denying motion to dismiss where plaintiff alleged that control persons were aware of and failed to disclose potential liabilities, in violation of GAAP, yet still certified statements regarding GAAP compliance).

### D.  Section 18 (Fourth Cause of Action; Select Plaintiffs[21] against all Defendants)

#### 1.  Applicable Law

Unlike Section 10(b) and Rule 10b-5—the proverbial "judicial oak … grown from little more than a legislative acorn"—Section 18 of the Exchange Act has, historically, remained a more narrow and seldom invoked provision.  *Ross v. A. H. Robins Co., Inc.*, 607 F.2d 545, 551-52 (2d Cir. 1979) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737 (1975)).  Section 18 provides that any person who purchases a security, in reliance upon "false or

---

[21] Only Plaintiffs Columbia Pacific Opportunity Fund, L.P.; Fir Tree Value Master Fund, L.P.; Lake Union Capital Fund L.P.; Lake Union Capital TE Fund L.P.; Ashford Capital Management, Inc.; ZS EDU L.P.; MRMP Managers LLP; WHI Growth Fund QP, LP; Woodrum; Berl; Horne; Brightlight Capital Partners LP; and Tortus Capital Master Fund, LP bring this claim.  Am. Compl. ¶ 234.

misleading" statements contained in "any application, report or document" filed with the SEC pursuant to the Exchange Act, may sue any person who made that statement or "caused it to be made." 15 U.S.C. § 78r(a).

To state a claim under Section 18, a plaintiff must plead that (1) the defendant "made or caused to be made" a false or misleading statement, (2) upon which the plaintiff *actually* relied, (3) resulting in loss to the plaintiff. *In re Alstom SA*, 406 F. Supp. 2d 433, 478 (S.D.N.Y. 2005). Importantly, "[u]nlike Section 10(b)'s relaxed standard for pleading reliance … Section 18 requires that plaintiffs allege actual reliance on specific statements in covered Exchange Act filings." *Marsh & Mclennan*, 501 F. Supp. 2d at 493 (citing 15 U.S.C. § 78r(a); *Heit v. Weitzen*, 402 F.2d 909, 916 (2d Cir. 1968) ("Reliance on the actual 10-K report is an essential prerequisite for a Section 18 action and constructive reliance is not sufficient.")). Yet, as Plaintiffs are quick to note, they need not allege scienter to state a claim under Section 18. Pls.' Opp. Deloitte U.S. Mot. 13; Pls.' Opp. DTTC Mot. 20; *In re Alstom*, 406 F. Supp. 2d at 480 ("Section 18, unlike Section 10(b), does not require a plaintiff to plead scienter."). Rather, a defendant's state of mind only gains relevance if asserted as a defense: a defendant can rebut Section 18 liability by proving "that he acted in good faith and had no knowledge that such statement was false or misleading." *See* 15 U.S.C. § 78r(a); *see also, e.g.*, *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 193 (1st Cir. 2005).

### 2.  Discussion

Plaintiffs' theory of Section 18 liability is that DTTC and Deloitte U.S "made or caused materially false and misleading statements to be made" in (1) the Company's annual reports filed with the SEC (Form 10-Ks) for the years ending December 31, 2009 and December 31, 2010;

49

and (2) certain of the Company's quarterly reports (Form 10-Qs) filed with the SEC between March 31, 2010 and November 9, 2011. Am. Compl. ¶¶ 238-39.

### a. Applicability of Rule 9(b)

As a threshold matter, the parties dispute whether Rule 9(b) applies to Plaintiffs' Section 18 claim. Plaintiffs acknowledge that "the Deloitte entities' audit failures are cognizable in both fraud (through recklessness) and negligence," but claim that they can plead negligence and fraud theories in the alternative. Pls.' Opp. Deloitte U.S. Mot. 14 n.7 (citing the Third Circuit's decision in *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 271 (3d Cir. 2006)). This is permissible, they argue, because the FAC includes a disclaimer stating that, for the purposes of their Section 18 claim, Plaintiffs "expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based on solely on [sic] claims of strict liability and/or negligence for false and misleading statements under Section 18 of the Securities Exchange Act." Am. Compl. ¶ 235.

