UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

SPECIAL SITUATIONS FUND III QP, L.P.;     :
SPECIAL SITUATIONS CAYMAN FUND, L.P.;     :
COLUMBIA PACIFIC OPPORTUNITY FUND,        :
L.P.; FIR TREE VALUE MASTER FUND, L.P.;   :
FIR TREE CAPITAL OPPORTUNITY MASTER       :     No. 1:13-cv-01094 (ER)
FUND, L.P.; LAKE UNION CAPITAL FUND       :
L.P.; LAKE UNION CAPITAL TE FUND L.P.;    :
ASHFORD CAPITAL MANAGEMENT, INC.; ZS      :
EDU L.P.; MRMP MANAGERS LLC; WHI          :
GROWTH FUND QP, LP; DOUGLAS N.            :
WOODRUM; ROBERT A. HORNE; HOWARD S.       :
BERL; BRIGHTLIGHT CAPITAL PARTNERS        :     Oral Argument Requested
LP; and TORTUS CAPITAL MASTER FUND, LP,   :
                                          :
              Plaintiffs,                 :
                                          :
        v.                                :
                                          :
DELOITTE TOUCHE TOHMATSU CPA, LTD.;       :
DELOITTE & TOUCHE LLP; ANTONIO SENA;      :
JUSTIN TANG; YIN JIANPING; RICHARD XUE;   :
MICHAEL SANTOS, JOHN AND JANE DOES 1-     :
10; and ABC CORPS. 1-10,                  :
                                          :
              Defendants.                 :

------------------------------------------------------------------x

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
THEIR MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT
AGAINST DEFENDANT DELOITTE TOUCHE TOHMATSU CPA LTD.**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT .................................................................................................................2

    I.      THE SAC PLEADS A VALID SECTION 10(B) CLAIM
          AGAINST DTTC.................................................................................2

          a.      Scienter is Adequately Alleged.................................................2

          b.      The SAC Pleads Actionable Misrepresentations by DTTC......................13

    II.     THE SAC ADEQUATELY PLEADS RELIANCE UNDER
          SECTION 18.......................................................................................14

    III.    THE SAC STATES A CLAIM FOR COMMON LAW FRAUD.........................15

CONCLUSION.............................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**PAGES**

Cases

*City of Pontiac Gen. Empls. Ret. Sys. v. Lockheed Martin Corp.,*
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)........................................................................4

*Freidus v. Barclay's Bank PLC,*
    734 F.3d 132 (2d Cir. 2013)..................................................................................13

*In re Lehman Bros. Sec. & ERISA Litig.,*
    799 F. Supp. 2d 258 (S.D.N.Y. 2011).....................................................................14

*In re Magnum Hunter Res. Corp. Sec. Litig.,*
    No. 13 Civ. 2668 (KBF), 2014 WL 2840152 (S.D.N.Y. June 23, 2014) ..................4

*In re MF Global Holdings Ltd. Sec. Litig.,*
    982 F. Supp. 2d 277 (S.D.N.Y. 2013).......................................................................4

*In re Scottish Re Group Sec. Litig.,*
    524 F. Supp. 2d 370 (S.D.N.Y. 2007).......................................................................2

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)...............................................................................................2, 4

*Varghese v. China Shenghuo Pharm. Holdings, Inc.,*
    672 F. Supp. 2d 596 (S.D.N.Y. 2009).........................................................2, 4, 7, 11

*Whalen v. Hibernia Foods PLC,*
    No. 04 Civ. 3182, 2005 WL 1799370 (S.D.N.Y. Aug. 1, 2005) .........................3, 13

