UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SPECIAL SITUATIONS FUND III QP, L.P.;
SPECIAL SITUATIONS CAYMAN FUND, L.P.;
COLUMBIA PACIFIC OPPORTUNITY FUND,
L.P.; FIR TREE VALUE MASTER FUND, L.P.;
FIR TREE CAPITAL OPPORTUNITY MASTER
FUND, L.P.; LAKE UNION CAPITAL FUND,
L.P.; LAKE UNION CAPITAL TE FUND L.P.;
ASHFORD CAPITAL MANAGEMENT, INC.; ZS
EDU L.P.; MRMP MANAGERS LLC; WHI
GROWTH FUND QP, LP; DOUGLAS N.
WOODRUM; ROBERT A. HORNE; HOWARD S.
BERL; BRIGHTLIGHT CAPITAL PARTNERS
LP; and TORTUS CAPITAL MASTER FUND, LP,

Plaintiffs,

– against –

DELOITTE TOUCHE TOHMATSU CPA, LTD.;
DELOITTE & TOUCHE LLP; ANTONIO SENA;
JUSTIN TANG; YIN JIANPING; RICHARD
XUE; and the ESTATE OF MICHAEL SANTOS,

Defendants.

**OPINION AND ORDER**

13 Civ. 1094 (ER)

---

Ramos, D.J.:

In this securities fraud action, a group of investors who purchased stock in ChinaCast

Education Corporation, Inc. ("ChinaCast" or the "Company"), an educational services company

in the People's Republic of China ("PRC"),[1] bring suit against the Company's Shanghai-based

independent auditor, Deloitte Touche Tohmatsu CPA, Ltd. ("DTTC"), and its U.S. affiliate,

Deloitte & Touche LLP ("Deloitte U.S."), along with several former ChinaCast officers and

directors (the "Individual Defendants," and collectively, "Defendants"). Plaintiffs allege that

---

[1] Plaintiffs, in the aggregate, purchased more than twenty million shares of ChinaCast common stock between
March 31, 2008 and March 30, 2012. SAC at 1-2. Plaintiff Douglas Woodrum ("Woodrum") is ChinaCast's
current Chief Financial Officer ("CFO"). *Id.* ¶¶ 20, 29.

Defendants violated several provisions of the Securities Exchange Act of 1934 (the "Exchange Act") and committed common law fraud by issuing and approving false statements in ChinaCast's public filings with the U.S. Securities and Exchange Commission ("SEC").[2]  Order at 1-2 (Doc. 42).

In an Order issued on July 21, 2014 (the "July 2014 Order"), this Court dismissed Plaintiffs' First Amended Complaint ("FAC") without prejudice.  *Id.* at 3.  Presently before the Court is Plaintiffs' motion for leave to file a Second Amended Complaint ("SAC").  Doc. 46. DTTC and Deloitte U.S. (the "Deloitte Defendants") oppose Plaintiffs' motion and urge the Court to dismiss their proposed SAC *with* prejudice on the grounds that it would not survive a motion to dismiss.  Deloitte U.S.'s Mem. L. Opp'n (Doc. 51) at 1; DTTC's Mem. L. Opp'n (Doc 53) at 2-3.  For the reasons stated herein, Plaintiffs' motion for leave to file a Second Amended Complaint against DTTC and Deloitte U.S. is DENIED.[3]

---

[2] Specifically, Plaintiffs assert causes of action for:  violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, against DTTC and the Individual Defendants; violations of Section 20(a) of the Exchange Act against Deloitte U.S.; violations of Section 18 of the Exchange Act against all Defendants; and common law fraud under New York law against "Deloitte."  *Id.* at 2-3; First Amended Complaint (Doc. 4) ¶¶ 205-55; Second Amended Complaint (Doc. 48, Ex. 2) ¶¶ 337-416.

[3] The Individual Defendants—Antonio Sena, Justin Tang, Yin Jian Ping, Richard Xue, and the Estate of Michael Santos, the latter having been substituted for Michael Santos based on a Suggestion of Death filed simultaneously with Plaintiffs' motion to amend (Doc. 45)—have not yet been served or appeared in this action.  Accordingly, neither the July 2014 Order nor this Order apply to them.  Pursuant to Federal Rule of Civil Procedure 4(m), the Court *must* dismiss an action without prejudice against a defendant who is not served within 120 days of the filing of a complaint or order that service be made within a specified time.  Fed. R. Civ. P. 4(m); *see also Zapata v. City of New York*, 502 F.3d 192, 194 (2d Cir. 2007).  That time period long ago elapsed.  However, Rule 4(m) also directs the court to extend the time for service where a plaintiff "shows good cause for the failure" to serve.  Accordingly, Plaintiffs are hereby directed to file a letter with the Court by April 30, 2015 explaining whether there is good cause for their failure to serve the Individual Defendants.  Plaintiffs' letter should also specify whether any of the Individual Defendants are located in a foreign country, in which case Rule 4(m), by its own terms, would not apply. "Rather, where service is in a foreign country, the Court uses a flexible due diligence standard to determine whether service of process is timely."  *Standard Commercial Tobacco Co. v. Mediterranean Shipping Co., S.A.*, No. 94 Civ. 7040 (PKL), 1995 WL 753901, at *1 (S.D.N.Y. Dec. 19, 1995).  If any of the Individual Defendants is located in a foreign country, Plaintiffs should explain in their letter whether this due diligence standard is met as to those defendants.

I.    **BACKGROUND**[4]

The Court presumes familiarity with its July 2014 Order, which recounts the background and history of this litigation, Order at 3-20,[5] and discusses here only those facts necessary for its disposition of the instant motion.

In their prior complaint, Doc. 4, Plaintiffs' allegations against the Deloitte Defendants boiled down to the argument that if DTTC had performed an audit that complied with U.S. Public Accounting Oversight Board ("PCAOB") standards and Generally Accepted Accounting Principles ("GAAP"),[6] it would have ascertained evidence of fraud.  Order at 14.  Plaintiffs outlined a series of "red flags" that Deloitte had failed to uncover and expose, including that: (1) ChinaCast's term deposits, which comprised more than half of its assets, had been pledged to secure the obligations of third parties; (2) ChinaCast Technology (HK) Limited ("CCT HK"), a subsidiary of ChinaCast, was fifty percent owned by then-CEO Ron Chan ("Chan") rather than majority-owned by ChinaCast; (3) ChinaCast never actually received the proceeds of a $44 million stock offering, $35 million of which, it turned out, had been looted by Chan and diverted to CCT HK; (4) ChinaCast never received a $5 million payment for stock sold to Thriving Blue Limited, a British Virgin Islands ("BVI") company owned by Chan, or a $29.3 million payment

---

[4] The following facts are drawn from the allegations in the SAC, which the Court accepts as true for purposes of the instant motion, documents referenced therein, and documents of which the Court may take judicial notice, such as public filings with the SEC.  *See, e.g., Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *In re China Organic Sec. Litig.*, No. 11 CIV. 8623 JMF, 2013 WL 5434637, at *1 (S.D.N.Y. Sept. 30, 2013).

[5] That Order is reported at *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401 (S.D.N.Y. 2014).

[6] "The PCAOB was created by the Sarbanes-Oxley Act of 2002, is a private-sector, non-profit corporation overseen by the SEC, and is charged with overseeing accounting firms that audit public company financial statements."  SAC ¶ 6.  PCAOB standards include generally accepted accounting standards ("GAAS"), the "authoritative standards" with which auditors must comply.  *Id.* ¶¶ 57, 257-58.  The GAAS include "ten basic standards known as 'Statements on Auditing Standards' that are codified and referred to as 'AU.'"  *Id.*   The AU are described in the July 2014 Order.  Order at 15-16.

from Wu Shi Xin[7] for a stock purchase agreement entered on June 2, 2010; (5) ChinaCast never actually made cash payments that it had reported paying for its acquisition of three universities; and (6) ChinaCast's trial balances revealed massive outflows of cash to, and unexplained inflows from, third parties with no legitimate business relationship to the Company.  Order at 17-19. Plaintiffs argued that a true audit, including review of readily obtainable documents and other information, would have unearthed each of these red flags and rendered the massive fraud clear.