Notwithstanding Plaintiffs' disclaimer, the Court finds that Plaintiffs' Section 18 claim sounds in fraud, and therefore must comply with the requirements of Rule 9(b) and the PSLRA. *See In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, No. 08 MDL 1963 (RWS), 2014 WL 463582 (S.D.N.Y. Feb. 5, 2014); *In re Alstom*, 406 F. Supp. 2d at 483 n.45 (noting that courts have not hesitated to apply Rule 9(b)'s requirements to Section 18 claims). Rule 9(b) applies whenever "the wording and imputations" of a claim involves fraud, and the rule "is not limited to allegations styled or denominated as fraud." *Rombach*, 355 F.3d at 171–72; *see also In re Alstom*, 406 F. Supp. 2d at 483 n.45. Plaintiffs have not cited a case in this Circuit holding otherwise.

Viewing the FAC's factual allegations as a whole, they overwhelmingly speak in terms of Deloitte Defendants' "knowing and/or reckless" actions, not negligence.  Indeed, even certain Section 18-specific allegations solely mention recklessness; for example, the subsection of the FAC entitled "Deloitte Causes the Company to Include False or Misleading Statements in Its Forms 10-Q"—which could only have relevance to Plaintiff's Section 18 claim, their lone claim premised on 10-Q filings—Plaintiffs allege that "Deloitte knowingly or recklessly by failing to conduct any audit at all, caused the Company to be make [sic] statements that were false or misleading at the time and in the light of the circumstances under which the statements were made" (Am. Compl. ¶ 197); and that "Deloitte recklessly disregarded GAAP … and otherwise was reckless in the performance of its review, if it conducted a review at all" (*id.* ¶¶ 198, 202).

The Court finds the logic of *In re Bear Stearns* apposite:  as is true of the instant case, there, the plaintiff "expressly disavow[ed] any claim of fraudulent or intentional conduct in connection with its Section 18 claim."  2014 WL 463582, at *14.  Because the complaint failed to distinguish the factual allegations supporting its Section 18 claim from its Section 10(b) and common law fraud claims, however, the court found that the plaintiff's disclaimer failed to exempt the Section 18 claim from compliance with Rule 9(b).  *Id.*; *see also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (holding that, "[d]espite their disclaimer of any claim of fraud with respect to the Section 11 claim," Rule 9(b)'s heightened pleading standards applied because "plaintiffs have alleged more than mere negligence—the entire complaint sounds in fraud."); *cf. In re Refco*, 503 F. Supp. 2d at 632 (permitting negligence-based allegations brought under Section 11 to coexist with fraud-based allegations where plaintiffs "carefully structured" the complaint to distinguish between its Securities Act

claims and Exchange Act claims, such as by including a section of factual allegations called "Defendants' Negligence.").

Accordingly, the Court will not permit Plaintiffs to disclaim their allegations of fraud simply to avoid the strictures of Rule 9(b).  *See Rombach*, 355 F.3d at 172 ("Plaintiffs assert that their Section 11 claims do not sound in fraud but the wording and imputations of the complaint are classically associated with fraud") (internal quotations and citations omitted); *accord In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 03 MD 1529 (LMM), 2007 WL 2615928, at *9 (S.D.N.Y. Sept. 10, 2007), *adhered to on reconsideration*, 542 F. Supp. 2d 266 (S.D.N.Y. 2008) (citing *Rombach*, 355 F.3d at 172) (plaintiff cannot "merely disclaim allegations of fraud where doing so would allow Rule 9(b) to be avoided"); *id.* ("The Complaint as a whole is targeted at the fraud perpetrated by [defendant] and other parties, not negligence, and the few paragraphs set aside under Count I do not alter the character of Plaintiffs' allegations.").

### b.   Covered Statements

Deloitte U.S. and DTTC both argue that Plaintiffs' Section 18 claims must be dismissed to the extent that Plaintiffs premise them on financial statements made in ChinaCast's 10-Q filings because, as a matter of law, such statements cannot incur Section 18 liability.  Deloitte U.S. Mot. Dismiss 21 (citing 17 C.F.R. § 240.13(a)-(d); *In re Alstom*, 406 F. Supp. 2d at 479); DTTC Mot. Dismiss 27 n.22 (citing same).   Plaintiffs submit that the 10-Q safe harbor in the regulations only exempts "financial information" and accordingly, because they allege misrepresentations of non-financial information in 10-Q filings, their claim may survive.  Pls.' Opp. Deloitte U.S. Mot. 18.