## PRELIMINARY STATEMENT[1]

The SAC's well-pled allegations bespeak a corrupt accounting firm facilitating its corrupt client's fraud on US investors:  Defendant Deloitte Touche Tohmatsu CPA Ltd.'s ("DTTC") audit partner, Chiu, actively colluded with ChinaCast's management on fraudulent accounting, including how to conceal a large, uncollectable receivable from shareholders.  DTTC knew that ChinaCast did not own a majority interest in a material subsidiary of which it claimed to own over 98%.  Virtually every one of ChinaCast's major transactions in 2008 and 2009 – the stock sales to Chan and others, the misappropriated public offering and the "brick and mortar" university purchases – were either outright frauds or had fraudulent components.  CCT BVI, whose business segment accounted for over half of the Company's revenues, booked fictitious sales that customers would not confirm, while CCT SH, one of CCT BVI's subsidiaries, engaged in over 1 billion RMB worth of transactions with unrelated parties that had no conceivably legitimate connection to the Company's business.  DTTC reviewed the general ledgers for both entities as part of its audits, yet never even questioned these flagrantly improper transactions.  The Company's major assets, its term deposits, were largely pledged to cover the debts of unrelated third parties – a fact DTTC consciously chose not to ask the banks to disclose.  DTTC also became aware of extensive material weaknesses in ChinaCast's internal controls that it simply chose to ignore in conducting its audits and issuing its opinions on the integrity of the Company's financial statements.  Then, when new management – who was trying to get to the bottom of Chan's manifold scamming – requested documentation from DTTC for its audit conclusions, DTTC refused or failed to provide key pieces of information and eventually ceased

---

[1]   This brief responds to Defendant Deloitte Touche Tohmatsu CPA Ltd.'s Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to File Second Amended Complaint ("DTTC Br."). Capitalized terms used herein have the same meaning as used in the SAC.

cooperating altogether.

Viewed collectively, as *Tellabs* requires, these allegations are sufficient to plead valid securities and common law fraud claims against DTTC. The Court should grant Plaintiffs leave to file the SAC and order the parties to begin discovery.

## ARGUMENT

## I. THE SAC PLEADS A VALID SECTION 10(B) CLAIM AGAINST DTTC

### a. Scienter is Adequately Alleged

Judging from the tenor and contents of its opposition brief, DTTC apparently believes an auditor is never liable for fraud committed by one of its clients. Under DTTC's view, even when, among other things, it reviews client documents that clearly indicate fraud or deliberately refuses to ask for information that will contradict its audit findings, it can still pass the "no audit at all" standard and escape legal responsibility for the consequences to investors so long as it can claim it did something – anything – that looks like an audit procedure.

That, of course, is not the law. Indeed, it is in the case of corrupt management that investors most heavily rely on the integrity and comprehensiveness of the watchdog functions performed by an independent auditor. Auditor conduct – like DTTC's here – amounting to "an egregious refusal to see the obvious, or to investigate the doubtful" or involving accounting judgments "that no reasonable accountant would have made … if confronted with the same facts" constitutes recklessness that subjects the auditor to liability for securities fraud. *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 609-10 (S.D.N.Y. 2009) (quoting *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 398 (S.D.N.Y. 2007)) (internal quotation marks omitted). That standard is met where the auditor ignores red flags, of which it was aware, that "would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." (Op. at 27

-2-

(citation omitted).)  *See also Whalen v. Hibernia Foods PLC*, No. 04 Civ. 3182, 2005 WL 1799370, at *4 (S.D.N.Y. Aug. 1, 2005) ("[W]hen all the 'flags' run up the same pol[e], it seems inescapable that a reasonable auditor was on notice, and acted recklessly when it disregarded all the 'flags.'").  At a minimum, that is what happened here.  Auditors may not be "bloodhounds," (Op. at 28), but neither can they be craven watchdogs who can escape accountability for turning a blind eye to the burglar coming through the window to rob the house.  DTTC was just such a craven watchdog.

DTTC points to three supposedly "odd" facts that it claims negate the inference that it acted with scienter.  (DTTC Br. at 3-4.)  But, when construed against the backdrop of the SAC's specific allegations, these "facts" simply do not exculpate DTTC.  Chan and his cohorts may well have "effectively concealed their dealings" from investors, ***but not from DTTC***.  (*Id*. at 3.)  DTTC knew of fraudulent transaction after fraudulent transaction at ChinaCast, and even helped implement at least one of them.  Moreover, that DTTC rendered an adverse opinion on the Company's internal controls over financial reporting as of December 31, 2010 (but not December 31, 2009) and was aware of serious internal control issues and missing financial information in 2009 that resulted in substantial delay in filing ChinaCast's 10-K for that year – but ***nevertheless issued a clean audit opinion*** on both years' financial statements despite what it knew about fraud at ChinaCast – actually substantiates DTTC's scienter.  (*Id*.)  The purpose of identifying internal control deficiencies in an audit is not solely to inform investors about those deficiencies, but also so that the ***auditor*** can then use what it knows about those weaknesses to assess the integrity and completeness of the financial statements themselves through a more rigorous audit.  One thus cannot infer that DTTC conducted an audit free of recklessness merely because it correctly (albeit belatedly) identified that ChinaCast had internal control weaknesses.