In the July 2014 Order, the Court distinguished the Deloitte Defendants' audits of ChinaCast from cases in which auditors, for example, demonstrably possessed documents evidencing fraud, conclusively identified and yet ignored suspect transactions, or actively aided in the development of deficient accounting practices.  The Court explained that Plaintiffs' allegations were insufficient to establish scienter, a crucial element of their claims, which requires particularized allegations demonstrating fraudulent intent and not merely negligent performance or non-compliance with industry standards.  Taken collectively, the Court concluded, "Plaintiffs' red flags and alleged accounting violations . . . fail[ed] to tip the scale from negligence to recklessness." *Id.* at 38.  Rather, the "competing inference"—that CEO Chan "effectively concealed the fraud" from ChinaCast's auditors as well as from its investors—was more forceful and compelling than Plaintiffs' allegations that the Deloitte Defendants had possessed the requisite state of mind to aid in the ChinaCast fraud.  *Id.*

In their motion for leave to file an amended complaint, Plaintiffs assert that the proposed SAC cures the prior deficiencies by adding "new, detailed allegations demonstrating that DTTC

---

[7] Wu Shi Xin was the purported owner of Wintown Enterprises Limited, which held the entire interest of Hubei Industrial University Business College ("HIUBC"), a private college affiliated with Hubei Industrial University, and eventually acquired by ChinaCast.  FAC ¶¶ 5, 50.  Plaintiffs alleged that in 2010, ChinaCast sold Wu Shi Xin 3.7 million shares of the Company for $29.3 million, but that its bank statements never confirmed receipt of any proceeds from that offering.  *Id.* ¶¶ 113-15.

and Deloitte U.S. were aware of many aspects of the fraud, that DTTC actually colluded with and facilitated some of ChinaCast's fraudulent accounting decisions, and that both [Deloitte] Defendants deliberately disregarded numerous red flags that no reasonable auditor would have ignored." Pl.'s Mem. L. Supp. Mot. at 1 (Doc. 47). The Deloitte Defendants maintain that the proposed SAC, like its predecessor: (1) does not state a Section 10(b) or Rule 10b-5 claim because Plaintiffs do not adequately plead scienter or any actionable misrepresentation; (2) does not state a "control person" claim under Section 20(a) as against Deloitte U.S. because Plaintiffs establish no primary violation by DTTC and no control or culpable participation by Deloitte U.S.; (3) does not state a claim under Section 18 as a matter of law; and (4) does not state a claim for common law fraud under New York law, which has a scienter requirement similar to that of the Exchange Act. *See* Doc. 51; Doc. 53.

## II.    LEGAL STANDARDS

### A.    Motion to Amend

Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to replead "when justice so requires." Fed. R. Civ. P. 15(a)(2). Upon granting a motion to dismiss, the "usual practice" in this Circuit is to permit amendment of the complaint. *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990); *see also, e.g.*, *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 55 (2d Cir. 1995) ("Leave to amend should be freely granted, especially where dismissal of the complaint was based on Rule 9(b).").

However, courts need not grant leave to amend where amendment "would be futile because the proposed amended complaint [does] not cure the original complaint's deficiencies." *Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany*, 615 F.3d 97, 99 (2d Cir. 2010). "Amendment is considered futile when the proposed new pleading would not withstand a motion

to dismiss for failure to state a claim pursuant to Rule 12(b)(6)." *In re Advanced Battery Technologies (ABAT), Inc. Sec. Litig.*, No. 11 Civ. 2279 (CM), 2013 WL 3784134, at *5 (S.D.N.Y. July 18, 2013) (citation omitted), *aff'd*, No. 14-1410-CV, 2015 WL 1321233, — F.3d — (2d Cir. Mar. 25, 2015).  In effect, to prevail on their motion, Plaintiffs' proposed SAC must withstand the scrutiny applicable on a motion to dismiss.  *See id.* ("[T]he parties treat Plaintiff's motion for leave to file a second amended complaint as a motion to dismiss, and so too does the Court.").

**B.    Motion to Dismiss**

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

Beyond the requirements of Rule 12(b)(6), a complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") by stating the circumstances constituting fraud with particularity. *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319-20 (2007)). Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170). Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); *see also, e.g.*, *Slayton v. Am. Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

## III.   DISCUSSION[8]

### A.   First Cause of Action:  Violations of Section 10(b) and Rule 10b-5; All Plaintiffs Against DTTC

To state a private civil claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that: (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss. *Dura*,

---

[8] A more comprehensive recitation of the legal requirements and elements of each of Plaintiffs' causes of action is provided in the July 2014 Order. *See Special Situations Fund*, 33 F. Supp. 3d at 401.

544 U.S. at 341-42; *see also, e.g.*, *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007); *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).  In its July 2014 Order, the Court found that Plaintiffs' First Cause of Action failed both because their allegations did not establish scienter, and because they had failed to plead a material misstatement or omission.  Order at 42.

### 1.    Scienter

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 319 (citation omitted); *Novak v. Kasaks*, 216 F.3d 300, 306-07 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(2)).  In a securities fraud action against an independent auditor, the auditor's conduct must amount to more than "a heightened form of negligence," *id.* at 312, and, instead, represent "an extreme departure from the standards of ordinary care, . . . approximat[ing] an actual intent to aid in the fraud being perpetrated by the audited company." *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (citation omitted).  "Mere allegations of GAAP violations or accounting irregularities, or even a lack of due diligence, will not state a securities fraud claim absent evidence of corresponding fraudulent intent."  *ABAT*, 2015 WL 1321233, at *3 (internal citations omitted).

Where, as here, a court is asked to determine whether facts alleged in a proposed complaint "establish 'the requisite strong inference of scienter,'" the court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* (quoting *Tellabs*, 551 U.S. at 324).  "[I]t is not enough 'to set out facts from which, if true, a reasonable person *could* infer that the defendant acted with the required intent.' The inference of scienter must be cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*  (quoting *S. Cherry St., LLC v. Hennesee Grp. LLC*, 574 F.3d 98, 110 (2d Cir. 2009); *Tellabs*, 551 U.S. at 324).

In the FAC, Plaintiffs contended that DTTC's scienter was evidenced by its allegedly reckless issuance of audit opinions certifying that ChinaCast's financial statements had been prepared in accordance with GAAP and that DTTC had conducted its audits in accordance with PCAOB standards for fiscal years 2007 through 2010, as well as its unqualified opinions on ChinaCast's internal controls over financial reporting for fiscal years 2008 and 2009.  Order at 29.  Plaintiffs argued that scienter was supported by their allegations of (1) "red flags" and accounting failures; (2) the magnitude of the alleged fraud; and (3) the fact that new management had quickly discovered the fraud by examining the same records that DTTC had possessed.  *Id.* at 30.  The Court concluded that Plaintiffs' allegations on this score amounted to no more than a theory that "had DTTC performed a higher quality audit, i.e., one that complied with GAAS and PCAOB standards, it would have unearthed red flags indicative of ChinaCast's pervasive wrongdoing."  *Id.* at 31.  Ultimately, Plaintiffs' allegations failed because accusations that a defendant "merely ought to have known" are insufficient to allege recklessness.  *Id.* (collecting cases).  Moreover, the Court explained, allegations of red flags do not amount to allegations "that the facts and circumstances at issue would have put a reasonable auditor on notice of potential fraud."  *Id.* at 32.