Liberally construed, the FAC alleges that Deloitte Defendants should be held liable under Section 18 for (1) statements DTTC made in its audit opinions and (2) statements that the

Deloitte Defendants caused to be made in 10-Ks and 10-Qs through certification of ChinaCast's financial statements.  Plaintiffs fail to cite any authority in support of its argument that the allegedly false and misleading financial statements in ChinaCast's 10-Q filings, identified by the FAC, fall outside the scope of "financial information."  Indeed, SEC Form 10-Q makes plain that a Company's financial statements constitute "financial information."[22]  Accordingly, the Court GRANTS Deloitte Defendants' motions to dismiss Plaintiffs' Section 18 claim to the extent that it is based on allegedly false portions of financial statements in ChinaCast's 10-Q filings.

### c.   "Made or Caused to be Made"

Deloitte Defendants argue that an auditor only speaks through its audit opinions, and cannot be held responsible for making or causing a company to make other statements in their SEC filings, including audited financial statements.  DTTC Mot. Dismiss 26; Deloitte U.S. Mot. Dismiss 19-20.  Deloitte Defendants rely on the Tenth Circuit's decision in *Deephaven Private Placement Trading, Ltd. v. Grant Thornton LLP*, 454 F.3d 1168, 1174 (10th Cir. 2006), for the proposition that an independent outside auditor cannot force an audited company to make statements in its financial filings, and that the sole end product of an audit is an audit report. Plaintiffs cannot succeed on a claim based on DTTC's audit opinions in any event, DTTC

---

[22] The instructions on Form 10-Q provide as follows:

> PART I—FINANCIAL INFORMATION
>
> **Item 1. Financial Statements.**  Provide the information required by Rule 10-01 of Regulation S-X (17 CFR Part 210).  A smaller reporting company, defined in Rule12b-2 (§ 240.12b-2 of this chapter) may provide the information required by Article 8-03 of Regulation S-X (§ 210.8-03 of this chapter).
> **Item 2.  Management's Discussion and Analysis of Financial Condition and Results of Operations.**  Furnish the information required by Item 303 of Regulation S-K (§ 229.303 of this chapter).
> **Item 3.  Quantitative and Qualitative Disclosures About Market Risk.**  Furnish the information required by Item 305 of Regulation S-K (§ 229.305 of this chapter).

*See* SEC Form 10-Q General Instructions at 5, *available at* https://www.sec.gov/about/forms/form10-q.pdf.

argues, because they fail to allege that DTTC subjectively believed its audit opinions to be false, as *Fait* requires (discussed *supra* at pp. 42-43).

Plaintiffs have not cited a single case adopting their theory that an auditor can be held liable under Section 18 for "causing" a company to make audited financial statements or other SEC filings, apart from its audit opinions, under circumstances such as those alleged here. Plaintiffs identify *In re Adelphia Communications Corporation Securities & Derivative Litigation* as the sole decision in this Circuit to address the issue of what constitutes "causing" a statement to be made for the purposes of Section 18.  Pls.' Opp. Deloitte U.S. Mot. 14.  In that case, Judge McKenna held that the natural meaning of "cause to be made" is that it "describe[s] actors who control the speaker in some way."  *In re Adelphia*, 2007 WL 2615928, at *12. However, Judge McKenna did not define "control … in some way."  Plaintiffs nevertheless argue that Deloitte Defendants controlled ChinaCast "in some way" because their audit opinions were integral to the Company's SEC filings, they signed off on the SEC filings, and they certified the Company's financial statements—thus they can be held liable for any false statements in the Company's SEC filings.  The Court declines to adopt this interpretation.