To the contrary, those weaknesses are themselves a red flag that, when combined with DTTC's actual knowledge about pervasive fraudulent transactions at ChinaCast and deliberate disregard of other red flags detailed in the SAC (and discussed below), demonstrates DTTC issued its false audit opinions at least recklessly (and weakly tried to cover up its complicity). *See, e.g.*, *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 609 (S.D.N.Y. 2009). It simply cannot be the case that a reckless (if not collusive) auditor who belatedly issues a correct accounting determination about one aspect of the company's pervasive wrongdoing somehow becomes insulated from liability for its otherwise false audit opinions.

None of DTTC's purported responses to the new facts pled in the SAC undermine the cogent and compelling inference that it acted with scienter. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (a "strong inference" of scienter is one that a reasonable person, considering the allegations in the complaint as a whole, would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged").[2] Although DTTC strives mightily to manufacture inferences from Plaintiffs' allegations that are favorable to itself, none is more plausible than the inference of fraud. The totality of Plaintiffs' allegations in this case depicts an auditor that blinded itself to indicia of fraud at every turn. DTTC had no intention of ever issuing a negative audit opinion on ChinaCast's financial

---

[2]  In seeking to pick apart each of Plaintiffs' allegations in isolation, DTTC ignores the fact that the relevant inquiry "'is whether *all* of the facts alleged, taken collectively, give rise to a *strong* inference of scienter, not whether any *individual* allegation, scrutinized in isolation, meets that standard.'"  *In re Magnum Hunter Res. Corp. Sec. Litig.*, No. 13 Civ. 2668 (KBF), 2014 WL 2840152, at *17 (S.D.N.Y. June 23, 2014) (emphasis in original) (citing *Tellabs*, 551 U.S. at 322-23).  If, as here, the "big picture" painted by the complaint's allegations gives rise to a strong inference of scienter, then the complaint passes muster under the PSLRA.  And a strong inference of fraudulent intent need not be irrefutable, or of the "smoking gun" variety, "or even the most plausible of competing inferences."  *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013) (quoting *Tellabs*, 551 U.S. at 324).  A "tie" on scienter goes to Plaintiffs at the motion to dismiss stage.  *City of Pontiac Gen. Empls. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

statements, no matter what its audit work revealed.[3]

   **CCT SH (SAC ¶¶ 22-28; 170-91.)**.   As explained in Plaintiffs' moving brief, CCT SH was a pass-through, shell entity for profits collected from the SOEs (including CCLX). Thus, CCT SH's general ledger, which DTTC possessed and reviewed as part of its audit, should have reflected virtually nothing except inter-company transfers -- payments from CCLX and transfers to CCT BVI (CCT SH's parent).  (SAC ¶¶ 170-91.)  Yet, *45%* of the transactions on the 2009 general ledger was comprised of *465* different third-party transactions, of which 213 were transactions with pawn shops, piston companies and other trading companies that, on their face, have no relation to the business of CCT SH.  Not only was CCT SH sending money to these entities, but it was also receiving hundreds of millions of RMB in cash from those same companies.  The 213 transactions with clearly unrelated third parties accounted for incoming receipts of 610 million RMB (more than three times ELG's 2009 total reported annual revenues of 196 million RMB), and outgoing payments of 629 million RMB.  The obvious conclusion was that ChinaCast was taking out hundreds of short term loans that were not disclosed in its financial statements – a red flag for any reasonable auditor.

   These specific allegations in the SAC resolve the concerns articulated by the Court when it deemed the allegations about these transactions in the FAC insufficient.  (*See* Op. at 32-34.)   The SAC explains the proportion of the transactions on the general ledger the questionable entries comprise, and provides specific reasons for why these transactions constitute clear indicia of wrongdoing.  As a pass-through entity, CCT SH should not have had *any* of these transactions on its general ledger.  Moreover, given the number of problematic transactions that

---

[3]  Given space constraints, Plaintiffs are only responding to DTTC's most salient arguments.  For any argument not specifically addressed herein, Plaintiffs rest on the SAC and the arguments made in their moving brief.

appear on the 2009 general ledger, no sample constructed in good faith for purposes of testing the entries could possibly have missed them all.