In the instant motion, Plaintiffs aver that the SAC includes twelve new or enhanced allegations of "red flags," accounting failures, and active collusion by DTTC:  (1) DTTC and its audit engagement partner colluded in the fraud; (2) DTTC knew of and disregarded ChinaCast's lack of a majority-ownership in CCT HK; (3) DTTC improperly used a technique known as "sampling" in its audits of the Company; (4) DTTC actively facilitated the cover-up of Ronald Chan's $35 million embezzlement from the Company; (5) DTTC ignored obvious impropriety on the general ledger of subsidiary ChinaCast Technology (Shanghai) Limited ("CCT SH" or

"CCT Shanghai"); (6) DTTC ignored the appearance of fictitious revenue on the books of CCT SH and another subsidiary, ChinaCast Technology ("CCT BVI") Limited ("CCI BVI"); (7) DTTC deliberately did not inquire into whether or not ChinaCast's term deposits had been pledged to third parties; (8) DTTC neglected to examine ChinaCast's failure to receive payment for stock sales; (9) DTTC was aware of internal control deficiencies and significant problems with the 2009 audit; (10) DTTC was alerted to the fraud by ChinaCast's failure to pay DTTC for its 2009 audit work; (11) DTTC and Deloitte U.S. refused to cooperate with the investigation undertaken by ChinaCast's new management; and (12) numerous red flags were quickly unearthed by another independent consultant brought in to examine ChinaCast's books in 2011. Doc. 47 at 2-3.

Six of these allegations were included in the FAC and have been reframed but not strengthened.  Plaintiffs now describe DTTC's actions as deliberate misdeeds or intentional omissions rather than mere lapses in performance or judgment, but have added only conclusory assertions rather than actual facts supporting fraudulent intent.  The other six allegations, although genuinely new, either do not describe red flags at all or lack a genuine factual basis. Taken collectively and evaluated alongside the allegations contained in the FAC, Plaintiffs' supplementary allegations cannot meet the rigorous standard established by Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the PSLRA.  Ultimately, the proposed SAC fares no better than its precursor:  Plaintiffs' primary contention remains that the Deloitte Defendants conducted a shoddy audit.

### a.     Allegations Included in the FAC

#### i.     CCT HK

Among Plaintiffs' primary allegations is that DTTC improperly certified ChinaCast's

financials, including those of CCT HK, on a consolidated basis.[9]   In the FAC, Plaintiffs argued

that if Deloitte had confirmed CCT HK's ownership "by reviewing records readily obtainable

from the Hong Kong Companies Registry," it would have known that ChinaCast only owned

49.25 percent of CCT HK, and that Chan had personally owned 50 percent of CCT HK since

2003.  FAC ¶¶ 5, 58-61.  This Court found that, absent any allegation that DTTC had *cause* to

suspect that ChinaCast was not CCT HK's majority owner, its failure to obtain records revealing

Chan's ownership did not indicate willful ignorance of fraud.  Order at 34-35.  In the SAC, rather

than merely alleging that DTTC failed to obtain documentation that would have revealed Chan's

majority-ownership, Plaintiffs now maintain that DTTC knew of Chan's majority-ownership all

along and nevertheless chose to disregard it and certify ChinaCast's improperly consolidated

financial statements.  SAC ¶¶ 15, 124-27, 300.  They insist that DTTC had this knowledge

because it "had obtained, reviewed, and maintained in its audit files evidence" of CCT HK's

ownership since 2004.  *Id.*  Yet Plaintiffs do not identify what evidence or documents DTTC's

audit files contained, and their allegation that DTTC had "obtained" and "reviewed" any such

materials is unsupported and conclusory.[10]

---

[9] On December 21, 2012, ChinaCast disclosed that although its 2007, 2008, 2009, and 2010 financial statements had reported a 98.5 percent indirect ownership interest in CCT HK, in fact, since 2003, Ron Chan had owned 50 percent of CCT HK, with the Company owning an approximately 49.25 percent indirect equity interest.  SAC ¶ 15. Consequently, under GAAP, CCT HK should not have been consolidated as a majority-owned subsidiary on ChinaCast financial statements.  *Id.* ¶ 292.

[10] Plaintiffs' only basis for this statement appears to be their assertion that, in March 2007, ChinaCast's then-CFO, Individual Defendant Antonio Sena, "confirmed that 'Deloitte's technical department in US [sic] is looking into this issue [of consolidating the Company's financials for its annual reports on Form 10-K]," and that Sena referenced "the consolidation issue" again in an October 2010 email.  SAC ¶ 125 (bracketed phrase in original).  Without

### ii.      Chan's Embezzlement

In the FAC, Plaintiffs alleged that DTTC would have unmasked Chan's massive embezzlement had they reviewed certain bank account statements showing that he had wired to CCT HK, which he majority-owned, $35 million of the proceeds from a $44 million stock offering and subsequently transferred that money from CCT HK to an entity outside of the Company.  FAC ¶¶ 5, 102-05, 170, 240.  The Court held that this allegation was "not truly a red flag" absent facts suggesting that "DTTC knew, or should have known, that Ron Chan majority-owned CCT HK . . . ."  Order at 35.

Plaintiffs now maintain that DTTC "set the stage for" Chan's embezzlement and "active[ly] facilitat[ed]" its cover-up.  SAC ¶¶ 16-17, 35.  They allege that "Deloitte willfully and/or recklessly approved the consolidation of CCT HK into the Company's consolidated financials, while not disclosing to shareholders that CCT HK was in fact 50% owned by [Chan]," which "resulted in" Chan's embezzlement.  *Id.* ¶¶ 301-02.  They claim that DTTC's scienter is evident from the fact that it deliberately excluded—"with remarkably convenient timing" for Chan's embezzlement—CCT HK from its 2009 Sarbanes-Oxley Internal Control Testing "because it needed plausible deniability" for its wrongful consolidation of CCT HK with ChinaCast.  *Id.* ¶¶ 16-17, 301-02; Doc. 47 at 8-9.

---

support for the allegation that this statement and email referred to CCT HK specifically, and not another aspect of ChinaCast's consolidated financials, the Court cannot interpret it to impute the knowledge that Plaintiffs suggest.

Plaintiffs also assert that DTTC's knowledge of Chan's majority-ownership is evidenced by a 2012 interaction between Plaintiff Woodrum and Deloitte in which Woodrum confronted Deloitte about Chan's interest in CCT HK. SAC ¶ 126.  Plaintiffs state that "Deloitte first claimed that it had a trust agreement by which Chan had transferred his 50% economic interest in CCT HK to BVI," but could not locate that agreement when called upon to produce it. *Id.*  They state matter-of-factly:  "That is because it never existed.  Indeed, Deloitte's John McKay eventually admitted to Woodrum that CCT HK should never have been consolidated into the Company's consolidated financials." *Id.*  Even if true, this statement is insufficient to establish a strong inference of fraudulent intent.  As DTTC argues, this "alleged inability to produce a document [that DTTC] stated it had says nothing about scienter, but alleges negligence at best."  Doc. 53 at 12 n.13.

As an initial matter, these assertions rely heavily on the allegation that DTTC "knew" of CCT HK's ownership, which allegation is not itself sufficient, as just explained.   Plaintiffs' allegations with respect to the Internal Control Testing, meanwhile, amount to an attack on DTTC's judgment, Doc. 53 at 15, but one not sufficient to support fraudulent intent.   Plaintiffs also ascribe fraudulent intent to DTTC's December 2012 statement to Woodrum that "it did not have in its working papers" a copy of the 2009 CCT HK Bank of China account, ostensibly revealing that DTTC "either never obtained the bank statements . . . or did not want to admit that it had them given what they showed."   SAC ¶¶ 198-99, 320; Doc. 47 at 8-9.   But auditors are not obligated to retain every document they read in the course of an audit.   Plaintiffs' new allegations with regard to DTTC's role in Chan's embezzlement, like their allegations concerning the CCT HK consolidation, are insufficient to support fraudulent intent as opposed to negligence or poor judgment.