First, *In re Adelphia* fails to support Plaintiffs' position.  There, Judge McKenna reasoned that an "attorney giving legal advice to a person or corporation making a statement, or assisting in its drafting," could not, "in [any] sense … be understood to 'cause' the statement  to be made."  *Id.*  Analogously, auditors assist in the drafting, preparation and review of SEC filings; it stands to reason that they should not be held liable under Section 18 for performing the same function.[23]

---

[23] Moreover, while Plaintiffs argue that this Court should reject the Tenth Circuit's opinion in *Deephaven* as non-binding authority, and instead expand the "cause to be made" standard announced by Judge McKenna, in a

Plaintiffs argue that DTTC controlled ChinaCast "in some way" because its SEC filings could not have been completed without the audit opinions; however, the Court finds the Tenth Circuit's reasoning in *Deephaven* more logically consistent with the role of an outside auditor than the theory proposed by Plaintiffs.  While auditors indeed serve the important function of "public watchdog," they "do not 'certify' a company's financial statements in the sense that they 'guarantee' or 'insure' them.  Nor do they, by virtue of auditing a company's financial statements, somehow make, own or adopt the assertions contained therein.  Rather, the end product of an audit is the audit report…."  *Deephaven*, 454 F.3d at 1174; *accord Dronsejko v. Thornton*, 632 F.3d 658, 663 (10th Cir. 2011).  Indeed, DTTC's audit opinions explicitly and consistently state that *ChinaCast management* is responsible for "maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting….," whereas DTTC's responsibility is to express an opinion on the Company's internal controls and/or an audit opinion.  Bendinger Decl. Exs. 2-6 (2007-2010 Form 10-Ks).

Accordingly, Plaintiffs may only potentially seek liability under Section 18 for DTTC's own opinions.

### d.  Actual Reliance

Ultimately, the Court finds that Plaintiffs' Section 18 claim fails due to their failure to adequately allege the element of reliance.

---

subsequent decision in *In re Adelphia*, Judge McKenna cited to *Deephaven* for the elements of a Section 18 claim. *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 542 F. Supp. 2d 266, 268 (S.D.N.Y. 2008).

DTTC contends that Plaintiffs have offered exclusively conclusory allegations of reliance in lieu of pleading any facts showing that they actually relied upon DTTC's audit opinions, the only statements that DTTC "made or caused to be made."  DTTC Mot. Dismiss 28-29.

As drafted, Plaintiffs' Section 18 claim does not allege reliance on the audit opinions. Plaintiffs' Section 18 allegations are unique among Plaintiffs' claims in that, unlike all of the others, they do *not* commence by stating, "Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein."  *Compare* Am. Compl. ¶¶ 234-247 *with* Am. Compl. ¶¶ 205, 217, 222, 248.  Plaintiffs' Section 18 allegations detail specific statements in the Company's 10-K and 10-Q filings on which they allegedly relied when purchasing securities (1) between March 30, 2010 and March 16, 2011; and (2) between March 17, 2011 and March 30, 2012, but none of the statements specified in this section of the FAC include DTTC's audit opinions.  *Id.* ¶¶ 240-41.  Thus, Plaintiffs' Section 18 allegations, as drafted, do not include allegations premised on the alleged falsity of, or reliance upon, DTTC's audit opinions.

In its opposition briefing, Plaintiffs argue that DTTC's "false statements in its own audit opinions" nonetheless fall within the ambit of their Section 18 claim.  Pls.' Opp. DTTC Mot. 21-22.  Plaintiffs argue that their Section 18 allegations incorporate the other paragraphs of the FAC by reference, and thus include the allegation that "DTTC issued unqualified audit opinions [for fiscal years 2007-2010] … Plaintiffs specifically read, reviewed, and relied on these false and misleading statements in purchasing ChinaCast Securities."  Am. Compl. ¶¶ 208; *see also id.* ¶¶ 56-57.  In response to DTTC's observation that Plaintiffs' Section 18-specific allegations (*id.* ¶¶ 234-247) exclude any "incorporation by reference" language, Plaintiffs characterize this failure as a "scrivener's error."  Pls.' Opp. DTTC Mot. 24 n.21.

56

Even accepting Plaintiffs' argument that they "clearly intended the substance of their Section 18 claim to encompass DTTC's audit opinions" (*see id.*)—which is at odds with the FAC's text—the FAC fails to identify any specific transactions that ensued as a result of Plaintiffs' purported "eyeball" reliance on DTTC's audit opinions.  This is fatal to the claim.