DTTC argues that the transactions at issue were not per se inappropriate because ChinaCast's 10-K describes CCT SH as an operating entity that would be expected to buy goods and services from other companies.  (DTTC Br. at 16.)  That simply is not true.  The portion of the 2009 10-K on which DTTC relies is discussing the provisions of the Technical Services Agreement between CCT SH and CCLX.  (Bendinger Decl., Ex. 4 at 8-9.)  It is true that, under the terms of that Agreement, CCT SH was to supply "CCLX with ancillary equipment" and provide technical services for use in CCLX's business.  (*Id*. at 8.)  But the important point is ***how*** CCT SH fulfilled those obligations; it did so by having CCLX acquire what it needed from others and then deduct those expenses from the monthly service fee it was contractually required to remit to CCT SH.  (*Id*.)  This was a pass-through arrangement designed to enable ChinaCast to realize the economic fruits of the satellite education business even though CCLX, and not ChinaCast, owned the relevant satellite licenses.  CCT SH did not have any business operations of its own.  It was a shell, and DTTC could not possibly have believed otherwise.

However, even if DTTC believed that CCT SH was an operating entity that legitimately would have purchased goods and services from metal factories (although never from a piston pin factory or a pawn shop), that still would not explain why CCT SH ***received*** 610 million RMB in cash – three times reported revenues – from those same entities in a single year. Given what it knew about ChinaCast's business, DTTC could not possibly have thought these transactions were legitimate.  CCT SH had nothing to sell to a piston factory, metal factory or pawn shop, and the sheer volume of these receipts was an obvious red flag that no reasonable auditor would have ignored.  DTTC has no response to this point.

DTTC is severely mistaken when it suggests that it was free to ignore everything in the general ledger so long as the **billions** of RMB worth of obviously improper transactions documented therein netted to zero by the end of the year (which, of course, they didn't – *see* SAC ¶ 180).  As a public watchdog, an auditor is not free to so finely compartmentalize the knowledge it acquires during an audit.  DTTC reviewed the CCT SH general ledger for 2009, which revealed over 200 blatantly improper transactions – a red flag indicative of wrongdoing that no reasonable auditor would have just disregarded.  DTTC's choice to ignore that red flag constituted an "an egregious refusal to see the obvious, or to investigate the doubtful." *Varghese*, 672 F. Supp. 2d at 609-10.  (*See also* Op. at 34 (noting the "'pawn shop' entries in the trial balances – if seen – should likely have caused an auditor to investigate further").[4]  That is enough to allege DTTC acted with scienter.

**ChinaCast's Lack of a Majority Ownership Interest in CCT HK (SAC ¶¶ 15-19; 122-27).**  ChinaCast's financial statements (the ones DTTC purportedly audited) represented to investors that ChinaCast indirectly owned 98.50% of the "issued share/registered capital" of CCT HK, a Hong Kong-based subsidiary that acted "as a liaison office for the Company's

---

[4]   The same pattern of DTTC's ignoring obviously inappropriate transactions in documents it actually reviewed occurred with respect to transfers between CCT BVI and CCT HK, on the one hand, and New Action, an unaffiliated health products company, on the other.  (SAC ¶¶ 19-20, 46, 304.)  Like those that appeared on the CCT SH general ledger, these transactions consisted of in-and-out transfers that simply could not have been construed as legitimate purchases of goods and services.  It defies credulity for ChinaCast to have both been selling learning services to New Action **and** buying health products from that entity at the same time.  DTTC's only response is to speculate that it might not have been given accurate bank statements during the course of its audits.  (DTTC Br. at 19.)  The SAC, however, alleges nothing of the sort, and DTTC must take the SAC as it finds it.  It does not get to make up its own allegations and then attribute them to Plaintiffs.  As for CCT BVI's sham revenues (SAC ¶¶ 230-35), DTTC both ignored the fact that CCT BVI did not engage in revenue-generating operations of its own and that the alleged revenue was not reflected in the bank statements for that entity.  It is no answer to claim that ChinaCast's 2010 10-K said that customers "may" engage one of the Company's subsidiaries directly to provide satellite broadband services.  (DTTC Br. at 18.)  No customer engaged CCT BVI for such services, a fact that was quite obvious from the bank statements' failure to reflect payment for any such transaction.