### iii.    Term Deposits

In the FAC, Plaintiffs alleged that DTTC had violated GAAS standards by failing to verify the "unencumbered" nature of ChinaCast's term deposits, a substantial portion of which were later revealed to have been "pledged to secure the obligations of third parties" lacking any legitimate business relationship with the Company.   FAC ¶¶ 5, 67-68, 153, 165, 169.   Because pledged term deposits "could not be transferred, spent, or used as collateral to secure the Company's borrowings," the cash balances on the Company's balance sheet, certified by Deloitte, "were illusory."   *Id.* ¶ 67.   Had DTTC "undertaken procedures to verify these assets," Plaintiffs argued, DTTC "could not possibly have missed" the "massive red flag" posed by the deposits' "encumbered nature."   Pls.' Opp'n DTTC Mot. to Dismiss (Doc. 38) at 9.   Plaintiffs'

argument fell short of alleging that DTTC definitively reviewed and disregarded evidence demonstrating that the term deposits had been pledged.

In the SAC, Plaintiffs now accuse the Deloitte Defendants of "willfully and/or recklessly ignor[ing] debt cards that disclosed third-party pledges," "willfully and/or recklessly craft[ing] its bank confirmations to specifically omit a request that the banks confirm that the term deposits were not pledged," and "deliberately and/or recklessly fail[ing] to physically inspect *any* of the original term deposit certificates, which also disclosed that they were . . . pledged to third parties." SAC ¶ 299. Although Plaintiffs argue that DTTC's decision not to examine ChinaCast's term deposits "bespeaks a deliberate desire to avoid learning the truth," Doc. 47 at 14, the SAC includes no facts indicating that DTTC knew of and disregarded any issue with the term deposits or specifically altered its auditing procedures to avoid learning of one. Again, where Plaintiffs previously could not establish scienter based on DTTC's failure to act, they now accuse DTTC of *deliberately* not acting, but do not plead facts supporting deliberateness.

### iv.     Failure to Receive Payment for Stock Sales

In the FAC, Plaintiffs claimed that DTTC had violated GAAP by failing to confirm that the Company had actually received a $5 million payment for stock sold to Thriving Blue Limited, a BVI company owned by Chan, FAC ¶¶ 5, 182, or $29.3 million owed for a private stock offering to Wu Shi Xin. *Id.* ¶¶ 5, 113-15. They alleged that although these were "significant, related-party transaction[s] at . . . above-market price[s], Deloitte failed to confirm that any of the Company's bank accounts ever actually received payment for the stock," which they had not. *Id.* ¶ 5. Again, the Court found, Plaintiffs had failed to allege anything more than DTTC's departure from PCAOB and GAAP standards. Order at 37.

Plaintiffs now claim that DTTC intentionally chose not to confirm ChinaCast's receipt of the missing payments. SAC ¶¶ 44, 221-23, 310-11. The only new allegation offered in the SAC to support such intent is that when ChinaCast's new CFO Douglas Woodrum demanded to see a copy of the payment voucher confirming that the Thriving Blue Limited payment had been made, DTTC's Jennie Jiang told him that, if he wanted to see the voucher, he should ask the bank for it. Doc. 47 at 15. This detail does not transform DTTC's alleged failure to follow auditing standards into an intent commit fraud.

### v.   Sampling

Plaintiffs purport to add four paragraphs to the SAC alleging the Deloitte Defendants' inappropriate use of sampling. *See* Doc. 47 at 7 (citing SAC ¶¶ 264-67). The first three paragraphs simply describe Auditing Standard 15 and its guidance to auditors regarding the appropriate circumstances for using "audit sampling" as opposed to testing all transactions in a particular set. SAC ¶¶ 264-66. The fourth paragraph, the only one containing factual allegations specific to DTTC, SAC ¶ 267, was also included in the FAC as ¶ 158, where it was offered as support for Plaintiffs' claim that Deloitte had "failed to obtain reasonable assurance that ChinaCast's financial statements were free from material misstatements." FAC at 42-43.

In both versions of the Complaint, the paragraph denounces Deloitte for ignoring "the massive red flag presented by the fact that [the] Company's trial balances for years ended December 31, 2007, 2008 and 2009 reflected massive outflows of cash to (and, in some cases, unexplained inflows from) parties that had no relationship to [ChinaCast subsidiary] CCT's disclosed business." SAC ¶ 267; FAC ¶ 158. Plaintiffs allege that DTTC was obligated "to audit these transactions and to express professional skepticism regarding any suspicious aspects of the transactions," but instead "either was complicit or recklessly failed to conduct any audit at

all, passing on the Company's financial statements without disclosing that the Company's assets were illusory, and that its purported cash assets were effectively rented." SAC ¶ 267; FAC ¶ 158. However, this Court has already observed that, "in accordance with professional accounting standards, auditors routinely employ sampling procedures." Order at 32. Absent allegations that DTTC "was required to test the specific CCT Shanghai trial balance that they identify," the Court explained, "their allegations amount to no more than an allegation of a lapse in professional judgment." *Id.* (citing DTTC Mot. to Dismiss at 16).

Plaintiffs' opposition papers allege more than what Plaintiffs actually present in the SAC, arguing that Auditing Standard 15, as applied to DTTC's audit of ChinaCast, required DTTC "to test 100% of ChinaCast's major transactions each year . . . such as the stock purchases and 'brick and mortar' university purchases," and that its "failure to do so constitutes a clear violation of PCAOB standards," that, "when combined with the allegations of fraudulent intent with which the SAC is replete, constitutes recklessness." Doc. 47 at 7.

Ultimately, Plaintiffs' argument regarding DTTC's use of sampling is substantively indistinguishable from the allegations deemed insufficient in this Court's July 2014 Order: Allegations that auditors "merely ought to have known" are "insufficient to allege recklessness." Order at 31 (quoting *Kuriakose v. Fed. Home Loan Mtg. Corp.*, 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012); *id.* at 37 (observing that Plaintiffs' claim that "*had* DTTC confirmed that ChinaCast paid the consideration for its brick-and-mortar universities, it may have uncovered suspicious activity, fall short of alleging that DTTC *must* have reviewed the documents containing these red flags, and then disregarded them."). DTTC's allegedly inappropriate use of sampling does not constitute recklessness alone *or* when combined with the rest of the SAC.

16

### vi.     CCT Shanghai

Presented separately from Plaintiffs' allegation regarding DTTC's improper use of sampling, the SAC revisits Plaintiffs' allegation that the trial balances of CCT Shanghai presented obvious red flags, DTTC's ignorance of which demonstrates scienter.  The Court discussed this allegation at length in its July 2014 Order.  *See* Order at 32-34 ("Of Plaintiffs' red flags, only one involves an allegation that DTTC had possession of the source documents evidencing suspicious activity:  the allegation that ChinaCast's trial balances for the years 2007 through 2009 reveal 'massive outflows' of cash to, and unexplained inflows from, parties that had 'no legitimate business relationship' to the Company.") (citing FAC ¶ 5).  As discussed above, the Court concluded that because Plaintiffs had not alleged that DTTC was *required* to test the specific trial balances Plaintiffs identified and had failed to state what proportion of the trial balances consisted of evidence of transactions with unrelated parties, their allegations amounted to "no more than an allegation of a lapse in professional judgment." *Id.* at 32.[11]  The Court also observed that Plaintiffs had alleged "no reason why transactions with businesses providing non-education services, such as hardware and equipment leasing, would constitute clear indicia of wrongdoing," and that the red flag raised by the pawn shop entries in CCT's trial balances was "not so grave as to establish that DTTC acted recklessly in a manner suggestive of intent to aid in fraud." *Id.* at 33-34.