In *In re Bear Stearns Companies, Inc. Securities, Derivative, & ERISA Litigation*, the court deemed allegations that the plaintiff, in reliance upon alleged misrepresentations in Bear Stearns' 10-K, purchased securities during a "year-long period from March 2007 through March 2008" inadequate to state a claim under Section 18.  *See* No. 08 MDL 1963 (RWS), 2014 WL 463582, at *15 (S.D.N.Y. Feb. 5, 2014); DTTC Reply Br. 14-15 (discussing same).  The court found that the plaintiff's allegations lacked the requisite particularity because they failed to "link [the plaintiff's] review of any particular statements in [the 10-K] or any other document to any actual purchases of Bear Stearns securities and *[did] not identify a particular transaction that it allegedly made in reliance on the document or any other document*."  2014 WL 463582, at *15 (emphasis added).  The plaintiff's response that "every SRM purchase of Bear securities was in reliance on the specific misrepresentations and omissions identified in the Complaint" could not save it; the court deemed such general proclamations insufficiently particularized.  *Id.*  Likewise, in *International Fund Management S.A. v. Citigroup Inc.*, Judge Stein rejected as conclusory the plaintiffs' allegations that "[i]n connection with [their] purchases of Securities after February 23, 2007, Plaintiffs and/or their investment managers read and relied upon Citi's 2006 [and 2007] Form 10–K[s], including the false financial statements and other statements alleged herein to be false or misleading."  822 F. Supp. 2d 368, 386 (S.D.N.Y. 2011).  These allegations failed to satisfy the requirements of *Twombly* and *Iqbal*, the court found, because they are conclusory, claimed reliance on "entire 10-Ks," claimed reliance "for indefinite periods of time," and failed

to allege "supporting factual matter indicating *how* plaintiffs relied on the alleged

misrepresentations."  *Id.* (emphasis added).

Here, Plaintiffs' allegations with respect to reliance on DTTC's audit opinions likewise

fail even construing them in the light most favorable to Plaintiffs, because they only state in the

most general sense that reliance upon DTTC's audit opinions caused *all* Plaintiffs—

undifferentiated from the Section 18 Plaintiffs—to purchase ChinaCast securities; nor do they

identify timeframes during which Plaintiffs purportedly purchased ChinaCast securities as a

result of the audit opinions.  Am. Compl. ¶¶ 9, 57; *Bear Stearns*, 2014 WL 463582, at *15; *Int'l

Fund Mgmt.*, 822 F. Supp. 2d at 386; *Marsh & Mclennan*, 501 F. Supp. 2d at 493 (dismissing

Section 18 claims where plaintiffs failed to allege that they personally read specific actionable

misstatements in covered filings and purchased or sold securities in reliance on such statements).

*But see Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 53-54 (E.D.N.Y.

2011) (concluding, in the context of the case, that the specifics of when plaintiffs made trades

and at what prices those trades were made need not be pleaded to satisfy Rule 9(b); plaintiffs had

provided "ample details concerning which statements are alleged to be fraudulent and why" and

alleged that they bought and sold shares of the Company's stock over the entire period of the

alleged stock-backdating fraud).   As such, the Section 18 Plaintiffs fail to causally link specific

statements by DTTC to their purchase of ChinaCast stock.

Plaintiffs argue that the Third Circuit's decision in *In re Suprema* "unambiguously"

supports their case (Pls.' Opp. DTTC Mot. 28), but even that case makes clear that plaintiffs

must plead "facts probative of [plaintiffs'] actual reliance on any specific false statements."  438

F.3d at 284.  There, the Court of Appeals affirmed the district court's dismissal of the plaintiffs'

"cursory" allegations that "they 'received, reviewed, actually read, and relied upon'" various 10-