operation" and also received all funds raised from US investors.  (Declaration of Gary F. Bendinger ("Bendinger Decl."), Ex. 4 at F-11; SAC ¶ 17.)  This was false.  In fact, Chan owned 50% of CCT HK personally, and the Company owned only a minority interest.  Moreover, because the Company owned only a minority interest, CCT HK should not have been consolidated in ChinaCast's financial statements, as subsequently admitted by Deloitte's John MacKay.  (SAC ¶ 126.)  DTTC knew about Chan's ownership all along from information that ChinaCast itself provided.  (Id. ¶ 125-126.)  Yet DTTC repeatedly signed off on the false financial statements.  If that is not scienter, it is hard to see what would be.

DTTC's response to this quite straightforward explanation of its knowing participation in fraud is quite anemic (albeit lengthy).  DTTC first claims that a 2004 public filing by ChinaCast disclosed that Chan partially owned CCT HK "for the benefit" of ChinaCast.  (DTTC Br. at 9 (citing Bendinger Decl., Ex. 16 at 63).)  Except that what the document actually says is that ChinaCast Technology (BVI) Limited owns 100% of CCT HK, but drops a footnote disclosing that Chan "holds one ordinary share HK$1 in the share capital of CCT HK on trust for CCT."  (Bendinger Decl., Ex. 16 at 62-63.)  What it *does not say* is that the Company owned only a minority interest in CCT HK and that the rest was owned by Chan in his personal capacity (and not in any sort of "trust"), which was the truth.  Moreover, even if the document could somehow be read to suggest that ChinaCast had only a minority ownership position in CCT HK, this disclosure was not repeated in the 10-Ks representing that ChinaCast owned 98.50% of CCT HK, which means any reasonable investor would construe the earlier statement as having been superseded.  The 10-Ks are what misled investors, and DTTC gave a clean audit opinion to representations in those 10-Ks it knew to be false.

When confronted with its complicity in this fraud by the Company's new

management in 2012, DTTC falsely claimed to have a trust agreement by which Chan had transferred his 50% interest in HK to CCT BVI (which, if true, would mean ChinaCast did indirectly own the majority of CCT HK).  (SAC ¶ 126.)  But DTTC could not actually produce a copy of that agreement, because it was a lie.  No such agreement exists.  (*Id.*)

DTTC's elaborate disquisition on the intricacies of the consolidation rules, under which it now asserts it **could have** concluded that CCT HK should still have been consolidated with ChinaCast despite Chan's 50% personal ownership, entirely misses the point.  (DTTC Br. at 12.)  That is not the justification DTTC gave for consolidation at the time the statements were made (or even to the Company's new management in 2012).   The financial statements communicated to a reasonable investor that consolidation was appropriate because ChinaCast owned 98.50% of CCT HK.  That was false, and DTTC knew it was false.  Even if DTTC's post-hoc rationalization for consolidation had some validity, ChinaCast's financial statements were still false by failing to disclose the Company's true ownership in one of its material subsidiaries.

**Chan's Embezzlement of $35 Million From a Company Stock Offering (SAC ¶¶ 16-17; 197-98; 301-02.).**  Far from a mere "lapse in professional judgment" (DTTC Br. at 14), DTTC's conduct in connection with Chan's embezzlement of stock offering proceeds amounting to over 70% of ChinaCast's total reported cash for 2009 reveals deliberate disregard of numerous red flags of which it was actually aware.  *First*, DTTC knew that CCT HK – the recipient of all funds received from US investors (SAC ¶ 17) – was majority-owned by Chan in his personal capacity.  Knowledge that millions of dollars of investor funds were being deposited in a company controlled by someone other than ChinaCast itself would cause a reasonable auditor to pay close attention to the disposition of those funds.

*Second*, DTTC knew that it had excluded CCT HK from its Sarbanes-Oxley

Internal Control Testing in its 2009 audit plan.  (SAC ¶ 302.)  That itself was a reckless decision given that it is hard to imagine a subsidiary more material to the Company than the one receiving *all* of the proceeds of its stock offerings to US investors (an allegation that DTTC not only does not contest, but affirmatively (albeit incorrectly) relies on in its own defense (DTTC Br. at 14)). (SAC ¶ 17.)  In light of the role played by that subsidiary, no reasonable auditor could have reached the conclusion that CCT HK was not "material" to ChinaCast.  (DTTC Br. at 15.)  But even leaving that problem aside, DTTC indisputably knew in 2009 that huge amounts of investor funds were being deposited in a subsidiary that ChinaCast did not control and the internal controls of which DTTC was not auditing.