In the SAC, Plaintiffs now allege that CCT Shanghai's trial balances *on their face* contained evidence of fraud that DTTC could have overlooked only through willful or reckless

---

[11] In the FAC, Plaintiffs provided that "the trial balances contain[ed] detailed records of cash outflows from CCT to well over one hundred individuals and entities, of which over ninety percent had no relationship to CCT's business," that a "limited sample of these transactions . . . included **well over $20 million in outflows to metal factories and a pawn shop**," and that "CCT's trial balances for the years ended December 31, 2007, 2008, and 2009 list[ed] massive cash transfers to and from dozens of individuals with no relationship to CCT's business."  FAC ¶¶ 137-38, 148 (emphasis in original).

ignorance:  "[T]he general ledger itself disclosed the Company's fraud before any testing was required."  SAC ¶¶ 22, 171.  Plaintiffs argue that the appearance of *any* third party transactions on CCT Shanghai's general ledger should have tipped off DTTC, because, "CCT SH was not an operating entity."  *Id.* ¶¶ 172-73.  Rather, CCT SH's "business was essentially to collect revenues," so "the vast majority of transactions Deloitte would have expected to see [on its] general ledger would have been inter-company transactions."  *Id.*; Doc. 47 at 10.[12]  They allege, "Deloitte reviewed this general ledger . . . , deliberately ignored a fraud of epic proportions that the Company made little, if any, attempt to hide, and falsely represented to the Company's shareholders that the financial statements presented fairly, in all material respects, the financial position of the Company."  SAC ¶ 189.

The assertion that these third-party transactions were obvious evidence of fraud is implausible.  The Company's 2009 Form 10-K explains that CCT SH provides "technical services . . . relating to the provision of computer, telecommunications and information technology products and services, including the provision of Internet service and content" and "supplies . . . ancillary equipment together with certain associated software and technical documentation."  2009 ChinaCast Form 10-K at 8-9, F-11 (Bendinger Decl., Ex. 4).  The appearance of transactions with third parties for goods and services on the ledger of an entity that provided technical services would not constitute clear indicia of wrongdoing, Order at 33, even if, as Plaintiffs allege, CCT SH's role in the provision of those services was that as a mere "pass-through" entity or "shell."  Pl.'s Reply (Doc. 56) at 6.  Plaintiffs' allegations regarding DTTC

---

[12] Plaintiffs did respond to the Court's observation regarding their failure, in the FAC, to note what proportion of the trial balances was comprised of record entries for transactions with unrelated parties.  Order at 33.  On the 2009 general ledger, "inter-company transfers," which should have comprised the "vast majority of transactions," in fact "accounted for only 30% of the incoming and outgoing transfers," while "[a]nother 17% . . . were CCT SH intra-bank transfers, . . . 8% reflected term deposit same-day rollovers," and "[t]he remaining 45% . . . was comprised of 465 different third-party transactions," 213 of which were "transactions with pawn shops, piston companies and other trading companies which, on their face, have no relation to the business of ChinaCast." SAC ¶¶ 173-74.

still are "not so egregious as to render [its] audit a farce."  *In re Priceline.com Inc. Sec. Litig.*, 342 F. Supp. 2d 33, 57 (D. Conn. 2004).

b.      "New" Allegations

i.      Chiu's Collusion in the Fraud

In the SAC, Plaintiffs claim that DTTC and Deric Chiu ("Chiu"), the engagement partner for its ChinaCast audits until 2010, "knowingly assisted the Company in reporting materially misstated related party transactions" on the Company's 2007, 2008, and 2009 Forms 10-K.  SAC ¶¶ 29-32, 307-09.  Specifically, in each of those years, ChinaCast reported an approximately $16 million "non-current advance" to ChinaCast Company Ltd. ("CCL"), a subsidiary owned by then-director Yin Jian Ping, despite the fact that both ChinaCast and DTTC "knew that [Yin] would not and/or could not repay the advance."  *Id.* ¶¶ 29, 307.  Although not characterized as such on ChinaCast's 10-Ks, Plaintiffs describe this "non-current advance" as a "receivable" due from CCL.  *Id.*  They contend that, after Yin resigned as a Company director in 2009, Chiu and DTTC helped ChinaCast conceal the fact they had advanced money to CCL that would never be recovered and, in 2010, re-categorize the advance as "an amount to be paid back to CCL as a 'prepayment' of a VSAT (satellite) license renewal fee"—in other words, as a payable rather than a receivable.  *Id.* ¶¶ 30-32.  Plaintiffs describe the role played by Chiu in reporting this item as indicative of DTTC's "active[] collu[sion] with ChinaCast management to deceive shareholders about material transactions by characterizing them falsely in the Company's financial statements."  Doc. 47 at 5.

However, Plaintiffs' allegations are belied by the 10-Ks themselves, which describe ChinaCast's "non-current advances" to CCL and its relationship with CCL and other "satellite operating entities" as having been structured to enable the Company's compliance with Chinese

19

law and its participation in the Chinese satellite communication market, which requires a so-called "VSAT license."[13]  As stated in the 2010 Form 10-K, that year, ChinaCast and CCL entered into a new ten-year Service Agreement under which CCL would continue to assist the Company in renewing its VSAT License, which was "critical to the Company's E-learning and training services" because without one the Company was "not allowed to conduct its business through satellite in China."  2010 ChinaCast Form 10-K at 32 (Bendinger Decl., Ex. 8).  As part of this agreement, ChinaCast treated previous "non-current advances" as "prepayment" for an annual service fee and, accordingly, wrote off the previously recorded advances.  *Id.* at F-15. This agreement was publicly disclosed and scrutinized by the SEC Division of Corporate Finance, which—while expressing its position that the prepayment should have been amortized annually rather than written off in a single year—took no issue with ChinaCast's accounting of the advances as prepayment.[14]  Although Plaintiffs characterize the advance as "a receivable that never should have been booked in the first place," Chiu's involvement with which "demonstrates that DTTC was more than simply an arms-length auditor of ChinaCast," Doc. 47 at 5, the Forms

---

[13] The 2009 Form 10-K explains that "[t]o operate in the PRC satellite communication market, a company needs a Very Small Aperture Terminals (VSAT) license," but that, "[w]hen the CCH group was established, foreign ownership was forbidden for companies holding a VSAT license."  2009 ChinaCast Form 10-K at 7 (Bendinger Decl., Ex. 4).  The "advances by the Company to CCL are for money spent on assets and expenses to build up the satellite business of CCL over the years."  *Id.* at F-63 n. 26(b)(4).  "[W]hen regulation allows," the 10-K provides, "all the relevant assets attributable to the satellite business operations in the books of CCL . . . will be transferred to the Company, the consideration of which will be settled against the above advances to CCL in the books of the Company at the sole discretion of the Company," and that "the Company considers the advances are of the nature of a deemed investment in the Satellite Business."  *Id.*  The same contractual relationship was reflected in the 2006, 2007, and 2008 10-Ks.  *See* 2006 Form 10-KSB at F-39 n. 19(7) (Bendinger Decl., Ex. 5); 2007 ChinaCast Form 10-KSB at F-42 n. 5 (Bendinger Decl., Ex. 6); 2008 ChinaCast Form 10-K at F-54 n. 4 (Bendinger Decl., Ex. 7).