K and 10-Q filings in making their decisions to invest in common stock because the plaintiffs failed to allege facts "show[ing] the requisite causal nexus between their purchase of securities and specific statements contained in the SEC filings." 438 F.3d at 284. Relying on precedent outside this jurisdiction, Plaintiffs repeatedly argue that the case law only requires that plaintiffs specifically identify the statements on which they relied; however, Plaintiffs' allegations of reliance on DTTC's audit opinions, *unlike* the eight pages of allegations pertaining to statements in ChinaCast's 10-K and 10-Q in the Section 18-specific portion of the FAC, are more brief and more broad. While Plaintiffs attempt to characterize the cases cited by DTTC, most notably Judge Stein's decision in *International Fund Management S.A. v. Citigroup Inc.*, as solely requiring plaintiffs to specifically identify the statements on which they relied, as explained *supra*, more is required, such as allegations of *how* plaintiffs relied. 822 F. Supp. 2d at 386.[24]

Accordingly, the Court GRANTS the Deloitte Defendants' motions to dismiss Plaintiffs' Section 18 claims.

### E. Common Law Fraud (Fifth Cause of Action; All Plaintiffs against "Deloitte")

#### 1. Applicable Law

To state a claim for common law fraud under New York law, a plaintiff must allege the following: "(1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant[ ] intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5)

---

[24] *Gould v. Winstar Communications, Inc.*, 692 F.3d 148, 161 (2d Cir. 2012), upon which Plaintiffs rely, is likewise distinguishable. There, the court found that a genuine issue of material fact existed, precluding summary judgment for the defendant on a Section 18 claim, where plaintiffs offered evidence demonstrating that a certain employee had a practice of "actively review[ing]" the audit opinions themselves when making the decision to recommend certain stocks, but also testified that she did not recall whether she read the audit opinion at issue. The court held that, based on her testimony, "a jury reasonably could infer" that the employee "actually reviewed and relied on the relevant statements in the documents." *Id.* The case did not address the pleading standard.

as a result of such reliance plaintiff sustained pecuniary loss[.]" *Stephenson v.*
*PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 622 (2d Cir. 2012), *as amended* (June 13,
2012) (summary order) (citing *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 488, 836
N.Y.S.2d 509, 868 N.E.2d 189 (N.Y. 2007)).  New York law also requires the plaintiff to plead
scienter.  *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 380 (S.D.N.Y. 2011) (citing
*Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).  The scienter element for common law
fraud "is essentially the same as that under federal securities laws."  *Saltz*, 782 F. Supp. 2d at 75
(citation omitted); *In re Allou Distributors, Inc.*, 395 B.R. 246, 284 (Bankr. E.D.N.Y. 2008)
(under New York law, "the scienter required to support a common law claim of fraud against
auditors or accountants may be satisfied by a showing of either gross negligence or
recklessness.") (citations omitted).  "Claims of common law fraud must satisfy the requirements
of Rule 9(b)."  *Pasternack v. Lab. Corp. of Am.*, No. 10 Civ. 4426 (PGG), 2011 WL 3478732, at
*5 (S.D.N.Y. Aug. 1, 2011) (quoting *Healthcare Fin. Group, Inc. v. Bank Leumi USA*, 669 F.
Supp. 2d 344, 348 (S.D.N.Y. 2009)).

### 2.  Discussion

Plaintiffs have failed to plead facts that give rise to a "strong inference" of scienter with
respect to either Deloitte U.S. or DTTC.  This failure is dispositive of Plaintiffs' common law
fraud claims for the same reasons already explained with respect to their federal claims.

Accordingly, Deloitte Defendants' motions to dismiss Plaintiffs' common law fraud
claim is likewise GRANTED.

## IV.     DISMISSAL WITHOUT PREJUDICE

In response to their opponents' request for dismissal with prejudice, Plaintiffs seek leave to amend the FAC.  Pls.' Opp. DTTC Mot. 2 n.2; Deloitte U.S. Mot. Dismiss 4; DTTC Reply Br. 15.

Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to replead "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Supreme Court has held that it would be an abuse of discretion, "inconsistent with the spirit of the Federal Rules," for a district court to deny leave without some justification, "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The Second Circuit has stated that a court should allow leave to amend a pleading unless the non-moving party can establish prejudice or bad faith.  *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).  Motions to amend are ultimately within the discretion of the district courts, *Foman*, 371 U.S. at 182, and they should be handled with a "strong preference for resolving disputes on the merits."  *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)) (internal quotation marks omitted).  Indeed, upon granting a motion to dismiss, the "usual practice" in this Circuit is to permit amendment of the complaint.  *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990); *see also, e.g.*, *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, No. 08 MDL 1963 (RWS), 2011 WL 4357166, at *2-*3 (S.D.N.Y. Sept. 13, 2011) (there is a "strong preference" in favor of granting leave to amend) (collecting cases); *Gissin v. Endres*, 739 F.

Supp. 2d 488, 504 (S.D.N.Y. 2010) (same).  Nevertheless, amendment "is not warranted absent

some indication as to what appellants might add to their complaint in order to make it viable."

*Shemian v. Research In Motion Ltd.*, No. 13 Civ. 1602, 2014 WL 2766173, at *3 (2d Cir. Jun.

19, 2014) (summary order) (citation omitted).

　　　While dismissal of Plaintiffs' claims is warranted, such dismissal shall be without

prejudice.[25]  Plaintiffs note that, as a result of the ongoing nature of the ChinaCast investigation,

they have incrementally gained access to "documents and evidence looted by prior

management."  Pls.' Opp. DTTC Mot. 2 n.2.  In their opposition briefing, Plaintiffs argue that

multiple facts absent from the FAC, or not clearly stated therein, would permit the Court to draw

stronger inferences of scienter; for example, Plaintiffs claim that, since filing their amended

complaint, they have become aware of communications evidencing that "to the extent DTTC

reviewed bank statements at all in the course of its audits, it only reviewed the last page and

destroyed all others, thereby ignoring" the fraudulent transactions documented therein.  *Id.*

Plaintiffs' opposition brief also notes that DTTC has admitted to the Company's new

management that it failed to test and confirm CCT HK's bank records and internal controls as

required by the Sarbanes Oxley Act for material subsidiaries.  *Id.* at 10 n.8.

　　　Accordingly, the Court grants Plaintiffs leave to file a motion to amend their complaint

pursuant to Rule 15(a).  *Hanson*, 2013 WL 5372749, at *8 (dismissing complaint without

prejudice and granting leave to replead where plaintiffs' opposition brief and oral argument on

motion cited facts and "drew inferences that are either absent from the Complaint or are not

---

[25] Although, at the pre-motion conference concerning Deloitte U.S.'s proposed motion, Plaintiffs declined the Court's invitation to amend, the Court did not at that juncture determine whether its dismissal would be final.  *Cf. Sinay v. CNOOC Ltd.*, No. 12 Civ. 1513 (KBF), 2013 WL 1890291, at *10 (S.D.N.Y. May 6, 2013), *aff'd*, 554 F. App'x 40 (2d Cir. 2014) (dismissing complaint with prejudice where, at pre-motion conference, court explicitly stated that any ruling on pending motion to dismiss would be with prejudice).

made clear there"); *China Auto. Sys.*, 2012 WL 3205062, at *16 (granting leave to amend where additional allegations, proffered in plaintiff's opposition brief, might, if properly plead, raise a strong inference of scienter sufficient to state a Section 10(b) claim). *Cf. City of Pontiac Policemen's & Fireman's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) (denying leave to amend where plaintiffs failed to offer any "additional facts or legal theories—either on appeal or to the District Court—they might assert if given leave to amend").

The Court cautions Plaintiffs that it will only grant a motion to amend the FAC to the extent that they can correct the deficiencies noted in this Opinion. *Longtop I*, 910 F. Supp. 2d at 581. Plaintiffs are directed to file their motion to amend within twenty (20) days of the date of this Opinion, which shall include as an exhibit a copy of the proposed second amended complaint. *ABAT I*, 2012 WL 3758085, at *24.

## V.      Conclusion

For the reasons set forth above, the Deloitte Defendants' motions to dismiss are GRANTED. Plaintiffs' motion to amend shall be due within twenty (20) days of the date of this Opinion. The Clerk of the Court is respectfully directed to terminate the motions, Docs. 14, 32.

It is SO ORDERED.

Dated:      July 21, 2014
            New York, New York

                                        Edgardo Ramos, U.S.D.J.

63