       *Third*, as discussed above in connection with CCT SH, DTTC knew that ChinaCast subsidiaries engaged in millions of dollars of in-and-out cash transactions with no business justification.  That gave DTTC additional reason to carefully examine the disposition of investor funds in a partially-owned subsidiary whose internal controls it was not auditing.

       *Fourth*, DTTC was required to, and did, review CCT HK's bank statements as part of its 2009 audit, which revealed the transfers of $35 million of the stock offering proceeds out of CCT HK to an account belonging to "Thriving Eagle," a company owned by Jiang Xian Yuan's nephew.  (SAC ¶¶ 197, 200.)  So, DTTC knew that $35 million in investor funds were being transferred out of CCT HK – a partially-owned subsidiary whose internal controls it was not auditing – to an independent company.  The ***only*** explanation for DTTC's failing to question this transaction – a bright, scarlet, fluttering flag – is that it deliberately ignored it.

       DTTC's only response is to assert that transfers of investor funds out of CCT HK were "far from surprising" because U.S. dollars had to be converted to Hong Kong dollars and then to Chinese currency for use in China.  (DTTC Br. at 14.)  The problem with this argument is

that currency conversion was plainly not the purpose of this particular transfer.  If it were, one would have expected the transferee to be a bank or some other financial institution or currency broker, not a company called "Thriving Eagle."  DTTC's failure to question this transaction – plainly apparent from the bank statement it reviewed – constitutes "an egregious refusal to see the obvious, or to investigate the doubtful."  *Varghese*, 672 F. Supp. 2d at 609-10.  And, yet again, just like the phantom Chan trust agreement, when asked by new management to produce the 2009 bank statements for CCT HK, DTTC delayed and dithered and then claimed it did not have them.  (SAC ¶¶ 199-200.)  The real reason DTTC did not produce them is because of what they would have showed – sheer auditor recklessness.[5]

**Collusion by DTTC's Audit Engagement Partner in the Fraud (SAC ¶¶ 29-32; 307-09)**.  Chiu, DTTC's engagement partner, colluded with ChinaCast in concealing from investors the collectability of approximately 110 million RMB in "non-current advances" due from CCL.  ChinaCast did not make these advances *gratis*; CCL owed the money back, which is why Chiu himself described the advances as "the receivable from CCL" (and also why DTTC's current effort to call them something else is quite telling).  (SAC ¶ 30; DTTC Br. at 5.)  The issue was that CCL could not pay the money back, and this became a real problem when Jian Ping (who for all intents and purposes was CCL) resigned from ChinaCast in August 2009.  Chiu, excluding from the discussion over this "highly sensitive" issue the DTTC partner who

---

[5]  DTTC's treatment of the pledged term deposits also bespeaks complicity in the fraud. (SAC ¶¶ 128-135; 144-49.)   DTTC deliberately refused to inquire into whether ChinaCast had pledged its term deposits, and, in flagrant violation of standard audit procedure, crafted its bank confirmation requests to specifically refrain from asking the banks to confirm the deposits were not pledged.  (*Id.* ¶ 135.) Remarkably, DTTC says this proves "it did not perform 'no audit at all'" because it asked the banks about *some* aspects of the term deposits – just not the ones that mattered.  (DTTC Br. at 20.)  But the fact that the one question DTTC omitted from its bank requests was the one that, if answered truthfully, would have revealed the fraud gives rise to a strong inference of willful blindness on DTTC's part – especially when considered in combination with DTTC's failure to review the debt cards, which also showed the pledges.  No reasonable auditor would have acted as DTTC did.

was set to replace him, arranged for a private meeting with ChinaCast management to concoct a subterfuge for hiding the receivable's lack of collectability.  After substantial delay in resolving the issue, what Chiu and ChinaCast came up with was to re-characterize the receivable as a sham "prepayment" for a VSAT (satellite) license renewal service fee, despite the fact that the uncollectible advance should simply have been written off years earlier.  (SAC ¶¶ 30-33.)