[14] *See* Letter from ChinaCast to Larry Spirgel, SEC (Oct. 7, 2011), cmt. 8 p. 5-9 (Bendinger Decl., Ex. 9) (inquiring as to why the advances were not "a cost to be recognized over the term of the service agreement); Letter from ChinaCast to Larry Spirgel (Jan. 13, 2012), cmt. 1 p. 1 (Bendinger Decl., Ex. 10) (stating SEC's position that "[s]ince the noncurrent advance of RMB 59.8 million was used as a prepayment of the RMB 8.1 annual payment under the new service agreement, we continue to believe that the prepayment should be amortized annually").  These letters are public documents of which the Court may take judicial notice.

10-K reveal a facially legitimate explanation for the way in which the advance was reported and the way in which ChinaCast and CCL structured their corporate relationship.

### ii.       "Fictitious Revenue"

CCT BVI, ChinaCast's principal subsidiary, was a British Virgin Islands offshore entity that purportedly owned all of CCT HK, through which it provided funding for satellite broadband Internet services.  SAC ¶¶ 15, 98, 230.  Plaintiffs allege that Defendants' recklessness is demonstrated by their knowledge of "tens of millions of dollars in fictitious revenue that ChinaCast booked at the end of 2010 at CCT BVI" from ChinaCast's E-learning and training service Group ("ELG").  Doc. 47 at 13-14.  According to Plaintiffs, because CCT BVI was a holding company with "no revenue generating operations of its own," SAC ¶ 230, "the only 'revenue' that should have appeared on its general ledger would have consisted of inter-company transfers from CCT SH and the other ELG segment subsidiaries."  Doc. 47 at 13-14.  Therefore, the fact that ChinaCast's 2010 consolidated financial worksheets, which "Deloitte reviewed and kept in its audit files[,] inexplicably showed operating revenues – *i.e.*, revenues from invoices issued directly to customers – booked on the general ledger of BVI," was a red flag that Deloitte could not have missed.  *Id.* at 13.  These allegations are also implausible in light of ChinaCast's 2010 Form 10-K, which states that CCT BVI is "a technology enabler in the satellite communication [industry]" in addition to being an investment holding company, and that ChinaCast's education customers may "engage" ChinaCast subsidiaries, including CCT BVI, "directly to provide . . . satellite broadband services."  2010 ChinaCast Form 10-K at F-11 (Bendinger Decl., Ex. 8).

Plaintiffs also argue that the allegedly fictitious revenue raises an unmistakable red flag because it did not appear on CCT BVI's bank statements.  SAC ¶ 232; Doc. 47 at 14.  However,

the allegation that DTTC could have discovered this red flag had it reviewed the bank statements is insufficient to establish scienter, because Plaintiffs do not allege that DTTC knew of the red flags contained in the bank statements and ignored them.

### iii.    The 2009 Audit

In the SAC, Plaintiffs also allege that problems apparent in the course of Deloitte's 2009 audit process presented undeniable red flags, DTTC's ignorance of which and failure to mention in its unqualified 2009 audit opinion demonstrate scienter.  SAC ¶¶ 201-09.  Plaintiffs describe how DTTC's Jennie Jiang sent several emails to ChinaCast board members noting that ChinaCast's failure to provide certain records would impact DTTC's ability to finalize its financial statements before the 10-K filing deadline.  *Id.* ¶ 201.  Her emails listed missing documents, warned of likely filing delays, and requested in-person meetings to discuss these issues.  *Id.* ¶¶ 202-04.  Even so, days after the 2009 10-K was due, DTTC was missing key items that were "significant enough" to draw the attention of its Audit Committee members and might "result in scope limitations" or "impact [DTTC's] opinion on the effectiveness" of ChinaCast's internal controls.  *Id.* ¶ 205.  However, this description of steps taken by DTTC employees to secure necessary documentation from ChinaCast does not support an inference of scienter. DTTC's efforts to obtain such documents suggest, if anything, that DTTC was, in fact, attempting to fulfill its role as an independent watchdog.

Plaintiffs additionally allege that DTTC should not have "represented that [its 2009] audit [had been] conducted 'in accordance with the standards of the [PCAOB]" and that ChinaCast's "consolidated financial statements present[ed] fairly, in all material respects, the financial position of the Company . . . in conformity with accounting principles generally accepted in the United States."  *Id.* ¶ 206.  Plaintiffs allege that, "Deloitte knew [these statements] to be false" and "could not in good faith give an unqualified clean audit report," due to red flags like the

22

transactions on the CCT SH general ledger and the absence of the $35 million embezzled by Chan. *Id.* ¶¶ 207-08. However, the Court has already addressed Plaintiffs' argument that DTTC was necessarily aware of these red flags, and found that argument lacking. As previously explained, that DTTC ultimately issued a clean audit opinion without referencing the CCT SH ledger or Chan's $35 million embezzlement constitutes at most negligence. Moreover, DTTC's statement that the audit was conducted in accordance with PCAOB standards, even if false, does not support an intent to participate in the ChinaCast fraud. Again, the facts pleaded might support the claim that DTTC did not live up to those standards, but they do not support the proposition that DTTC knew this was so and lied about it.

### iv.     Payment to DTTC

In addition to highlighting ChinaCast's failure to timely provide DTTC with certain documents in conjunction with the 2009 audit, Plaintiffs now also allege that ChinaCast's failure to pay DTTC for its work on that 2009 audit was, in and of itself, a red flag. Doc. 47 at 18; SAC ¶¶ 239-40. Plaintiffs cite an email exchange between DTTC's Jennie Jiang and ChinaCast's former CFO Antonio Sena, in which Jiang warned that DTTC's 2009 audit fee had not been paid, which might preclude DTTC from performing further audit work for 2010, and advised that the outstanding payments were a "red flag" for Deloitte. *Id.* Notably, Plaintiffs do not allege that the bill was never paid, only that it was paid late. Although the late payment may have raised eyebrows, it was not, alone, enough to raise a clear warning that fraudulent activity was underfoot. *Compare Whalen v. Hibernia Foods PLC*, No. 04 Civ. 3182, 2005 WL 1799370, at *4 (S.D.N.Y. Aug. 1, 2005) (noting the significance of allegations "that [an independent auditor] was told . . . that [a] company's cash situation had become so severe [that a manager] was paying suppliers out of his personal bank account" and that the company fell behind in payments to the

auditor itself, prompting the auditor to delay its own audit).  As the Court observed in its July 2014 Order, "the Company's financial filings show only that ChinaCast failed to pay outstanding bills to DTTC after the fraud became public."  Order at 31.

### v.   Refusal to Cooperate

Plaintiffs add a single paragraph to the SAC alleging that Deloitte refused to cooperate with ChinaCast's new management once the fraud was revealed.  According to the SAC, "While Deloitte initially cooperated, . . . the cooperation was short-lived."  SAC ¶ 116.  Eventually, a Deloitte U.S. representative "conveyed Deloitte's position in refusing to cooperate further," in part because "there is a lawsuit against us and at this point we are looking at it from the standpoint of it's not clear to us what would be used in court and if it would be used against us." *Id.*  Plaintiffs describe this change of heart as an example of "Deloitte US and DTTC tr[ying] to cover up their involvement."  Doc. 47 at 18.  But this statement, and Deloitte's cautiousness regarding the instant litigation, cannot be stretched to imply any effort to conceal Deloitte's "involvement" with the ChinaCast fraud.  The Deloitte Defendants are currently being sued by ChinaCast investors, and their reticence to, in effect, aid their adversaries cannot be taken as evidence of fraudulent intent.  Meanwhile, the fact that DTTC *did* cooperate until the onset of litigation is inconsistent with any attempt to cover up fraud, and undermines, rather than supports, any inference of scienter on the part of Deloitte.