DTTC's rejoinder addresses the wrong issue – namely whether the "prepayment" should have been booked all at once or amortized over the course of the "Service Agreement" that ChinaCast entered into with CCL, and what the Securities and Exchange Commission ("SEC") thought about that.  (DTTC Br. at 5-6.)  But the real issue is that, by entering into the Service Agreement and re-characterizing the receivable as a "prepayment," the Company gave investors the impression that it was getting a great deal in avoiding future cash payments for license renewal fees by using its "non-current advances" instead, when in reality all it was doing was writing off an uncollectable advance to an insider that it should have written off years before.  No one told that part to the SEC.  Chiu, however, did exactly what ChinaCast wanted him to do – he came up with a way to dispose of the advances that would not look like a simple write-off.  That constitutes auditor collusion in its client's fraud.

**ChinaCast's Failure to Even Pay DTTC for Its 2009 Audit Work (SAC ¶¶ 239-40) and Knowledge of Internal Control Deficiencies in the 2009 Audit (SAC ¶¶ 201-09)**.  DTTC's attempt to downplay its own contemporaneous characterization of ChinaCast's failure to pay it for its 2009 audit work – the bill was outstanding for nearly a year – as a "red flag" is a perfect example of its repeated attempts to manufacture favorable inferences for itself. (DTTC Br. at 22.)  Accountants know what a "red flag" is in the context of an audit – and it is not simply an e-mail designation.  (*Id.*)  It is certainly cogent and compelling to infer that DTTC

audit team member Jiang meant exactly what she said to ChinaCast:  the failure to pay DTTC's bill raised a red flag that would have to be addressed in the audit, precisely because it raised questions about the Company's cash position.  *See Whalen*, 2005 WL 1799370, at *4 (evidence of company's cash flow problems were in the auditor's "own backyard" where company fell behind on payments to the auditor itself).  But DTTC deliberately disregarded this red flag, just like all the others.

Similarly, with respect to the problems that DTTC experienced in connection with the 2009 audit, the point is not that ChinaCast failed to provide the requested information before the audit was completed.  (DTTC Br. at 21-22.)  The point, rather, is that the tardiness in providing such basic information indicated to a reasonable auditor that ChinaCast was experiencing serious internal control deficiencies, which should have provoked additional professional skepticism and more robust auditing procedures.  A company's failure to deliver financials in a timely manner – especially when they showed (in the case of CCT SH) over a billion RMB worth of improper, in-and-out transfers – would have sent alarm bells ringing at any reasonable auditing firm who actually intended to discharge its independent watchdog function.[6]

## b.    The SAC Pleads Actionable Misrepresentations by DTTC

As explained above, Plaintiffs have demonstrated that DTTC both acted with scienter and conducted a "plainly deplorable audit."  (*See* Op. at 43 and n.18.); *see also Freidus v. Barclay's Bank PLC*, 734 F.3d 132, 141 (2d Cir. 2013) (holding that "the pleading required for beliefs and opinions does not amount to requirement of scienter") (internal quotation marks and citation omitted).  That is more than enough to allege that DTTC either did not believe its audit

---

[6]    Similarly, DTTC's attempt to explain away its failure to cooperate with new management's investigation of the fraud at ChinaCast on the grounds that a lawsuit had been filed against it rings hollow.  (DTTC Br. at 22-23; SAC ¶ 116.)  If Chan and his cohorts really did fool DTTC, as it claims, then it should have nothing to fear from disclosing its workpapers.  The more cogent inference is that DTTC stopped cooperating because it knew its workpapers would expose it to liability.

opinions or knew it had no reasonable basis for them.[7]  *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 302 (S.D.N.Y. 2011).  (Op. at 42-43.)  The fact that DTTC knew that the Company's internal controls contained material weaknesses in 2010, combined with everything else it knew about ChinaCast, further establishes that it knew it had no reasonable basis for its 2010 audit opinion – *i.e.*, that its opinion was the product of an extreme departure from the standards of ordinary care akin to an actual intent to aid in the fraud.  DTTC's self-serving speculation about why it chose to disclose its material weakness finding in 2010 adds nothing to the inquiry.  Plaintiffs have adequately stated a Section 10(b) claim against DTTC.