### vi.   FTI Report

The final new allegation contained in the FAC addresses the findings of FTI Consulting ("FTI"), an outside entity brought in by ChinaCast's Audit committee in mid-2011 to conduct an independent verification of the Company's cash balances.  SAC ¶ 241.  In the course of its examination, Plaintiffs allege, FTI "turned up numerous significant red flags, which Deloitte

either already knew of and deliberately or recklessly ignored, or, if Deloitte had no such actual knowledge, then it in fact had never conducted any audit at all, while deliberately falsely representing that it had conducted its audits in accordance with PCAOB standards." *Id.* ¶¶ 241-55. Among these alleged red flags were multiple instances in which FTI sought bank documents only to be informed that they had been withdrawn or collected by ChinaCast employees or that the banks could not provide the records to anyone outside of the Company.[15] *Id.*

As an initial matter, allegations about the magnitude of the purported red flags uncovered by FTI are the same in substance as allegations that this Court has already found insufficient, namely that the "magnitude of the alleged fraud" supports scienter, and that new management quickly discovered the fraud. Order at 38-40. Moreover, and particularly given FTI's ultimate approval of ChinaCast's 2011 cash balances, which does not support Plaintiff's illustration of a subsequent audit that uncovered accounts riddled with fraud, the difficulties experienced by FTI in finding records supports just as easily the inference that the ChinaCast fraud was concealed from its auditors, as well as its investors.

### c.      The SAC Does Not Establish Scienter

This Court previously held that the FAC came close "but ultimately [fell] short" of pleading auditor scienter. Order at 30. Plaintiffs argue that its "new allegations," along with those included in the FAC, "pull [them] across the finish line." *Id.* at 2. However, the proposed SAC does not cure the deficiencies of the FAC; Plaintiffs do not cross the finish line at all.

---

[15] For example, FTI reported that it had been unable to "observe the physical extraction of statements relating to RMB 294,901,138 in two accounts at the Bank of Shanghai," and that "[i]t appear[ed] that the Company withdrew FTI's request for bank confirmation of balances totaling RMB 80 million without our knowledge." SAC ¶ 243. When FTI contacted banks in Beijing and Shenzhen, it found those banks "reluctant to return . . . confirmation letters directly to FTI." *Id.* ¶ 244. At several Shanghai banks, employees informed FTI that ChinaCast representatives had already withdrawn or collected confirmation letters or that it could not provide bank statements to anyone other than an authorized ChinaCast cashier. *Id.* ¶ 245.

In half of the new or expanded allegations in the SAC, Plaintiffs attempt to convert allegations of negligent omissions—i.e., *had* Deloitte taken a certain step, they *would have* discovered an aspect of the ChinaCast fraud—into allegations of deliberate or willful repudiation of duty—i.e., Deloitte *refused* to take a certain step in order to avoid learning of an aspect of the ChinaCast fraud.  However, adverbs are not facts, and the addition of terms such as "deliberately" or "willfully" does not prove scienter.  Nor does speculation, and Plaintiffs' conclusory allegations that DTTC "must have taken" certain steps or decided, for nefarious reasons, not to take others do not fill the factual void.

As to the other half of Plaintiffs' allegations, Plaintiffs endeavor to state claims using facts, communications, or events that are just as likely to undercut as to support an inference of scienter, or that provide no insight at all into the Deloitte Defendants' state of mind.  Although, in retrospect, certain actions or statements may be interpreted or characterized as demonstrating awareness of fraud, "fraud by hindsight" is not a cognizable theory of relief; indeed, "fraud is always obvious in retrospect, but it is not reckless to lack clairvoyance."  *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 579 (S.D.N.Y. 2012) ("*Longtop I*"); *see also, e.g.*, *Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636, 640-41 (2d Cir. 2012) (summary order).  Because Plaintiffs cannot establish scienter, they cannot state a claim under Section 10(b) or Rule 10b-5, and their motion for leave to file an amended complaint is DENIED as to these claims as against the Deloitte Defendants.

### 2.     Misstatements or Omissions of Material Fact

In its July 2014 Order, the Court held that in addition to scienter, Plaintiffs also could not establish a material misstatement or omission.  Order at 42.  To bring a fraud claim based on an alleged misstatement in an opinion, a plaintiff must plausibly assert that "defendants did not

[subjectively] believe the statements . . . at the time they made them."  *City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67 (2d Cir. 2012).

Plaintiffs argue that "[b]ecause the SAC adequately alleges that DTTC acted with scienter, it also adequately alleges DTTC's subjective disbelief in its own audit opinions."  Doc. 47 at 24.  They claim that DTTC's subjective disbelief in its own audit opinions is established through its allegations regarding "Chiu's active facilitation of ChinaCast's false characterization of the uncollectable CCL receivable as a payable, DTTC's knowledge that ChinaCast did not own a majority interest in CCT HK, and ChinaCast's failure to pay DTTC for its work in connection with the 2009 audit."  *Id.*  As explained above, however, these allegations are insufficient to establish scienter.  They likewise do not establish that DTTC subjectively knew its audit opinions to be false.  Plaintiffs still cannot allege that DTTC "either did not in fact hold [its] opinion[s] or knew that it had no reasonable basis for [them]."  *Longtop I*, 910 F. Supp. 2d at 580 (quoting *Lehman Bros.*, 799 F. Supp. 2d at 302).  As the Supreme Court recently explained, "[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, No. 13-435, 2015 WL 1291916, at *7, — S. Ct. — (U.S. Mar. 24, 2015).

**B.     Second Cause of Action:  Violations of Section 20(a) By All Plaintiffs Against Deloitte U.S.**

Section 20(a) of the Exchange Act, which imposes liability upon "control persons" of a primary violator, requires a plaintiff to show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *In re OSG Sec. Litig.*, No. 12 Civ. 7948 (SAS), 2014 WL 1678915, at *5 (S.D.N.Y. Apr. 28, 2014) (citation omitted).

27

As with the FAC, Plaintiffs' failure to establish a primary violation of Section 10(b) precludes them from stating a claim under Section 20(a). *See id.* ("Where there is no primary violation, there can be no 'control person' liability under Section 20(a).") (citations omitted).  However, even if Plaintiffs *had* established a primary violation, the SAC, like the FAC, does not state with particularity any facts that would enable the Court to conclude that Deloitte U.S. culpably participated in any fraudulent activity.  Indeed, culpable participation under Section 20(a) "must be [pleaded] with the same particularity as scienter under section 10(b)."  *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 246 (S.D.N.Y. 2006).

Although, in the SAC, Plaintiffs add several paragraphs addressing Deloitte U.S.'s involvement with ChinaCast, these paragraphs add little or nothing of substance to buttress Plaintiffs' Section 20(a) claim.  The sole "new 'fact'" in the SAC concerning Deloitte U.S.'s role, as opposed to DTTC's, is the allegation that in 2007 Deloitte U.S.'s technical department was "looking into" an accounting issue related to the consolidation of ChinaCast's financial statements.  Doc. 51 at 2 (quoting SAC ¶ 125).  As previously mentioned, this allegation does not establish that Deloitte U.S. was "looking into" the specific issue of *CCT HK's* consolidation.  Moreover, even if Plaintiffs had pleaded that Deloitte U.S. representatives were "looking into" the CCT HK consolidation, that would be just as consistent with innocent conduct, if not more so, as with fraud.  This allegation does not indicate that Deloitte U.S. "culpably participated" in any fraudulent activity.[16]  Accordingly, Plaintiffs' motion for leave to file an amended complaint is DENIED as to their proposed Section 20(a) claim.