## II.      THE SAC ADEQUATELY PLEADS RELIANCE UNDER SECTION 18

The SAC's expanded reliance allegations satisfy the standard for pleading reliance articulated by the Court in the July 21 Order.  *First*, the SAC specifically alleges that each of the Section 18 Plaintiffs read and relied on DTTC's audit opinions before purchasing ChinaCast securities.  (*E.g.*, SAC ¶¶ 378, 398; Op. at 56.)  *Second*, the SAC cures the Court's concern that the FAC "only state[s] in the most general sense that reliance upon DTTC's audit opinions caused *all* Plaintiffs – undifferentiated from the Section 18 Plaintiffs – to purchase ChinaCast securities" and did not "identify timeframes during which Plaintiffs purportedly purchased ChinaCast securities as a result of the audit opinions."  (Op. at 58.)  The SAC now alleges with specificity the timeframes during which each Section 18 Plaintiff purchased ChinaCast securities, as well as the "specific" purchase transactions each Section 18 Plaintiff made, in reliance on DTTC's audit opinions.  (SAC ¶¶ 372-401 and Exhibits attached to SAC.)  It also explains how the assurance of a Big Four accounting firm like Deloitte gave the Section 18 Plaintiffs comfort about investing in a company based in China, and states that they would not

---

[7]  For this reason, Plaintiffs also satisfy the subjective falsity requirement of Section 18, if one applies.

have invested had DTTC failed to give a clean opinion on the Company's financial statements. (*Id*. ¶¶ 380, 400.)  That is more than adequate to allege "how" the Section 18 Plaintiffs relied on DTTC's false statements concerning its audits of ChinaCast.  The Section 18 Plaintiffs read the false clean audit opinions and relied upon them in making specific purchases of ChinaCast stock. Had those audit opinions been qualified or negative as to the financial statements, Plaintiffs would not have made those purchases – one cannot have a closer causal "link" than that.[8]  (*See* DTTC Br. at 29.)

### III.    THE SAC STATES A CLAIM FOR COMMON LAW FRAUD

As discussed above, the SAC adequately pleads that DTTC made numerous misrepresentations with scienter, on which Plaintiffs relied to their detriment.  Thus, the SAC states a valid common law fraud claim against DTTC.[9]

### CONCLUSION

Plaintiffs' motion for leave to amend should be granted.

---

[8]  DTTC's identification of material weaknesses in ChinaCast's internal controls in the 2010 10-K does not negate reliance by certain Section 18 Plaintiffs on DTTC's clean audit opinion concerning ChinaCast's financial statements in that same document.  (*See id*. at 29-30.)  As the SAC explains, the fact that DTTC identified such weaknesses but *still* found the Company's financial statements free of material misstatements led the Section 18 Plaintiffs to believe that the deficient internal controls did not *actually* undermine the integrity of the Company's financial reporting or call into question the soundness of its financial condition.  (SAC ¶ 401.)  Moreover, the Section 18 Plaintiffs quite reasonably believed that DTTC's awareness of internal control weaknesses would have led it to conduct an even more thorough audit than usual to test whether those weaknesses compromised the integrity of ChinaCast's financial statements, meaning that the clean bill of health DTTC gave to the financial statements carried even more weight than usual.  (*Id*.)  Under those circumstances, it is more than plausible – and not at all surprising – that rational investors like the Section 18 Plaintiffs bought additional ChinaCast shares in reliance on DTTC's false 2010 audit opinion.  There certainly is no justification for DTTC's procedurally improper attempt to have the Court draw inferences most favorable to DTTC from Plaintiffs' allegations. (Op. at 20 ("[T]he Court must … draw all reasonable inferences in the plaintiff's favor.").)
[9]  DTTC's suggestion that the Court lacks long-arm jurisdiction over it with respect to Plaintiffs' state law claims is not properly before the Court, as DTTC has not provided any evidence or developed any legal argument with respect to that issue.  (DTTC Br. at 30 n.29.)

Dated: November 14, 2014
      New York, New York

                        LOWENSTEIN SANDLER LLP

                        By: /s/ Lawrence M. Rolnick
                              Lawrence M. Rolnick
                              Amiad M. Kushner
                              1251 Avenue of the Americas
                              17th Floor
                              New York, NY  10020
                              Tel. 212.262.6700

                              -and-

                              Sheila A. Sadighi (*pro hac vice*)
                              Thomas E. Redburn (*pro hac vice*)
                              65 Livingston Avenue
                              Roseland, NJ  07068
                              Attorneys for Plaintiffs