---

[16] The Court also questions whether Plaintiffs have adequately pleaded the element of "control."  To be liable under Section 20(a), "the defendant must actually possess, in fact, rather than in theory, the ability to direct the actions of the controlled person."  *In re Global Crossing, Ltd. Sec. Litig.,* No. 02 Civ. 910, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005) (internal quotation marks and citations omitted).  The SAC includes allegations that Deloitte U.S.: provided "input, technical expertise" and had "final authority" or the "last word" on U.S. GAAP issues"; "worked directly with" DTTC on issues related to ChinaCast's 10-Ks and 10-Qs; "directly communicated with ChinaCast's Audit Committee"; "authored" in part or in whole several 2009 and 2010 annual and quarterly Audit Committee

C.    **Fourth Cause of Action:  Section 18; Select Plaintiffs[17] Against All Defendants[18]**

To state a claim under Section 18, a plaintiff must plead that (1) the defendant "made or caused to be made" a false or misleading statement, (2) upon which the plaintiff *actually* relied, (3) resulting in loss to the plaintiff.  *In re Alstom SA*, 406 F. Supp. 2d 433, 478 (S.D.N.Y. 2005). Although Plaintiffs need not allege scienter to state a Section 18 claim, *id.* at 480, they must allege "actual reliance on specific statements in covered Exchange Act filings."  *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 493 (S.D.N.Y. 2006) (citing 15 U.S.C. § 78r(a); *Heit v. Weitzen*, 402 F.2d 909, 916 (2d Cir. 1968).  If a plaintiff establishes reliance, a defendant may rebut Section 18 liability by proving "that he acted in good faith and had no knowledge that such statement was false or misleading."  *See* 15 U.S.C. § 78r(a).

In the FAC, Plaintiffs asserted that DTTC and Deloitte U.S. had "made or caused materially false and misleading statements to be made" in ChinaCast's 2009 and 2010 Forms 10-K and certain of its 2010 and 2011 Forms 10-Q, as well as in DTTC's audit opinions.  Order at 49-50, 52-53.  This Court dismissed Plaintiffs' Section 18 claim to the extent that it was based

---

presentations; approved ChinaCast's financials, "knowing[ly] and/or reckless[ly] ignoring evidence in its review files that CCT HK was 50% owned by [Chan]"; "actively consulted and gave directions to DTTC throughout the Deloitte-ChinaCast engagement; "sign[ed]-off" on ChinaCast's 10-Q and 10-K filings; and "had the power and influence," which it in fact exercised, "to cause DTTC to publish audited financial statements" that were GAAP non-compliant.  SAC ¶¶ 106, 108-110, 112-13, 350-51.  With the possible exception of the allegation regarding CCT HK, addressed above, these generalized allegations do not establish Deloitte U.S.'s control of any specific transaction.  *See In re Alstom SA*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (requiring "actual control over the *transaction* in question") (emphasis in original) (citation omitted).

[17] Only Columbia Pacific Opportunity Fund, L.P., Fir Tree Value Master Fund, L.P., Lake Union Capital Fund, L.P, Lake Union Capital TE Fund L.P., Ashford Capital Management, Inc., ZS EDU L.P., MRMP Managers LLC, WHI Growth Fund QP, LP, Woodrum, Berl, Horne, Brightlight Capital Partners LP, and Tortus Capital Master Fund, LP ("Section 18 Plaintiffs") bring this claim.  SAC at 128.

[18] Plaintiffs' Third Cause of Action alleges violations of Section 10(b) and Rule 10b-5 by the Individual Defendants, and Plaintiffs' Fourth Cause of Action alleges violations of Section 18 against the Individual Defendants, as well as the Deloitte Defendants.  As stated above, the Individual Defendants have not yet appeared in this action, let alone filed any motion to dismiss.  Accordingly, the Court does not address the sufficiency of Plaintiffs' allegations as against the Individual Defendants in support of the Third or Fourth Causes of Action.

on allegedly false portions of financial statements in ChinaCast's 10-Q filings, finding that, as a matter of law, such statements cannot incur Section 18 liability. *Id.* at 53. Additionally, the Court concluded that Plaintiffs could not demonstrate the Deloitte Defendants' liability under Section 18 based on the theory that they had caused ChinaCast to make false statements in their SEC filings, including audited financial statements; rather, Plaintiffs could seek liability only for the Deloitte Defendants' *own opinions*. *Id.* at 53-55. With regard to Deloitte U.S., the Court found that Plaintiffs had proffered no facts to support a contention that Deloitte U.S. had "caused to be made" any misrepresentations in DTTC's audit opinions. *Id.* at 18. With regard to DTTC, the Court concluded that Plaintiffs had not alleged the element of reliance, as they had had "fail[ed] to identify any specific transactions that ensued as a result of Plaintiffs' purported 'eyeball' reliance on DTTC's audit opinions," which deficiency was "fatal" to Plaintiffs' Section 18 claim. *Id.* at 53-58. Plaintiffs were required to, and could not, allege reliance beyond identifying the statements on which they ostensibly relied, and could not causally link specific statements in specific audit opinions to purchases of ChinaCast stock. *Id.* at 58.

The SAC, like its prior iteration, states simply that certain of the Section 18 Plaintiffs made stock purchase decisions in reliance on the Company's 2009 and 2010 Forms 10-K and certain of its 2010 and 2011 Forms 10-Q. SAC ¶¶ 371-408. Plaintiffs still fall short of alleging the subjective falsity of DTTC's opinions, which would be the only possible basis for Section 18 liability. *See Omnicare*, 2015 WL 1291916, at *7 (holding that a statement of opinion may be an "untrue statement of material fact" only where it is not "honestly" held by the speaker). Plaintiffs also continue to fall short of alleging that Deloitte U.S. caused any false statements to be made by DTTC. Accordingly, the SAC does not mitigate the legal defects identified by the

Court's July 2014 Order, and Plaintiffs' motion for leave to file an amended complaint is DENIED as to their Fourth Cause of Action against the Deloitte Defendants.

>        **D.        Fifth Cause of Action:  Common Law Fraud**

To state a claim for common law fraud under New York law, a plaintiff must allege that "(1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant[] intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss[.]"  *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 622 (2d Cir. 2012), *as amended* (June 13, 2012) (summary order) (citing *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 488, 836, N.Y.S.2d 509, 868, N.E.2d 189 (N.Y. 2007)).  New York law also requires plaintiffs to plead scienter, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 380 (S.D.N.Y. 2011) (citing *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2011), which is "essentially the same" at common law "as . . . under federal securities law."  *Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 75 (S.D.N.Y. 2010) (citation omitted), *aff'd*, 485 F. App'x 461 (2d Cir. 2012).  Moreover, claims of common law fraud, like federal securities claims, must satisfy the requirements of Rule 9(b).  *Pasternack v. Lab. Corp. of Am.*, No. 10 Civ. 4426 (PGG), 2011 WL 3478732, at *5 (S.D.N.Y. Aug. 1, 2011) (quoting *Healthcare Fin. Grp, Inc. v. Bank Leumi USA*, 669 F. Supp. 2d 344, 348 (S.D.N.Y. 2009)).  Because, as explained above, Plaintiffs have not pleaded facts giving rise to a strong inference of scienter with regard to either DTTC or Deloitte U.S, their motion for leave to file an amended complaint alleging common law fraud as against the Deloitte Defendants is DENIED.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs' motion for leave to file an amended complaint is DENIED, and their proposed claims against the Deloitte Defendants are DISMISSED with prejudice.  The Clerk of the Court is respectfully directed to terminate the motion, Doc. 46.

It is SO ORDERED.

Dated:      March 31, 2015
            New York, New York

                                        _____
                                        Edgardo Ramos, U.S.D.J.